**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SESSION LINK RESEARCH LLC,<br><br>Plaintiff,<br><br>v.<br><br>VERIZON COMMUNICATIONS, INC. and CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS,<br><br>Defendants. | ) | Case No. 2:26-cv-00<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Session Link Research LLC ("SLR" or "Plaintiff") for its Complaint for patent infringement against Defendants Verizon Communications, Inc. and Cellco Partnership d/b/a Verizon Wireless (collectively, "Verizon" or "Defendants") alleges as follows:

**THE PARTIES**

1. SLR is a limited liability company, organized and existing under the laws of the State of Texas, with its principal place of business located at 209 East Austin Street, Marshall, TX 75670.

2. Defendant Verizon Communications, Inc. is a Delaware corporation with a principal place of business at 1095 Avenue of the Americas, New York, NY 10036. Verizon Communications, Inc. can be served at its registered agent for service: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, Verizon Communications, Inc. does business in Texas, directly or through intermediaries, and offers its products and/or services, including those accused herein of

infringement, to customers and potential customers located in Texas, including in the judicial Eastern District of Texas.

3. Defendant Cellco Partnership d/b/a Verizon Wireless is a general partnership organized and existing under the laws of the State of Delaware, with a principal place of business at 1 Verizon Way, Basking Ridge, NJ 07920. Verizon Wireless can be served at its registered agent for service: The Corporation Trust Company at Corporation Trust Center 1209 Orange Street, Wilmington, DE. Upon information and belief, Verizon Wireless does business in Texas, directly or through intermediaries, and offers its products and/or services, including those accused herein of infringement, to customers and potential customers located in Texas, including in the judicial Eastern District of Texas.

## JURISDICTION

4. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

5. This Court has personal jurisdiction over Verizon in this action because Verizon has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Verizon would not offend traditional notions of fair play and substantial justice. Verizon conducts business and has committed acts of patent infringement and/or has induced acts of patent infringement by others in this Judicial District and/or has contributed to patent infringement by others in this Judicial District, the State of Texas, and elsewhere in the United States by, among other things, offering to sell and selling products and/or services that infringe the Patents-in-Suit.

6. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391 and 1400(b). Verizon is registered to do business in Texas and, on information and belief, Verizon has transacted business in the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas. Verizon has regular and established places of business in this Judicial District, including at least 1111 East Grand Avenue, Marshall, TX 75670; 500 East Loop 281, Longview, TX 75605; 2400 South Jefferson Avenue, Mount Pleasant, TX 75455; 1006 East End Boulevard North, Suite A, Marshall, Texas 75670; 741 North Central Expressway, Plano, Texas 75075; 2330 Preston Road, Suite 500, Frisco, Texas 75034; 3220 East Hebron Parkway, Suite 114, Carrollton, TX 75010; 5020 State Highway 121, The Colony, TX 75056; 204 Central Expressway South, Suite 40, Allen, TX 75013; 1271 West Exchange Pkwy, Allen, TX, 75013; 190 East Stacy Road, Allen, TX, 75002; 8049 Preston Road, Frisco, TX, 75034; 2035 North Central Expressway, Suite 620, McKinney, TX 75070; 3610 West University Drive, McKinney, TX 75071; 1016 West SW Loop 323, Tyler, TX 75701; 8988 South Broadway Avenue, Suite 110, Tyler, TX 75703; 6874 South Broadway Avenue, Tyler, TX 75703; 2818 West University Drive, Denton, TX 76201; 1805 South Loop 288, Denton, TX 76205; 3113 North US Highway 75, Sherman, TX 75090; 380 Shannon Road East, Sulphur Springs, Texas 75482; and 218 East FM 544, Murphy, TX, 75094.

7. Verizon operates and sells access to a mobile network that provides telecommunication, Internet service, and other services to customers via cellular base stations located in this District and throughout the United States, in infringement of the asserted patents. Verizon's network coverage extends to cities in this District, including within the Marshall division, according to Verizon's website.

8. In other actions, Verizon has either sought out, admitted, or not contested that this federal Judicial District is a proper venue for patent infringement actions against it. *See, e.g.*, *Active Wireless Techs. LLC v. T-Mobile USA, Inc.,* Dkt. 24, No. 2:24-cv-00723 (E.D. Tex. Nov. 15, 2024); *Dali Wireless, Inc. v. Cellco P'ship d/b/a Verizon Wireless*, Dkt. 92, No. 6:22-cv-00104-ADA (W.D. Tex. December 13, 2022); *General Access Sols., Ltd. v. Cellco P'ship d/b/a Verizon Wireless*, Dkt. 22, No. 2:22-cv-00394 (E.D. Tex. Dec. 16, 2022); *Howlink Global LLC v. AT&T, Inc.,* No. 2:22-cv-00040, Dkt. 18 (E.D. Tex. April 18, 2022); *Finesse Wireless LLC v. AT&T Mobility LLC,* No. 2:21-cv-00316, Dkt. 35 (E.D. Tex. Sept. 29, 2021); *Cobblestone Wireless, LLC v. T-Mobile USA, Inc.,* Dkt. 20, No. 2:22-cv-00477 (E.D. Tex. Feb. 24. 2023).

9. Verizon operates and sells access to a mobile network that provides telecommunication, Internet service, and other services to customers via cellular base stations located in this District and throughout the United States, in infringement of the asserted patents.

## PATENTS-IN-SUIT

10. On May 1, 2018, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,961,209 (the "'209 Patent") entitled "Codec Selection Optimization." A true and correct copy of the '209 Patent is attached hereto as Exhibit 1.

11. On July 12, 2016, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,392,436 (the "'436 Patent") entitled "Method and Apparatus for Voice Over LTE." A true and correct copy of the '436 Patent is attached hereto as Exhibit 2.

12. On September 11, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,265,062 (the "'062 Patent") entitled "System and Method for Accomplishing Special Call Treatment in a Voice Over Internet Protocol Telephone System." A true and correct copy of the '062 Patent is attached hereto as Exhibit 3.

13. On July 14, 2015, the United Stated Patent and Trademark Office duly and legally issued U.S. Patent No. 9,083,771 (the "'771 Patent") entitled "System and Methods for Multi-Participant Teleconferencing Using Preferred Forms of Telecommunication." A true and correct copy of the '771 Patent is attached hereto as Exhibit 4.

14. On August 21, 2028, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,057,429 (the "'429 Patent") entitled "Pre-Paid Voice Calling Using Sponsored Data Roaming." A true and correct copy of the '429 Patent is attached hereto as Exhibit 5.

15. On March 22, 2022, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,284,459 (the "'459 Patent") entitled "Data Access Security." A true and correct copy of the '459 Patent is attached hereto as Exhibit 6.

16. On April 13, 2021, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,979,462 (the "'462 Patent") entitled "Identifying Voice Over LTE Users." A true and correct copy of the '462 Patent is attached hereto as Exhibit 7.

17. SLR is the sole and exclusive owner of all right, title, and interest in the '209 Patent, the '436 Patent, the '062 Patent, the '771 Patent, the '429 Patent, the '459 Patent, and the '462 Patent (collectively, the "Patents-in-Suit" or "Asserted Patents"), and holds the exclusive right to take all actions necessary to enforce its rights to the Patents-in-Suit, including the filing of this patent infringement lawsuit. SLR also has the right to recover all damages for past, present, and future infringement of the Patents-in-Suit and to seek injunctive relief as appropriate under the law.

18. SLR has at all times complied with the marking provisions of 35 U.S.C. § 287 with respect to the Patents-in-Suit. On information and belief, prior assignees and licensees have also

complied with the marking provisions of 35 U.S.C. § 287.

## THE INFRINGING INSTRUMENTALITIES

19. Verizon operates cellular wireless networks employing several wireless communication technologies including, but not limited to, 5G technologies. Verizon also sells and offers for sale a variety of devices that make use of these same wireless communication technologies.

20. For its wireless communication technologies, Verizon generally advertises its plans to enter the market and deploy related cellular wireless networks, and associated equipment and services. For example, in October 2018, Verizon announced that "Verizon turns on world's first 5G network" and that a "Houston resident is first 5G customer on the globe." *See, e.g.*, https://www.globenewswire.com/news-release/2018/10/01/1587651/0/en/verizon-turns-on-world-s-first-commercial-5g-network.html. This announcement followed an early announcement by Verizon that "5G is here" and that "the world's first commercial 5G service, Verizon 5G Home, launches on Oct. 1." *See, e.g.*, https://www.globenewswire.com/news-release/2018/09/11/1569458/0/en/5g-is-here.html.

21. On information and belief, Verizon owns, leases, maintains and/or operates cellular base stations in this District that provide 5G data services to Verizon customers in this District, including numerous cell tower locations in Tyler, Texas; Longview, Texas; and Marshall, Texas. On information and belief, Verizon further owns, leases, maintains, and/or operates network data centers in this District that provide 5G data services to Verizon customers in this District. Verizon offers 5G data coverage to customers in this District and within the Marshall division. According to its website, Verizon also offers and provides 5G services and equipment to customers in this District.




Source: https://www.verizon.com/coverage-map/

22. The products accused of infringing the Patents-in-Suit include, but are not limited to, at least Defendants' 5G Ultra Wideband network, including the Standalone 5G core, data centers, and 5G cellular base stations (including 5G and 5G Ultra Wideband base stations), 5G hardware, software, radio units, and baseband units, and associated equipment, services, and platforms (*e.g.*, Verizon Connect, ThingSpace) (collectively, the "Accused Products").

23. On information and belief, Verizon's 5G Network, 5G Standalone Core, and IMS networks are designed and operated in compliance with applicable 3GPP, GSMA, and IETF telecommunications standards, including standards governing VoLTE, VoNR, IMS-based SIP/SDP signaling, codec negotiation, inter-operator connectivity, and roaming.

**FACTUAL ALLEGATIONS**

24. The ’209 Patent relates to systems and methods for providing a listing of codecs for offers and for providing an effective listing of codecs for answers. The technology described in the ’209 Patent was developed by Manpreet Singh at iBasis, Inc. For example, the patented technology of the ’209 Patent is infringed by the Accused Products, including all associated hardware and software.

25. The ’436 Patent generally relates to systems and methods for a transit network configured to handle signaling messages between service provider networks. The technology described in the ’436 Patent was developed by Richard H. Xu and Hwan Jang Tang at iBasis, Inc. For example, the patented technology of the ’436 Patent is infringed by the Accused Products, including all associated hardware and software.

26. The ’062 Patent generally relates to systems and methods for treating a VoIP call in a fashion when the call is to be routed from an originating gateway to a destination gateway over the Internet. The technology described in the ’062 Patent was developed by Hwan Jang Tang and Vitaliy Yurchencko at iBasis, Inc. For example, the patented technology of the ’062 Patent is infringed by the Accused Products, including all associated hardware and software.

27. The ’771 Patent generally relates to systems and methods for a multi-participant teleconferencing system that can include a telecommunication manager configured to establish telecommunication connections with participants by instructing and initiating one or more telecommunication devices. The technology described in the ’771 Patent was developed by Vitaliy Yurchencko at iBasis, Inc. For example, the patented technology of the ’771 Patent is infringed by the Accused Products, including all associated hardware and software.

28. The'429 Patent generally relates to systems and methods for establishing a packetized data path for a roaming mobile device through visited and home mobile networks to a calling service, providing network and access information used to determine a calling rate, and carrying call audio over that data path. The technology described in the '429 Patent was developed by Manpreet Singh at iBasis, Inc. For example, the patented technology of the '429 Patent is infringed by the Accused Products, including all associated hardware and software.

29. The '459 Patent generally relates to systems and methods for securing network data access by authenticating network and subscriber information associated with a session-establishment request and preventing establishment of the corresponding data tunnel when the request cannot be authenticated. The technology described in the '459 Patent was developed by Manpreet Singh at iBasis, Inc. For example, the patented technology of the '459 Patent is infringed by the Accused Products, including all associated hardware and software.

30. The '462 Patent generally related to a method for determining a terminating subscriber's provisioned communications service across different operator networks by querying an IP exchange using the subscriber's identifier and using the returned service information to select how the communication is routed between the users. The technology described in the '462 Patent was developed by Richard H. Xu and Hwan Jang Tang at iBasis, Inc. For example, the patented technology of the '462 Patent is infringed by the Accused Products, including all associated hardware and software.

31. Verizon has infringed and is continuing to infringe the Patents-in-Suit by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or importing, products including, but not limited, the Accused Products.

**COUNT I**
**(Infringement of the ’209 Patent)**

32. Paragraphs 1 through 31 are incorporated by reference as if fully set forth herein.

33. SLR has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the ’209 Patent.

34. Defendants have and continue to directly infringe the ’209 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the ’209 Patent. Such infringing products include at least the Accused Products.

35. For example, Defendants have and continue to directly infringe at least Claim 1 of the ’209 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include the Accused Products, such as the Verizon 5G Network, including the 5G Core and IP Multimedia Subsystem (IMS) Core.

36. The Accused Products perform a method comprising: receiving an incoming offer that lists a plurality of codecs. For example, the Verizon 5G network, including the 5G Core and IMS Core, supports Voice over New Radio (VoNR) services using standardized Session Initiation Protocol (SIP) signaling and Session Description Protocol (SDP) offers and answers for codec negotiation in accordance with 3GPP specifications. The 3GPP IMS standards, TS 23.228 and TS 24.229, define the IMS architecture that includes functional entities, such as the Interconnection Border Control Function (IBCF) and Transition Gateway (TrGW) for interworking with IP multimedia networks using SIP signaling. In this framework, the IBCF and TrGW process incoming SDP offers and answers, evaluate the listed codecs, apply local policy, and modify or add codecs when generating and sending the outgoing SDP offer. Upon receipt of an SDP offer or

answer, the IBCF inspects the list of a plurality of codecs.

Verizon offered a glimpse under the hood in late 2022 when it announced that it was starting to move commercial traffic to its 5G core—a key component of the network—which features an all-new design that could support standalone and non-standalone 5G, among other advanced technologies. That's an exciting leap forward, but what do those things really mean, and why do they matter for businesses and consumers?[1]



**Verizon IMS Cell Towers**

**02-27-2023**

Cell site with performance enhancement technology that gives Verizon engineers more leeway to adjust performance based on where customers move and how they use data in various sectors[2]

**5G standalone: What sets Verizon apart**

Verizon's 5G core—and thus its 5G SA technology—is built on a cloud-based platform that Verizon created specifically for telecommunications workloads. No other telecommunications company has taken this step (others are using cloud systems from outside providers). Because it's built specifically for telecommunications workloads, it can support the advanced technologies and services that provide the reliability and performance customers expect now, as well as what they'll need in the future.[3]

[1] https://www.verizon.com/about/news/5g-standalone-why-it-matters
[2] https://www.verizon.com/about/news/feed/media-resources/attachment/016-verizon-ims-cell-towers242868
[3] https://www.verizon.com/about/news/5g-standalone-why-it-matters

> **The 5G core is built on the Verizon Cloud Platform**
>
> Verizon has officially begun moving customer traffic onto its cloud-native, containerized-design 5G core. Doing so will deliver "unprecedented levels of service agility, flexibility and automated scalability," said the carrier.
>
> The 5G core is built on the Verizon Cloud Platform (VCP), which is an internally built telco cloud base on a Webscale software architecture that the carrier runs in its data centers. The VCP, said Verizon, will enable support for 5G standalone, 4G/5G Non-Standalone and Voice over New Radio (VoNR) services.

[4]

> Entner added Verizon's SA 5G core will allow the operator to take advantage of all of the "goodies" in 3GPP's Release-17 and Release-18 specifications.

[5]

> The IP multimedia core network (IM CN) subsystem enables operators to offer their subscribers multimedia services. The IM CN subsystem should enable the convergence of and access to, voice, video, messaging, data and web-based technologies for the wireless and wireline user.

[6]

---

[4] https://www.rcrwireless.com/20221014/featured/now-is-the-time-verizon-migrates-commercial-traffic-to-5g-core

[5] https://www.samenacouncil.org/samena_daily_news?news=92282

[6] https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.07.00_60/ts_123228v190700p.pdf, at 30

Figure 4.0 below represents the IMS reference architecture including interfaces towards CS network and other IP based multimedia Networks. Details of the roles of these nodes are described in clauses 4.6, 4.7 and 4.7a.

NOTE 1: Some entities defined as part of the IMS Subsystem can also be used by other subsystems.

NOTE 2: The Ici and Izi reference points are only applicable for IP Multimedia Networks that are IMS subsystems.

NOTE 3: In certain configuration, two entities can exchange SIP messages directly with each other without a reference point being defined between them (e.g. intermediate entity(ies) not record-routed).




**Figure 4.0: Reference Architecture of the IP Multimedia Core Network Subsystem** [7]

## 5.4.13 Transcoding concepts

IMS control plane entities, including the P-CSCF, Application Servers or (for inter-domain sessions) the IBCF, may check the SDP offer/answer information associated with session requests and responses, to determine the need for transcoding. If such a need is determined to exist, media transcoding resources are reserved from the MRFP (via the MRFC), the IMS-AGW, or the TrGW.

Transcoding requires knowledge of the codecs supported by the end points and may be invoked at the originating or terminating network based on interworking agreements (e.g. local policy) or service level agreement (SLA). [8]

[7] *Id.* at 31

[8] *Id.* at 107

## Q.1 General

The purpose of optimal media routing (OMR) is to identify and remove unnecessary media functions from the media path for each media stream associated with a session.

The IP Multimedia Subsystem has the option to deploy media functions such as TrGWs on the media path associated with each media stream associated with a session. These media functions can perform only transport level functions such as firewall or NAT, or can also perform application level functions such as transcoding or conferencing. These media functions are typically allocated proactively during SDP offer/answer signalling within a session since it is unknown which of the functions are actually needed for a media stream until the SDP offer/answer signalling completes. For example, a transcoder can be allocated during session establishment but whether transcoding is needed is determined once the SDP offer reaches the far endpoint. In another example, the IBCFs at the boundary of a network allocate TrGWs to protect media functions within the network or to provide address translation to the private address space used within the network, however it might be determined later during session establishment that no media resources are needed within the network, thus making the TrGWs unnecessary. [9]

## Q.2.1 SDP extension

Each OMR-capable entity on the signalling path of an SDP offer/answer transaction shall be able to manipulate an SDP offer to describe the following information about the IP realm associated with each known media path segment for each media line:

- a unique name for the IP realm on the subsequent media path segment,
- the position of the IP realm instance in the media path,
- connection/port data for the corresponding media resource in the IP realm on the subsequent media path segment,
- sufficient information to reconstruct the codec list for the previous media path segment if the codec list has changed (e.g. to offer transcoding options). [10]

## 5.10 Procedures at the IBCF

### 5.10.1 General

As specified in 3GPP TS 23.228 [7] border control functions may be applied between two IM CN subsystems or between an IM CN subsystem and other SIP-based multimedia networks based on operator preference. The IBCF may act both as an entry point and as an exit point for a network. If it processes a SIP request received from other network it functions as an entry point (see subclause 5.10.3) and it acts as an exit point whenever it processes a SIP request sent to other network (see subclause 5.10.2).

The functionalities of the IBCF are entry and exit point procedures as defined in subclause 5.10.2 and subclause 5.10.3 and additionally can include:

- network configuration hiding (as defined in subclause 5.10.4);
- application level gateway (as defined in subclause 5.10.5);
- transport plane control, i.e. QoS control (as defined in subclause 5.10.5);
- screening of SIP signalling (as defined in subclause 5.10.6);
- inclusion of an IWF if appropriate;
- media transcoding control (as defined in suclause 5.10.7); [11]

[9] *Id.* at 284.
[10] *Id.* at 286
[11] https://www.etsi.org/deliver/etsi_ts/124200_124299/124229/19.06.00_60/ts_124229v190600p.pdf, at 354

### 5.10.7 Media transcoding control

The IBCF may perform the media transcoding control in order to allow establishing communication between IM CN subsystems using different media codecs based on the interworking agreement and session information. When performing media transcoding control the IBCF acts as a special case of an IMS-ALG compliant with the description given in subclause 5.10.5.

Upon receipt of any request containing an SDP offer, based on local policy and signalling inspection (e.g ICSI values, SDP), the IBCF may perform media transcoding control, as defined in subclause 6.7.1.3. Based on the local configuration determines the media which requires transcoding in the SDP offer. 12

#### 6.7.1.3 IMS-ALG in IBCF for transcoding

Before forwarding the SDP offer to the answerer, the IBCF may add to the selected media one or more codecs to the codec list contained in the SDP offer. The codecs added to the SDP offer are based on local policy and shall be in accordance with the requirements of clause T.2.

NOTE 1: The local policy can be based on supported codecs in the terminating network.

Upon receipt of an SDP answer, the IBCF shall inspect the list of the returned codecs and proceed as follows:

- if the list contains at least one of the codecs belonging to the original SDP offer, the IBCF shall not invoke the transcoding function; and

***ETSI***

**3GPP TS 24.229 version 19.6.0 Release 19 406 ETSI TS 124 229 V19.6.0 (2026-03)**

- if the list contains none of the codecs belonging to the original SDP offer, the IBCF shall select one of the returned codecs introduced in the answer and invoke the transcoding function. In order to perform the transcoding the IBCF shall select one of the codecs originally offered and set to a non-zero port value the related media stream in the answer sent to the offerer.

NOTE 2: The protocol used between IBCF and TrGW to allow the transport plane media trascoding control is out of scope of this specification. The codec selected by the answerer and the one selected by the IBCF and sent to the offerer can be used to instruct the TrGW for the transcoding purposes.

The IBCF shall remove from the SDP the codecs added to the original SDP offer before forwarding the SDP answer to the offerer.

NOTE 3: In accordance with normal SDP procedure the transcoding IBCF informs the answerer of the properties of the chosen codecs (IP-address and ports). 13

## T.2 Application of network policy for the support of transcoding

When providing transcoding functions at the P-CSCF, at the IBCF and at an AS, the set of codecs to be forwarded as the SDP offer to the remote user is subject to network policy. In order to give support to the codecs and media quality originally requested by the offerer, the network policy shall meet the following requirements.

NOTE 1: RFC 3264 [27B] recommends to list codecs in priority order, so by adding network inserted codecs to the end of the codec list will give higher priority to previous codecs that might have been inserted by the originating UE.

A) An intermediate entity should attempt to support the original request for codecs from the UE. 14

---

[12] *Id.* at 368
[13] *Id.* at 405-06
[14] *Id.* at 1028

> ### 7.1 Media and Codec
>
> For "end-to-end" media session involving the II-NNI, the SIP/SDP codec negotiation procedure can be applied between IM CN subsystems using different media codecs. It is possible that the end-to-end codec negotiation could fail because no common codec could be supported by the UEs, in particular for voice services.
>
> To enhance interoperability, the IBCF, the MRFC, or other IMS network entities can interfere with the end-to-end codec negotiation to offer additional codec(s) available via transcoding, or to remove codecs. The IBCF can configure an attached TrGW to transcode, and the MRFC can configure an attached MRFP to transcode.
>
> Codecs applicable at the II-NNI may be a subject of interworking agreements.
>
> NOTE 1: Possible codecs which could be used at the II-NNI are described in 3GPP TS 26.114 [11] and ETSI TS 181 005 [12].

[15]

37. The Accused Products perform the steps of determining for each of the plurality of codecs whether one or more related codecs are not listed in the incoming offer; generating an outgoing offer that lists the plurality of codecs and the one or more related codecs determined not to be listed in the incoming offer. For example, upon receipt of an SDP offer or answer, the IBCF inspects the list of a plurality of codecs to determine whether codecs should be added to the SDP offer based session information and interworking policy, configured on a local and network level. By way of further example, 3GPP TS 26.114 describes modifying an SDP offer listing AMR, AMR-WB, and EVS codecs to include EVS AMR-WB IO, resulting in an outgoing SDP offer that contains both the originally offered codecs and the added related codec.

> ### 5.4.13 Transcoding concepts
>
> IMS control plane entities, including the P-CSCF, Application Servers or (for inter-domain sessions) the IBCF, may check the SDP offer/answer information associated with session requests and responses, to determine the need for transcoding. If such a need is determined to exist, media transcoding resources are reserved from the MRFP (via the MRFC), the IMS-AGW, or the TrGW.
>
> Transcoding requires knowledge of the codecs supported by the end points and may be invoked at the originating or terminating network based on interworking agreements (e.g. local policy) or service level agreement (SLA).

[16]

15 https://www.etsi.org/deliver/etsi_ts/129100_129199/129165/19.03.00_60/ts_129165v190300p.pdf, at 46

16 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.07.00_60/ts_123228v190700p.pdf, at 107

## I.3.3.2 Session Flows

### I.3.3.2.1 Proactive transcoding support

The following example session flow shows a proactive transcoding support scenario where an IBCF acting as an exit point allocates a TrGW prior to signalling towards the entry point of the other operator's network. The IBCF inserts additional codecs in the SIP signalling. The calling UE capabilities are contained in the SDP offer. Based on the interworking agreement between IM CN subsystems, terminating IBCFs acting as the network entry points may also insert additional codecs in the SIP signalling.

The IBCF and TrGW in Figure I.4 below may be located in the originating network (the IBCF acts as an exit point), or in the terminating network (the IBCF acts as an entry point). There can also be additional IBCF's and TrGW's (not shown) in the case of scenarios involving transit networks. [17]

1. UE (A) initiates an IMS session towards User B, via the session path for IMS and the session is analysed at the IMS network of UE (A).
2. The IMS network of UE (A) determines that the User B's domain need be communicated via IBCF and forwards the request to the IBCF.
3. The IBCF checks the SIP message and decides whether additional codec(s) need be inserted into SIP message based on the session information (such as ICSI , SDP) and interworking agreement. When inserting additional codec(s), the network should be able to indicate the preferred codec order. A TrGW is allocated.

***ETSI***

**3GPP TS 23.228 version 19.7.0 Release 19 257 ETSI TS 123 228 V19.7.0 (2026-07)**

4. The IBCF generates a new SIP message towards User B network based on the received SIP message where additional codec(s) have been added and where the transport address and port information has been altered to indicate the addresses associated by the TrGW.
5. User (B) selects a codec from the offer modified by IBCF and responds with an SDP answer.
6. When receiving the SDP answer, if the IBCF invoked the TrGW in step 3, it now configures the TrGW with address and port towards UE (B). The IBCF checks if the agreed codec belongs to the original offer it received in step 3 or it is one of the codecs that was added by IBCF. If the agreed codec was added by the IBCF, the IBCF configures the TrGW to enable the transcoding functionality. Otherwise, the IBCF will not invoke the transcoding function.

NOTE 1: If the IBCF forwards an SDP offer without allocating a TrGW and changing the connection information and the subsequent SDP answer indicates selection of a transcoding option associated with the TrGW, then the IBCF needs to allocate a TrGW and initiate another SDP offer/answer transaction to forward the TrGW connection information. If the IBCF forwards an SDP offer with connection information for its TrGW and the subsequent SDP answer indicates the use of an original codec (transcoding is not needed), then the IBCF can initiate another SDP offer/answer transaction to forward the original connection information and de-allocate the TrGW. The details are not shown.

7. The IBCF generates a new response message back to UE (A) based on the received response message where the codec received from peer side has been replaced with the selected codec.

NOTE 2: On the new response message the selected codec will based on the SDP offer received by IBCF on step 3.

8. Session signalling path is established between User (A) and IBCF, IBCF and User (B).
9. The media path is established between the UE (A) and the TrGW and then between the TrGW and user B. [18]

[17] *Id.* at 255
[18] *Id.* at 256-57

### Q.2.1 SDP extension

Each OMR-capable entity on the signalling path of an SDP offer/answer transaction shall be able to manipulate an SDP offer to describe the following information about the IP realm associated with each known media path segment for each media line:

- a unique name for the IP realm on the subsequent media path segment,
- the position of the IP realm instance in the media path,
- connection/port data for the corresponding media resource in the IP realm on the subsequent media path segment,
- sufficient information to reconstruct the codec list for the previous media path segment if the codec list has changed (e.g. to offer transcoding options).

[19]

### 5.10.7 Media transcoding control

The IBCF may perform the media transcoding control in order to allow establishing communication between IM CN subsystems using different media codecs based on the interworking agreement and session information. When performing media transcoding control the IBCF acts as a special case of an IMS-ALG compliant with the description given in subclause 5.10.5.

Upon receipt of any request containing an SDP offer, based on local policy and signalling inspection (e.g ICSI values, SDP), the IBCF may perform media transcoding control, as defined in subclause 6.7.1.3. Based on the local configuration determines the media which requires transcoding in the SDP offer.

[20]

[19] *Id.* at 286

[20] https://www.etsi.org/deliver/etsi_ts/124200_124299/124229/19.06.00_60/ts_124229v190600p.pdf, at 368

6.7.1.3 IMS-ALG in IBCF for transcoding

Before forwarding the SDP offer to the answerer, the IBCF may add to the selected media one or more codecs to the codec list contained in the SDP offer. The codecs added to the SDP offer are based on local policy and shall be in accordance with the requirements of clause T.2.

NOTE 1: The local policy can be based on supported codecs in the terminating network.

Upon receipt of an SDP answer, the IBCF shall inspect the list of the returned codecs and proceed as follows:

- if the list contains at least one of the codecs belonging to the original SDP offer, the IBCF shall not invoke the transcoding function; and

ETSI

3GPP TS 24.229 version 19.6.0 Release 19 406 ETSI TS 124 229 V19.6.0 (2026-03)

- if the list contains none of the codecs belonging to the original SDP offer, the IBCF shall select one of the returned codecs introduced in the answer and invoke the transcoding function. In order to perform the transcoding the IBCF shall select one of the codecs originally offered and set to a non-zero port value the related media stream in the answer sent to the offerer.

NOTE 2: The protocol used between IBCF and TrGW to allow the transport plane media trascoding control is out of scope of this specification. The codec selected by the answerer and the one selected by the IBCF and sent to the offerer can be used to instruct the TrGW for the transcoding purposes.

The IBCF shall remove from the SDP the codecs added to the original SDP offer before forwarding the SDP answer to the offerer.

NOTE 3: In accordance with normal SDP procedure the transcoding IBCF informs the answerer of the properties of the chosen codecs (IP-address and ports). [21]

[21] *Id.* at 405-06

## T.2 Application of network policy for the support of transcoding

When providing transcoding functions at the P-CSCF, at the IBCF and at an AS, the set of codecs to be forwarded as the SDP offer to the remote user is subject to network policy. In order to give support to the codecs and media quality originally requested by the offerer, the network policy shall meet the following requirements.

NOTE 1: RFC 3264 [27B] recommends to list codecs in priority order, so by adding network inserted codecs to the end of the codec list will give higher priority to previous codecs that might have been inserted by the originating UE.

A) An intermediate entity should attempt to support the original request for codecs from the UE.

B) An intermediate entity should only remove a codec from the codec list to meet policy requirements of the local access of the user.

C) A modification (i.e. any combination of reordering, removal or addition) to the codec list should only be made, such that the resultant SDP offer / answer exchange results in media of equal or better end-to-end quality than if the modification had not been made, subject to policy restrictions of the access of the local user.

NOTE 2: Transcoding between codecs of higher quality can provide better end-to-end quality than using a common codec of lower quality.

D) A modification (i.e. any combination of reordering, removal or addition) to the codec list should only be made, such that the resultant SDP offer / answer exchange prefers solutions that do not use a transcoder rather than ones that do use transcoder, subject to meeting the policy restrictions in B) and meeting the best end-to-end media quality in C) above.

E) Additions to the codec list that are provided by the network entity shall be supported by transcoding between at least one of the offered codecs contained in the SDP offer and the added codecs.

F) An intermediate entity shall not insert a codec to the codec list if end-to-end media security mechanism is required for the related media.

G) If an intermediate entity performs transcoding during an ongoing session and receives a SIP message containing a subsequent SDP offer including the codec that is currently in use on the incoming call leg, the entity should include the codec that is currently in use on the outgoing call leg when forwarding the SIP message.

H) If an intermediate entity performs transcoding during an ongoing session and receives a SIP message containing a subsequent SDP offer not including the codec that is currently in use on the incoming call leg, the entity should include the codec that is currently in use on the outgoing call leg when forwarding the SIP message, subject to meeting the policy restrictions in E).

I) If an intermediate entity does not perform transcoding during an ongoing session and receives a SIP message containing a subsequent SDP offer including the codec that is currently in use, the entity should not add any codecs in the subsequent SDP offer.

[22]

### 5.2.1.4 Detailed codec requirements, EVS

When the EVS codec is supported, the MTSI client in terminal may support dual-mono encoding and decoding.

When the EVS codec is supported, EVS AMR-WB IO may serve as an alternative implementation of the AMR-WB codec, [125]. In this case, the requirements and recommendations defined in this specification for the AMR-WB codec also apply to EVS AMR-WB IO.

NOTE: The DTX operation of EVS Primary and AMR-WB IO can be configured in sending direction with either a fixed SID update interval (from 3 to 100 frames) or an adaptive SID update interval - more details can be found in clauses 4.4.3 and 5.6.1.1 of TS 26.445 [125]. Implementers of MTSI clients are advised to take into account this SID flexibility of EVS.

[23]

[22] *Id.* at 1028

[23] https://www.etsi.org/deliver/etsi_ts/126100_126199/126114/19.03.00_60/ts_126114v190300p.pdf, at 36

A.14.2.1 Network between MTSI using fixed access and MTSI modifying SDP offer to configure EVS AMR-WB IO mode

This example shows the SDP offer when the session is initiated from MTSI client in terminal using fixed access, which supports AMR (all modes) and AMR-WB (all modes). In addition, EVS, G.722, and PCM codecs are supported by the MTSI client in terminal.

The offers for AMR, AMR-WB and EVS codecs are changed by the network to include AMR {12.2, 7.4, 5.9, 4.75}, AMR-WB {12.65, 8.85, 6.60}, EVS AMR-WB IO {12.65, 8.85, 6.60}. For payload type 98, the network also changes the offer to start the session with EVS in EVS AMR-WB IO mode if it is agreed to use the codec. [24]

7.1 Media and Codec

For "end-to-end" media session involving the II-NNI, the SIP/SDP codec negotiation procedure can be applied between IM CN subsystems using different media codecs. It is possible that the end-to-end codec negotiation could fail because no common codec could be supported by the UEs, in particular for voice services.

To enhance interoperability, the IBCF, the MRFC, or other IMS network entities can interfere with the end-to-end codec negotiation to offer additional codec(s) available via transcoding, or to remove codecs. The IBCF can configure an attached TrGW to transcode, and the MRFC can configure an attached MRFP to transcode.

Codecs applicable at the II-NNI may be a subject of interworking agreements.

NOTE 1: Possible codecs which could be used at the II-NNI are described in 3GPP TS 26.114 [11] and ETSI TS 181 005 [12]. [25]

38. The Accused Products perform the step of transmitting the outgoing offer. For example, after processing the incoming SDP offer and generating the outgoing SDP offer, the IBCF transmits the outgoing SDP offer to the remote user, subject to the network policy.

T.2 Application of network policy for the support of transcoding

When providing transcoding functions at the P-CSCF, at the IBCF and at an AS, the set of codecs to be forwarded as the SDP offer to the remote user is subject to network policy. In order to give support to the codecs and media quality originally requested by the offerer, the network policy shall meet the following requirements.

NOTE 1: RFC 3264 [27B] recommends to list codecs in priority order, so by adding network inserted codecs to the end of the codec list will give higher priority to previous codecs that might have been inserted by the originating UE.

A) An intermediate entity should attempt to support the original request for codecs from the UE. [26]

39. Defendants have and continue to indirectly infringe one or more claims of the ’209 Patent by knowingly and intentionally inducing others, including Verizon customers and end-

[24] *Id.* at 308

[25] https://www.etsi.org/deliver/etsi_ts/129100_129199/129165/19.03.00_60/ts_129165v190300p.pdf, at 46

[26] https://www.etsi.org/deliver/etsi_ts/124200_124299/124229/19.06.00_60/ts_124229v190600p.pdf, at 1028

users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include infringing technology.

40. Defendants, with knowledge that these products, or the use thereof, infringe the ’209 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continue to knowingly and intentionally induce, direct infringement of the ’209 Patent by providing these products to end-users for use in an infringing manner. Alternatively, on information and belief, Defendants have adopted a policy of not reviewing the patents of others, and instructing their officers, agents, and employees to not review the patents of others, including specifically those related to Defendants’ specific industry, thereby remaining willfully blind to the ’209 Patent at least as early as the issuance of the ’209 Patent.

41. Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the ’209 Patent, but while remaining willfully blind to the infringement. Defendants have and continue to induce infringement by their customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants’ website, product literature and packaging, and other publications, including any of Defendants’ materials cited in this Complaint. On information and belief, operation of the Accused Products and services offered by Defendants necessarily infringe the ’209 Patent.

42. On information and belief, Defendants directly prepare and/or assist in the preparation of, and provide customers and end-users with, information and documents for their

specific products. On information and belief, Defendants' product literature and other product information documents are prepared by or under the direction of Defendants to instruct customers and end-users on how to use the Accused Products in an infringing manner.

43. Because of Defendants' inducement, Defendants' customers and end-users use Accused Products in a way Defendants intend and directly infringe the '209 Patent. Defendants perform these affirmative acts with knowledge of the '209 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '209 Patent.

44. Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '209 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '209 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '209 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be especially made or adapted for use in the infringement of the '209 Patent. The accused components include, but are not limited to, components necessary for the operation of Defendants infringing systems including, but not limited to, the Accused Products, such as the hardware and software components of the Verizon 5G Core and the IMS Core. Defendants perform these affirmative acts with knowledge of the '209 Patent and with intent, or willful blindness, that they cause the direct infringement of the '209 Patent.

45. SLR has suffered damages as a result of Defendants' direct and indirect infringement of the '209 Patent in an amount to be proven at trial.

46. SLR has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '209 Patent, for which there is no adequate remedy at law, unless Defendants' infringement is enjoined by this Court.

**COUNT II**
**(Infringement of the '436 Patent)**

47. Paragraphs 1 through 31 are incorporated by reference as if fully set forth herein.

48. SLR has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '436 Patent.

49. Defendants have and continue to directly infringe the '436 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '436 Patent. Such infringing products include the Accused Products, including all associated hardware and software.

50. For example, Defendants have and continue to directly infringe at least Claim 1 of the '436 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include the Accused Products, such as Verizon's 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR.

51. The Accused Products perform a method of handling signaling messages at a transit network connected between mobile networks, the method comprising: receiving, at the transit network, a session control message from a mobile network. For example, Verizon operates 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR. Verizon's IMS architecture supports voice services over both LTE and 5G NR access. Accordingly, the Verizon

network can establish an IMS voice session using VoLTE over LTE or VoNR over 5G NR, with IMS signaling conveying information regarding the serving. The 3GPP TS 23.228 defines an IMS architecture comprising functional entities, including the Interconnection Border Control Function (IBCF) enable interoperability with external IP multimedia networks using SIP communication. As further specified in 3GPP TS 24.229, the IBCF is deployed at interconnect boundaries to manage, process, and forward SIP signaling across domains, including support for IMS interconnect, I-BCF roles, TRF-based roaming, and SIP signaling. The IBCF functions as an entry and exit point for signaling between networks, thereby aligning with handling signaling messages at a transit network between mobile networks. By way of further example, as further specified in 3GPP TS 24.229, an IBCF functions as an entry point when it processes SIP requests arriving from another network, including INVITE and REGISTER messages.

> Verizon offered a glimpse under the hood in late 2022 when it announced that it was starting to move commercial traffic to its 5G core—a key component of the network—which features an all-new design that could support standalone and non-standalone 5G, among other advanced technologies. That's an exciting leap forward, but what do those things really mean, and why do they matter for businesses and consumers?

[27]

[27] https://www.verizon.com/about/news/5g-standalone-why-it-matters



**Verizon IMS Cell Towers**

**02-27-2023**

Cell site with performance enhancement technology that gives Verizon engineers more leeway to adjust performance based on where customers move and how they use data in various sectors [28]

**5G standalone: What sets Verizon apart**

Verizon's 5G core—and thus its 5G SA technology—is built on a cloud-based platform that Verizon created specifically for telecommunications workloads. No other telecommunications company has taken this step (others are using cloud systems from outside providers). Because it's built specifically for telecommunications workloads, it can support the advanced technologies and services that provide the reliability and performance customers expect now, as well as what they'll need in the future. [29]

**The 5G core is built on the Verizon Cloud Platform**

Verizon has officially begun moving customer traffic onto its cloud-native, containerized-design 5G core. Doing so will deliver "unprecedented levels of service agility, flexibility and automated scalability," said the carrier.

The 5G core is built on the Verizon Cloud Platform (VCP), which is an internally built telco cloud base on a Webscale software architecture that the carrier runs in its data centers. The VCP, said Verizon, will enable support for 5G standalone, 4G/5G Non-Standalone and Voice over New Radio (VoNR) services. [30]

Entner added Verizon's SA 5G core will allow the operator to take advantage of all of the "goodies" in 3GPP's Release-17 and Release-18 specifications. [31]

---

[28] https://www.verizon.com/about/news/feed/media-resources/attachment/016-verizon-ims-cell-towers242868
[29] https://www.verizon.com/about/news/5g-standalone-why-it-matters
[30] https://www.rcrwireless.com/20221014/featured/now-is-the-time-verizon-migrates-commercial-traffic-to-5g-core
[31] https://www.samenacouncil.org/samena_daily_news?news=92282

## 4.0 General

The IP Multimedia CN subsystem comprises all CN elements for provision of multimedia services. This includes the collection of signalling and media related network elements as defined in TS 23.002 [1]. IP multimedia services are based on an IETF defined session control capability which, along with multimedia transport capabilities, utilises the IP-Connectivity Access Network (this may include an equivalent set of services to the relevant subset of CS Services).

In order to achieve access independence and to maintain a smooth interoperation with wireline terminals across the Internet, the IP multimedia subsystem attempts to be conformant to IETF "Internet standards". Therefore, the interfaces specified conform as far as possible to IETF "Internet standards" for the cases where an IETF protocol has been selected, e.g. SIP and RTP.

The IP multimedia core network (IM CN) subsystem enables operators to offer their subscribers multimedia services. The IM CN subsystem should enable the convergence of, and access to, voice, video, messaging, data and web-based technologies for the wireless and wireline user.

The complete solution for the support of IP multimedia applications consists of terminals, IP-Connectivity Access Networks (IP-CAN), and the specific functional elements of the IM CN subsystem described in this technical specification. Examples of IP-Connectivity Access Network are:

- the GPRS core network with GERAN and/or UTRAN radio access networks; and
- EPC core network and E-UTRAN radio access network; and
- 5GS access network.

Figure 4.0 below represents the IMS reference architecture including interfaces towards CS network and other IP based multimedia Networks. Details of the roles of these nodes are described in clauses 4.6, 4.7 and 4.7a. [32]




**Figure 4.0: Reference Architecture of the IP Multimedia Core Network Subsystem** [33]

32 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/18.10.00_60/ts_123228v181000p.pdf, at 27

33 *Id.* at 28

## I.2 Originating, transit and interconnection routeing procedures

The additional routeing functionality, or associated functional entity, performing these additional routeing procedures should analyse the destination address, and determine whether to route to another network, directly, or via the IBCF, or to the BGCF, the MGCF or the I-CSCF in its own network. This analysis may use public (e.g., DNS, ENUM) and/or private database lookups, and/or locally configured data and may, based on operator policy, modify the Request-URI (e.g. to remove number prefixes, to translate local numbers to global numbers, to update the Request-URI with the URI including an obtained ported-to routeing number, etc).

In addition, and based upon local policy, the analysis may include the carrier identified by the "cic" tel-URI parameter of the Request-URI and other signalling information from the incoming request as part of the route determination. Examples of other signalling information are: the content of the P-Access-Network-Info header field, the value of the "cpc" tel URI parameter of the P-Asserted-Identity header field, the value of the "phone-context" Tel URI parameter of the Request-URI, the SDP content, the ICSI values in the Contact header field and the content of the P-Asserted-Service header field.

If the additional routeing functionality decides that the request shall be routed via a specific entity (e.g. IBCF), it shall insert the URI of this entity in the Route header of the request.

When provided as a stand-alone entity, the network element performing these functions need not Record-Route the INVITE request.

When provided as a stand-alone entity, the network element performing these functions shall not apply the procedures of RFC 3323 [33] relating to privacy. [34]

## 5.10 Procedures at the IBCF

### 5.10.1 General

As specified in 3GPP TS 23.228 [7] border control functions may be applied between two IM CN subsystems or between an IM CN subsystem and other SIP-based multimedia networks based on operator preference. The IBCF may act both as an entry point and as an exit point for a network. If it processes a SIP request received from other network it functions as an entry point (see subclause 5.10.3) and it acts as an exit point whenever it processes a SIP request sent to other network (see subclause 5.10.2).

The functionalities of the IBCF are entry and exit point procedures as defined in subclause 5.10.2 and subclause 5.10.3 and additionally can include:

- network configuration hiding (as defined in subclause 5.10.4);
- application level gateway (as defined in subclause 5.10.5);
- transport plane control, i.e. QoS control (as defined in subclause 5.10.5);
- screening of SIP signalling (as defined in subclause 5.10.6);
- inclusion of an IWF if appropriate; [35]

---

[34] https://www.etsi.org/deliver/etsi_ts/124200_124299/124229/18.08.00_60/ts_124229v180800p.pdf, at 913

[35] https://www.etsi.org/deliver/etsi_ts/124200_124299/124229/18.08.00_60/ts_124229v180800p.pdf, at 347

5.10.2.1 Registration

When IBCF receives a REGISTER request, the IBCF shall:

1) void;

2) if network topology hiding is required or IBCF is configured to perform application level gateway and/or transport plane control functionalities, then the IBCF shall add its own routeable SIP URI to the top of the Path header field; and

NOTE 1: The IBCF can include in the inserted SIP URI an indicator that identifies the direction of subsequent requests received by the IBCF i.e., from the S-CSCF towards the P-CSCF, to identify the UE-terminating case. The IBCF can encode this indicator in different ways, such as, e.g., a unique parameter in the URI, a character string in the username part of the URI, or a dedicated port number in the URI.

NOTE 2: Any subsequent request that includes the direction indicator (in the Route header field) or arrives at the dedicated port number, indicates that the request was sent by the S-CSCF towards the P-CSCF.

3) select an entry point of the home network and forward the request to that entry point.

If the selected entry point:

- does not respond to the REGISTER request and its retransmissions by the IBCF; or

- sends back a 3xx response or 480 (Temporarily Unavailable) response to a REGISTER request;

the IBCF shall select a new entry point and forward the REGISTER request to that entry point.

NOTE 3: The list of the entry points can be either obtained as specified in RFC 3263 [27A] or provisioned in the IBCF. The entry point can be an IBCF or an I-CSCF.

If the IBCF fails to forward the REGISTER request to any entry point, the IBCF shall send back a 504 (Server Time-Out) response to the P-CSCF, in accordance with the procedures in RFC 3261 [26]. [36]

52. The Accused Products perform the step of determining, at the transit network, a signaling type associated with the session control message. For example, as specified in 3GPP TS 24.229, the IBCF, operating as the transit network, determines the signaling type of a received SIP session request by analyzing specific indicators defined in 3GPP specifications. The IBCF identifies whether an incoming INVITE corresponds to a roaming scenario by evaluating Feature-Caps parameters, such as g.3gpp.trf and g.3gpp.loopback. These indicators signal that the session is associated with roaming architecture for IMS voice with local breakout. If a SIP session request is received without these indicators, the IBCF treats it as non-roaming signaling.

[36] *Id.* at 348

## 4.0 General

The IP Multimedia CN subsystem comprises all CN elements for provision of multimedia services. This includes the collection of signalling and media related network elements as defined in TS 23.002 [1]. IP multimedia services are based on an IETF defined session control capability which, along with multimedia transport capabilities, utilises the IP-Connectivity Access Network (this may include an equivalent set of services to the relevant subset of CS Services).

In order to achieve access independence and to maintain a smooth interoperation with wireline terminals across the Internet, the IP multimedia subsystem attempts to be conformant to IETF "Internet standards". Therefore, the interfaces specified conform as far as possible to IETF "Internet standards" for the cases where an IETF protocol has been selected, e.g. SIP and RTP.

The IP multimedia core network (IM CN) subsystem enables operators to offer their subscribers multimedia services. The IM CN subsystem should enable the convergence of, and access to, voice, video, messaging, data and web-based technologies for the wireless and wireline user.

The complete solution for the support of IP multimedia applications consists of terminals, IP-Connectivity Access Networks (IP-CAN), and the specific functional elements of the IM CN subsystem described in this technical specification. Examples of IP-Connectivity Access Network are:

- the GPRS core network with GERAN and/or UTRAN radio access networks; and
- EPC core network and E-UTRAN radio access network; and
- 5GS access network.

Figure 4.0 below represents the IMS reference architecture including interfaces towards CS network and other IP based multimedia Networks. Details of the roles of these nodes are described in clauses 4.6, 4.7 and 4.7a. [37]




**Figure 4.0: Reference Architecture of the IP Multimedia Core Network Subsystem** [38]

37 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/18.10.00_60/ts_123228v181000p.pdf, at 27

38 *Id.* at 28

### 5.10.9 Roaming architecture for voice over IMS with local breakout

The IBCF shall apply OMR as specified in 3GPP TS 29.079 [11D] and in accordance with the roaming architecture for voice over IMS with local breakout when a session is identified as a roaming architecture for voice over IMS with local breakout session.

A session can be identified as a potential roaming architecture for voice over IMS with local breakout session when:

1) a received initial INVITE request contains a Feature-Caps header field with a "+g.3gpp.trf" header field parameter, a "+g.3gpp.loopback" header field parameter or any other implementation dependent indication; or [39]

### 7.9A.3 Definition of feature-capability indicators g.3gpp.trf

Feature-capability indicator name: g.3gpp.trf

Summary of the feature indicated by this feature-capability indicator:

*ETSI*

**3GPP TS 24.229 version 18.8.0 Release 18 488 ETSI TS 124 229 V18.8.0 (2025-07)**

This feature-capability indicator, when included in a Feature-Caps header field as specified in RFC 6809 [190] in a SIP INVITE request, indicates that in a roaming scenario, the visited network supports a transit and roaming functionality in order to allow loopback of session requests to the visited network from the home network. When used, it may indicate the URI of the transit and roaming functionality.

Feature-capability indicator specification reference: 3GPP TS 24.229: "IP multimedia call control protocol based on Session Initiation Protocol (SIP) and Session Description Protocol (SDP); Stage 3".

Values appropriate for use with this feature-capability indicator:

None or string with an equality relationship. When used in a Feature-Caps header field, the value is string and follows the syntax as described in table 7.9A.1 for g-3gpp-trf. The value of g-3gpp-trf parameter is an instance of fcap-string-value of Feature-Caps header field specified in RFC 6809 [190].

**Table 7.9A.1: ABNF syntax of values of the g.3gpp.trf feature-capability indicator**

```
g-3gpp-trf = "<" SIP-URI ">"
```

The feature-capability indicator is intended primarily for use in the following applications, protocols, services, or negotiation mechanisms: This feature-capability indicator is used to indicate visited network support of the roaming architecture for voice over IMS with local breakout and to transport the TRF address. [40]

[39] https://www.etsi.org/deliver/etsi_ts/124200_124299/124229/18.08.00_60/ts_124229v180800p.pdf, at 362

[40] *Id.* at 487-488

### 7.9A.4 Definition of feature-capability indicator g.3gpp.loopback

Feature-capability indicator name: g.3gpp.loopback

Summary of the feature indicated by this feature-capability indicator:

This feature-capability indicator, when included in a Feature-Caps header field as specified in RFC 6809 [190] in a SIP INVITE request, indicates the support of the roaming architecture for voice over IMS with local breakout.

Feature-capability indicator specification reference: 3GPP TS 24.229: "IP multimedia call control protocol based on Session Initiation Protocol (SIP) and Session Description Protocol (SDP); Stage 3".

Values appropriate for use with this feature-capability indicator:

None or a string with an equality relationship.

When used in a Feature-Caps header field, the value is a string identifying the home network and follows the syntax as described in table 7.9A.4-1 for g-3gpp-loopback. The value of g-3gpp-loopback parameter is an instance of fcap-string-value of Feature-Caps header field specified in RFC 6809 [190].

**Table 7.9A.4-1: ABNF syntax of values of the g-3gpp-loopback feature-capability indicator**

```
g-3gpp-loopback = "<" 1*(qdtext / quoted-pair) ">"
```

The feature-capability indicator is intended primarily for use in the following applications, protocols, services, or negotiation mechanisms: This feature-capability indicator is used to indicate support of the roaming architecture for voice over IMS with local breakout and that the INVITE request is a loopback request. [41]

53. The Accused Products perform the step of routing, at the transit network, the session control message based on the signaling type determined, including routing the session control message based on domain routing if the determined signaling type is roaming signaling and routing the session control message based on called party routing if the determined signaling type is non-roaming signaling. For example, when the received INVITE contains roaming indicators, such as g.3gpp.trf or g.3gpp.loopback, the signaling is identified as roaming, and the specification requires the transit network to apply domain-based routing. This routing is performed using SIP URIs to forward the request to roaming-specific entities, such as the TRF and IBCF, including support for loopback and local-breakout procedures. For non-roaming signaling, where such roaming indicators are not present, the routing decision is instead based on called-party information. The request carries a tel URI (representing a local or global number), and the additional routing functionality performs number-based analysis using the Request-URI, ENUM/DNS results, phone-context parameters, CIC identifiers, and other signaling attributes to

[41] *Id.* at 488

determine the appropriate terminating network. The transit network then routes the message accordingly.




Figure 4.0: Reference Architecture of the IP Multimedia Core Network Subsystem 42

## I.1 Scope

Additional routeing functionality is necessary for support of:

- transit traffic as operators may use the IM CN subsystem as a transit network to provide transit functionality for their own CS networks, enterprise networks, or other network operators;
- other traffics such as roaming traffic and incoming traffic destined to CSI UEs (Combining Circuit Switched (CS) and IP Multimedia Subsystem (IMS) services) traffics;
- traffic for the roaming architecture for voice over IMS with local breakout; and
- originating traffic if required by local policy as specified in subclause 5.4.3.2.

Depending on the additional routeing functionalities, the required specific functions may reside in a stand-alone entity or may be collocated with an MGCF, a BGCF, an I-CSCF, an S-CSCF, or an IBCF as appropriate for the specific scenario. 43

42 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/18.10.00_60/ts_123228v181000p.pdf, at 27-28

43 https://www.etsi.org/deliver/etsi_ts/124200_124299/124229/18.08.00_60/ts_124229v180800p.pdf, at 912

> ## I.2 Originating, transit and interconnection routeing procedures
>
> The additional routeing functionality, or associated functional entity, performing these additional routeing procedures should analyse the destination address, and determine whether to route to another network, directly, or via the IBCF, or to the BGCF, the MGCF or the I-CSCF in its own network. This analysis may use public (e.g., DNS, ENUM) and/or private database lookups, and/or locally configured data and may, based on operator policy, modify the Request-URI (e.g. to remove number prefixes, to translate local numbers to global numbers, to update the Request-URI with the URI including an obtained ported-to routeing number, etc).
>
> In addition, and based upon local policy, the analysis may include the carrier identified by the "cic" tel-URI parameter of the Request-URI and other signalling information from the incoming request as part of the route determination. Examples of other signalling information are: the content of the P-Access-Network-Info header field, the value of the "cpc" tel URI parameter of the P-Asserted-Identity header field, the value of the "phone-context" Tel URI parameter of the Request-URI, the SDP content, the ICSI values in the Contact header field and the content of the P-Asserted-Service header field.
>
> If the additional routeing functionality decides that the request shall be routed via a specific entity (e.g. IBCF), it shall insert the URI of this entity in the Route header of the request.

[44]

[44] *Id.* at 913

## 7.9A.3 Definition of feature-capability indicators g.3gpp.trf

Feature-capability indicator name: g.3gpp.trf

Summary of the feature indicated by this feature-capability indicator:

***ETSI***

**3GPP TS 24.229 version 18.8.0 Release 18 488 ETSI TS 124 229 V18.8.0 (2025-07)**

This feature-capability indicator, when included in a Feature-Caps header field as specified in RFC 6809 [190] in a SIP INVITE request, indicates that in a roaming scenario, the visited network supports a transit and roaming functionality in order to allow loopback of session requests to the visited network from the home network. When used, it may indicate the URI of the transit and roaming functionality.

Feature-capability indicator specification reference: 3GPP TS 24.229: "IP multimedia call control protocol based on Session Initiation Protocol (SIP) and Session Description Protocol (SDP); Stage 3".

Values appropriate for use with this feature-capability indicator:

None or string with an equality relationship. When used in a Feature-Caps header field, the value is string and follows the syntax as described in table 7.9A.1 for g-3gpp-trf. The value of g-3gpp-trf parameter is an instance of fcap-string-value of Feature-Caps header field specified in RFC 6809 [190].

**Table 7.9A.1: ABNF syntax of values of the g.3gpp.trf feature-capability indicator**

```
g-3gpp-trf = "<" SIP-URI ">"
```

The feature-capability indicator is intended primarily for use in the following applications, protocols, services, or negotiation mechanisms: This feature-capability indicator is used to indicate visited network support of the roaming architecture for voice over IMS with local breakout and to transport the TRF address. [45]

[45] *Id.* at 487-488

### 7.9A.4 Definition of feature-capability indicator g.3gpp.loopback

Feature-capability indicator name: g.3gpp.loopback

Summary of the feature indicated by this feature-capability indicator:

This feature-capability indicator, when included in a Feature-Caps header field as specified in RFC 6809 [190] in a SIP INVITE request, indicates the support of the roaming architecture for voice over IMS with local breakout.

Feature-capability indicator specification reference: 3GPP TS 24.229: "IP multimedia call control protocol based on Session Initiation Protocol (SIP) and Session Description Protocol (SDP); Stage 3".

Values appropriate for use with this feature-capability indicator:

None or a string with an equality relationship.

When used in a Feature-Caps header field, the value is a string identifying the home network and follows the syntax as described in table 7.9A.4-1 for g-3gpp-loopback. The value of g-3gpp-loopback parameter is an instance of fcap-string-value of Feature-Caps header field specified in RFC 6809 [190].

**Table 7.9A.4-1: ABNF syntax of values of the g-3gpp-loopback feature-capability indicator**

```
g-3gpp-loopback = "<" 1*(qdtext / quoted-pair) ">"
```

The feature-capability indicator is intended primarily for use in the following applications, protocols, services, or negotiation mechanisms: This feature-capability indicator is used to indicate support of the roaming architecture for voice over IMS with local breakout and that the INVITE request is a loopback request. [46]

## I.4 Loopback routeing procedures

### I.4.1 Introduction

In order to support traffics for the roaming architecture for voice over IMS with local breakout the additional routeing functionality will perform the procedures described in this subclause. An additional routeing functionality performing the procedures in this subclause is always located in the visited PLMN and is referred to as Transit and Roaming Function (TRF).

The TRF performs local break out and routes the INVITE request via a specific entity e.g. IBCF or BGCF.

Loopback routeing requires support in the visited network and the home network. If the visited network supports loopback routeing then the P-CSCF will, based on local policy, express this support by adding a g.3gpp.trf feature-capability indicator value to the URI of the desired TRF.

The home network decides based on local operator policy if loopback routeing shall be applied. If loopback routeing is applied, the home network routes the INVITE request back to the TRF located in the visited network indicating that loopback routeing is used by including the g.3gpp.loopback feature-capability indicator in a Feature-Caps header field.

In the loopback scenario OMR as specified in 3GPP TS 29.079 [11D] is used to determine the optimal media path between the visited network and the terminating network without passing through the home network. [47]

[46] *Id.* at 488
[47] *Id.* at 917

### I.4.2 TRF procedure

When the TRF receives an initial request for a dialog, the TRF shall:

1) retain the "icid-value" header field parameter in the P-Charging-Vector header field;

2) store the value of the "orig-ioi" header field parameter received in the P-Charging-Vector header field, if present, and remove the "orig-ioi" header field parameter from the P-Charging-Vector header field. Insert a type 2 "orig-ioi" header field parameter into the P-Charging-Vector header field. Set the type 2 "orig-ioi" header field parameter to a value that identifies the sending network in which the TRF resides. The TRF shall not include the "term-ioi" header field parameter. Store the value of a "transit-ioi" header field parameter received in the P-Charging-Vector header field, if present, and remove the "transit-ioi" header field parameter from the P-Charging-Vector header field before forwarding the request;

3) if required by local policy, perform number normalization and enum translation in the same way as performed by S-CSCF in subclause 5.4.3.2 step 10);

4) if the P-Access-Network header field is available, determine the entity for local break out (e.g. IBCF or BGCF) using:

   a) the location of the originating user; and

   b) the destination address,

   then include a Route header field set to the URI associated with the determined entity in the forwarded request;

5) create a Record-Route header field containing the TRF own SIP URI;

6) remove the "+g.3gpp.loopback" header field parameter from the Feature-Caps header field of the outgoing request;

6A) if the TRF supports indicating the traffic leg as specified in RFC 7549 [225] and required by local policy:

   a) if the Request-URI in the INVITE request contains a SIP URI, append an "iotl" SIP URI parameter set to "visitedA-homeB" to the Request-URI; and

   b) if the Request-URI in the INVITE request contains a tel URI:

      - convert the tel URI in the Request-URI to the form of a SIP URI with user=phone; and

*ETSI*

**3GPP TS 24.229 version 18.8.0 Release 18** **918** **ETSI TS 124 229 V18.8.0 (2025-07)**

      - append the "iotl" SIP URI parameter set to "visitedA-homeB" in the Request-URI; and

7) route the request based on SIP routeing procedures. [48]

---

[48] *Id.* at 917-918

5.1.2A.1.3 UE without dial string processing capabilities

In this case the UE does not perform any analysis of the dial string. This requires that the dialling plan is designed so it enables the network to differentiate local numbers from other numbers.

The dial string is sent to the network, in the Request-URI of a initial request or a stand alone transaction, using one of the following formats:

1) a tel-URI, syntactically complying with RFC 3966 [22], with the dial string encoded as a local number followed by a "phone-context" tel URI parameter value;

EXAMPLE: tel:00447700900123;phone-context=example.com

2) a SIP URI, syntactically complying with RFC 3261 [26], with the user=phone parameter, embedding a tel-URI with a "phone-context" tel URI parameter value;

EXAMPLE: sip:00447700900123;
phone-context=example.com@example.com;user=phone

3) a SIP URI, complying with RFC 3261 [26] and RFC 4967 [103], with the user=dialstring parameter and with a "phone-context" tel-URI parameter value in the user part; or

EXAMPLE: sip:00447700900123;
phone-context=example.com@example.com;user=dialstring

4) a SIP URI syntactically complying with RFC 3261 [26], where the user part contains the dial string and the domain name is specific enough to enable to network to understand that the user part contains a dial string.

EXAMPLE: sip:00447700900123@dialstrings.entreprise.com

For cases 1), 2), and 3) the UE shall set the "phone-context" tel URI parameter in accordance with subclause 5.1.2A.1.5. [49]

## I.2 Originating, transit and interconnection routeing procedures

The additional routeing functionality, or associated functional entity, performing these additional routeing procedures should analyse the destination address, and determine whether to route to another network, directly, or via the IBCF, or to the BGCF, the MGCF or the I-CSCF in its own network. This analysis may use public (e.g., DNS, ENUM) and/or private database lookups, and/or locally configured data and may, based on operator policy, modify the Request-URI (e.g. to remove number prefixes, to translate local numbers to global numbers, to update the Request-URI with the URI including an obtained ported-to routeing number, etc).

In addition, and based upon local policy, the analysis may include the carrier identified by the "cic" tel-URI parameter of the Request-URI and other signalling information from the incoming request as part of the route determination. Examples of other signalling information are: the content of the P-Access-Network-Info header field, the value of the "cpc" tel URI parameter of the P-Asserted-Identity header field, the value of the "phone-context" Tel URI parameter of the Request-URI, the SDP content, the ICSI values in the Contact header field and the content of the P-Asserted-Service header field.

If the additional routeing functionality decides that the request shall be routed via a specific entity (e.g. IBCF), it shall insert the URI of this entity in the Route header of the request.

When provided as a stand-alone entity, the network element performing these functions need not Record-Route the INVITE request. [50]

[49] *Id.* at 137
[50] *Id.* at 913

- a SIP URI with a local number (see RFC 3966 [22]) in the user part and a "user" SIP URI parameter equals "phone" and the domain name of the SIP URI belongs to the home network (i.e. the local number analysis and handling is either failed in the appropriate AS or the request has not been forwarded to AS for local number analysis and handling at all), either forward the request to to a BGCFor any appropriate entity (e.g a MRFC to play an announcement) in the originator's home network or send an appropriate SIP response to the originator;

- a tel URI containing a global number (see RFC 3966 [22]) in the international format, the S-CSCF shall translate the E.164 address to a globally routeable SIP URI using either an ENUM/DNS translation mechanism with the format specified in RFC 6116 [24], or any other available database. Database aspects of ENUM are outside the scope of the present document. An S-CSCF that implements the additional routeing functionality described in annex I may forward the request without attempting translation. If an agreement exists between the home network and the visited network to support roaming architecture for voice over IMS with local breakout, the S-CSCF does not enable NP capabilities, and the S-CSCF decides to loopback the call to the visited network, the S-CSCF may forward the request without attempting translation. If this translation is in fact performed and it succeeds, the S-CSCF shall update the Request-URI with the globally routeable SIP URI returned by ENUM/DNS or any other available database. If this translation fails, the request may be forwarded to a BGCF or any other appropriate entity (e.g a MRFC to play an announcement) in the originator's home network or the S-CSCF may send an appropriate SIP response to the originator. When forwarding the request to a BGCF or any other appropriate entity, the S-CSCF shall leave the original Request-URI containing the tel URI unmodified. If the request is forwarded, the S-CSCF shall remove the

*ETSI*

**3GPP TS 24.229 version 18.8.0 Release 18 278 ETSI TS 124 229 V18.8.0 (2025-07)**

access-network-charging-info parameter from the P-Charging-Vector header field prior to forwarding the message;

- a tel URI containing a local number (see RFC 3966 [22]) (i.e. the local number analysis and handling is either failed in the appropriate AS or the request has not been forwarded to AS for local number analysis and handling at all), either forward the request to a BGCF or any other appropriate entity (e.g. a MRFC to play an announcement) in the originator's home network or send an appropriate SIP response to the originator;

- a pres URI or an im URI, the S-CSCF shall forward the request as specified in RFC 3861 [63]. In this case, the S-CSCF shall not modify the received Request-URI: and

- a service URN, e.g. a service URN with a top-level service type of "sos" as specified in RFC 5031 [69]. In this case the S-CSCF shall not modify the received Request-URI. [51]

### 5.1.2A.1.3 UE without dial string processing capabilities

In this case the UE does not perform any analysis of the dial string. This requires that the dialling plan is designed so it enables the network to differentiate local numbers from other numbers.

The dial string is sent to the network, in the Request-URI of a initial request or a stand alone transaction, using one of the following formats:

1) a tel-URI, syntactically complying with RFC 3966 [22], with the dial string encoded as a local number followed by a "phone-context" tel URI parameter value;

EXAMPLE: tel:00447700900123;phone-context=example.com

2) a SIP URI, syntactically complying with RFC 3261 [26], with the user=phone parameter, embedding a tel-URI with a "phone-context" tel URI parameter value;

EXAMPLE: sip:00447700900123;
phone-context=example.com@example.com;user=phone

3) a SIP URI, complying with RFC 3261 [26] and RFC 4967 [103], with the user=dialstring parameter and with a "phone-context" tel-URI parameter value in the user part; or

EXAMPLE: sip:00447700900123;
phone-context=example.com@example.com;user=dialstring

4) a SIP URI syntactically complying with RFC 3261 [26], where the user part contains the dial string and the domain name is specific enough to enable to network to understand that the user part contains a dial string.

EXAMPLE: sip:00447700900123@dialstrings.entreprise.com

For cases 1), 2), and 3) the UE shall set the "phone-context" tel URI parameter in accordance with subclause 5.1.2A.1.5. [52]

---

[51] *Id.* at 277-278

[52] *Id.* at 137

54. Defendants have and continue to indirectly infringe one or more claims of the '436 Patent by knowingly and intentionally inducing others, including Verizon customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

55. Defendants, with knowledge that these products, or the use thereof, infringe the '436 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continue to knowingly and intentionally induce, direct infringement of the '436 Patent by providing these products to end-users for use in an infringing manner. Alternatively, on information and belief, Defendants have adopted a policy of not reviewing the patents of others, and instructing their officers, agents, and employees to not review the patents of others, including specifically those related to Defendants' specific industry, thereby remaining willfully blind to the '436 at least as early as the issuance of the '436 Patent.

56. Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the '436 Patent, but while remaining willfully blind to the infringement. Defendants have and continue to induce infringement by their customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants' website, product literature and packaging, and other publications, including any of Defendants' materials cited in this Complaint. On information and belief, operation of the Accused Products and services offered by Defendants necessarily infringe the '436 Patent.

57. On information and belief, Defendants directly prepare and/or assist in the preparation of, and provide customers and end-users with, information and documents for their specific products. On information and belief, Defendants' product literature and other product information documents are prepared by or under the direction of Defendants to instruct customers and end-users on how to use the Accused Products in an infringing manner.

58. Because of Defendants' inducement, Defendants' customers and end-users use Accused Products in a way Defendants intend and directly infringe the '436 Patent. Defendants perform these affirmative acts with knowledge of the '436 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '436 Patent.

59. Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '436 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products, such that the '436 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '436 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be especially made or adapted for use in the infringement of the '436 Patent. The accused components include, but are not limited to, components necessary for the operation of Defendants infringing systems including, but not limited to, the Accused Products, such as the hardware and software components of Verizon's 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR. Defendants perform these affirmative acts with knowledge of the '436 Patent and with intent, or

willful blindness, that they cause the direct infringement of the ’436 Patent.

60. SLR has suffered damages as a result of Defendants’ direct and indirect infringement of the ’436 Patent in an amount to be proven at trial.

61. SLR has suffered, and will continue to suffer, irreparable harm as a result of Defendants’ infringement of the ’436 Patent, for which there is no adequate remedy at law, unless Defendants’ infringement is enjoined by this Court.

**COUNT III**
**(Infringement of the ’062 Patent)**

62. Paragraphs 1 through 31 are incorporated by reference as if fully set forth herein.

63. SLR has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the ’062 Patent.

64. Defendants have and continue to directly infringe the ’062 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the ’062 Patent. Such infringing products include the Accused Products and all associated hardware and software.

65. For example, Defendants have and continue to directly infringe at least Claim 1 of the ’062 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include the Accused Products and all associated hardware and software, such as Verizon’s 5G network with IMS-based VoNR/VoLTE services, a 5G Core, and IMS network.

66. The Accused Products perform a method of determining when to decline a call request from a customer, wherein the call is to be routed from an originating gateway to one of a plurality of destination gateways over the Internet, comprising: obtaining call routing information that indicates destination gateways that are potentially capable of completing the call, wherein the

routing information includes the address for a decline destination gateway that will cause the call to be treated in a special fashion, wherein the special fashion does not include attempting to complete the call to a destination telephony device identified in the customer's call request. For example, Verizon's 5G network supports IMS-based VoNR/VoLTE services, using a 5G Core and IMS network to transport SIP signalling for voice-session establishment and handling. During call establishment, a Verizon customer's mobile device transmits a call request through Verizon's 5G network to the IMS Core, where the IMS network processes and routes the SIP session toward an appropriate destination. The IMS architecture includes standardized session-control and routing functions, including CSCFs, BGCF, and Application Servers. The IMS reference model establishes adherence to IETF SIP procedures, enabling request routing across IP networks, including Internet-based interconnection paths. P-CSCF and S-CSCF act as SIP proxies, forwarding and routing SIP requests including initial call attempts toward appropriate next-hop entities based on operator service configuration. The S-CSCF further determines, via ISC interface, whether an Application Server must process an incoming request to enforce service logic. Further, RFC 3261 mentions that such proxies maintain transaction state and select downstream destinations for SIP requests, supporting routing among multiple potential gateways. Additionally, 3GPP TS 23.228 states that an Application Server, upon invocation of its service logic, may terminate a session at the AS itself. As described in TS 23.228, the S-CSCF obtains service filter information and the addresses of the appropriate Application Server(s) from the HSS to determine how the incoming SIP request should be handled. Based on the received routing information and applicable service logic, the S-CSCF either forwards the SIP request toward the appropriate next-hop entity, such as an Application Server or BGCF, or invokes application-specific processing instead of directly routing the call to the originally requested destination. RFC 3261 further

specifies that a SIP proxy determines one or more next-hop locations based on routing information and forwards the request accordingly, enabling service-specific call handling. Consequently, Verizon's IMS network utilizes routing information identifying destination entities capable of processing the call, including service-specific Application Servers that may apply specialized call treatment before normal call completion.

> Verizon offered a glimpse under the hood in late 2022 when it announced that it was starting to move commercial traffic to its 5G core—a key component of the network—which features an all-new design that could support standalone and non-standalone 5G, among other advanced technologies. That's an exciting leap forward, but what do those things really mean, and why do they matter for businesses and consumers?[53]



**Verizon IMS Cell Towers**

02-27-2023

Cell site with performance enhancement technology that gives Verizon engineers more leeway to adjust performance based on where customers move and how they use data in various sectors[54]

---

[53] https://www.verizon.com/about/news/5g-standalone-why-it-matters

[54] https://www.verizon.com/about/news/feed/media-resources/attachment/016-verizon-ims-cell-towers242868

## 5G standalone: What sets Verizon apart

Verizon's 5G core—and thus its 5G SA technology—is built on a cloud-based platform that Verizon created specifically for telecommunications workloads. No other telecommunications company has taken this step (others are using cloud systems from outside providers). Because it's built specifically for telecommunications workloads, it can support the advanced technologies and services that provide the reliability and performance customers expect now, as well as what they'll need in the future. [55]

### The 5G core is built on the Verizon Cloud Platform

Verizon has officially begun moving customer traffic onto its cloud-native, containerized-design 5G core. Doing so will deliver "unprecedented levels of service agility, flexibility and automated scalability," said the carrier.

The 5G core is built on the Verizon Cloud Platform (VCP), which is an internally built telco cloud base on a Webscale software architecture that the carrier runs in its data centers. The VCP, said Verizon, will enable support for 5G standalone, 4G/5G Non-Standalone and Voice over New Radio (VoNR) services. [56]

Entner added Verizon's SA 5G core will allow the operator to take advantage of all of the "goodies" in 3GPP's Release-17 and Release-18 specifications. [57]

55 https://www.verizon.com/about/news/5g-standalone-why-it-matters
56 https://www.rcrwireless.com/20221014/featured/now-is-the-time-verizon-migrates-commercial-traffic-to-5g-core
57 https://www.samenacouncil.org/samena_daily_news?news=92282

## 4.0 General

The IP Multimedia CN subsystem comprises all CN elements for provision of multimedia services. This includes the collection of signalling and media related network elements as defined in TS 23.002 [1]. IP multimedia services are based on an IETF defined session control capability which, along with multimedia transport capabilities, utilises the IP-Connectivity Access Network (this may include an equivalent set of services to the relevant subset of CS Services).

In order to achieve access independence and to maintain a smooth interoperation with wireline terminals across the Internet, the IP multimedia subsystem attempts to be conformant to IETF "Internet standards". Therefore, the interfaces specified conform as far as possible to IETF "Internet standards" for the cases where an IETF protocol has been selected, e.g. SIP and RTP.

The IP multimedia core network (IM CN) subsystem enables operators to offer their subscribers multimedia services. The IM CN subsystem should enable the convergence of, and access to, voice, video, messaging, data and web-based technologies for the wireless and wireline user.

The complete solution for the support of IP multimedia applications consists of terminals, IP-Connectivity Access Networks (IP-CAN), and the specific functional elements of the IM CN subsystem described in this technical specification. Examples of IP-Connectivity Access Network are:

- the GPRS core network with GERAN and/or UTRAN radio access networks; and
- EPC core network and E-UTRAN radio access network; and
- 5GS access network.

Figure 4.0 below represents the IMS reference architecture including interfaces towards CS network and other IP based multimedia Networks. Details of the roles of these nodes are described in clauses 4.6, 4.7 and 4.7a. [58]




Figure 4.0: Reference Architecture of the IP Multimedia Core Network Subsystem [59]

58 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/18.10.00_60/ts_123228v181000p.pdf, at 27

59 *Id.* at 28

## 4.6 Roles of Session Control Functions

### 4.6.0 General

The CSCF may take on various roles as used in the IP multimedia subsystem. The following clauses describe these various roles.

### 4.6.1 Proxy-CSCF

The Proxy-CSCF (P-CSCF) is the first contact point within the IM CN subsystem. Its address is discovered by UEs using the mechanism described in the clause "Procedures related to Local CSCF Discovery". The P-CSCF behaves like a Proxy (as defined in IETF RFC 3261 [12] or subsequent versions), i.e. it accepts requests and services them internally or forwards them on. The P-CSCF shall not modify the Request URI in the SIP INVITE message. The P-CSCF may behave as a User Agent (as defined in the IETF RFC 3261 [12] or subsequent versions), i.e. in abnormal conditions it may terminate and independently generate SIP transactions.

NOTE 1: When requests are sent towards another domain they may, if required, be routed via a local network exit point (IBCF), which will then forward the request to the entry point of the other domain. More details on this can be found in clause 4.14 and Annex I.

The P-CSCF in the role of an AF may interact with the Policy and Charging Architecture; the P-CSCF may interact over the Rx interface (see TS 29.214 [11]) with the Policy and Charging Architecture defined in TS 23.203 [54]; the P-CSCF may interact over the Rx interface (see TS 29.214 [11]) or over the N5 interface (using the Npcf_PolicyAutorization service, see TS 29.514 [96]) with the Policy and Charging Architecture defined in TS 23.503 [95].

The functions performed by the P-CSCF are:

- Forward the SIP register request received from the UE to an entry point determined using the home domain name, as provided by the UE.
- Forward SIP messages received from the UE to the SIP server (e.g. S-CSCF) whose name the P-CSCF has received as a result of the registration procedure.
- Ensure that the SIP messages received from the UE to the SIP server (e.g. S-CSCF) contain the correct or up to date information about the access network type currently used by the UE, when the information is available from the access network. Depending on operator policies, the P-CSCF may insert in any SIP message (request or response) the access network type currently used by the UE, when the information is available from the access network. [60]

### 4.6.3 Serving-CSCF

The Serving-CSCF (S-CSCF) performs the session control services for the UE. It maintains a session state as needed by the network operator for support of the services. Within an operator's network, different S-CSCFs may have different functionalities. The functions performed by the S-CSCF during a session are:

[60] *Id.* at 49

> For Session-related and session-unrelated flows:
>
> - Session control for the registered endpoint's sessions. It shall reject IMS communication to/from Public User Identity(s) that are barred for IMS communications after completion of registration, as described in clause 5.2.1.
> - May behave as a Proxy Server as defined in IETF RFC 3261 [12] or subsequent versions, i.e. it accepts requests and services them internally or forwards them on, possibly after translation.
> - May behave as a User Agent as defined in IETF RFC 3261 [12] or subsequent versions, i.e. it may terminate and independently generate SIP transactions.
> - Based on the determined served user, handle interaction with Services Platforms for the support of Services
> - Provide endpoints with service event related information (e.g. notification of tones/announcement together with location of additional media resources, billing notification)
> - For an originating endpoint (i.e. the originating user/UE, or originating AS)
>     - Obtain from a database the Address of the entry point for the network operator serving the destination user from the destination name (e.g. dialled phone number or SIP URI), when the destination user is a customer of a different network operator, and forward the SIP request or response to that entry point.
>
>       If a GRUU is received as the contact, ensures that the Public User Identity of the served user in the request and the Public User Identity encapsulated in the P-GRUU or associated with the T-GRUU belongs to the same service profile.
>     - When the destination name of the destination user (e.g. dialled phone number or SIP URI), and the originating user is a customer of the same network operator, forward the SIP request or response to an I-CSCF within the operator's network.
>     - Depending on operator policy, forward the SIP request or response to another SIP server located within an ISP domain outside of the IM CN subsystem.
>     - Forward the SIP request or response to a BGCF for call routing to the PSTN or CS Domain.
>     - Ensure the originating end point is subscribed to the determined IMS communication service.

[61]

[61] *Id.* at 51

### 4.2.4 IP multimedia Subsystem Service Control Interface (ISC)

The ISC interface is between the Serving CSCF and the service platform(s).

An Application Server (AS) offering value added IM services resides either in the user's home network or in a third party location. The third party could be a network or simply a stand-alone AS.

The Serving-CSCF to AS interface is used to provide services residing in an AS. Two cases were identified:

- Serving-CSCF to an AS in Home Network.
- Serving-CSCF to an AS in External Network (e.g. Third Party or Visited)

The SIP Application Server may host and execute services. The SIP Application Server can influence and impact the SIP session on behalf of the services and it uses the ISC interface to communicate with the S-CSCF. The S-CSCF shall be able to supply the AS with information to allow it to execute multiple services in order within a single SIP transaction.

**ETSI**

**3GPP TS 23.228 version 18.10.0 Release 18 32 ETSI TS 123 228 V18.10.0 (2025-07)**

The ISC interface shall be able support subscription to event notifications between the Application Server and S-CSCF to allow the Application Server to be notified of the implicit registered Public User Identities, registration state and UE capabilities and characteristics in terms of SIP User Agent capabilities and characteristics.

The S-CSCF shall decide whether an Application Server is required to receive information related to an incoming initial SIP request to ensure appropriate service handling. The decision at the S-CSCF is based on (filter) information received from the HSS. This filter information is stored and conveyed on a per Application Server basis for each user. It shall be possible to include a service indication in the filter information, which is used to identify services and the order that they are executed on an Application Server within a single SIP transaction. The name(s)/address(es) information of the Application Server (s) are received from the HSS. [62]

**16.2 Stateful Proxy**

When stateful, a proxy is purely a SIP transaction processing engine. Its behavior is modeled here in terms of the server and client transactions defined in Section 17. A stateful proxy has a server transaction associated with one or more client transactions by a higher layer proxy processing component (see figure 3), known as a proxy core. An incoming request is processed by a server transaction. Requests from the server transaction are passed to a proxy core. The proxy core determines where to route the request, choosing one or more next-hop locations. An outgoing request for each next-hop location is processed by its own associated client transaction. The proxy core collects the responses from the client transactions and uses them to send responses to the server transaction. [63]

[62] *Id.* at 31-32

[63] https://datatracker.ietf.org/doc/html/rfc3261#section-16.2, at 92-93

### 5.7.8 (AST#4) Termination at Application Server based on service logic

This termination procedure applies to an Application Server that terminates a session. In this case the addressed user is a UE and is not hosted by the AS. Based on the invoked service logic at the Application Server the session is terminated at the AS. 64




**Figure 5.19g: Application Server termination**

1. I-CSCF receives a request destined to the user.

2-3. I-CSCF queries HSS in order to determine the next hop in the routing path for the user.

4. HSS determines the routing information, which is the S-CSCF defined for the user.

5. HSS returns the S-CSCF address/capabilities to the I-CSCF.

6-7. I-CSCF, as per existing procedures, forwards the request to S-CSCF that will handle the session termination.

8. S-CSCF evaluates the filter criteria and gets the AS address where to forward the request.

9. The request is then routed towards the AS identified by the filter criteria. The AS terminates the session instead of allowing it to continue on to the address end user.

10-12. Session setup continues as per existing procedures. 65

67. The Accused Products perform the step of attempting to setup the call through at least one destination gateway that is potentially capable of completing the call. For example, when

---

64 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/18.10.00_60/ts_123228v181000p.pdf, at 140

65 *Id.* at 141

a user places a call from a Verizon mobile device, the UE generates a SIP INVITE request that is transmitted over Verizon's 5G radio access network to the IMS Core. As described in 3GPP TS 23.228 §4.6.3, the Serving-CSCF (S-CSCF) performs session control for the originating UE and operates as a SIP proxy that accepts incoming SIP requests and either processes them internally or forwards them to the appropriate network entity. For originating sessions, the S-CSCF forwards the SIP request to the Breakout Gateway Control Function (BGCF) for routing toward the PSTN or Circuit Switched domain when applicable, thereby initiating establishment of the requested communication session through an appropriate destination gateway capable of completing the call. The BGCF subsequently determines the appropriate breakout path for the call based on the destination information and applicable network routing policies.

### 4.6.3 Serving-CSCF

The Serving-CSCF (S-CSCF) performs the session control services for the UE. It maintains a session state as needed by the network operator for support of the services. Within an operator's network, different S-CSCFs may have different functionalities. The functions performed by the S-CSCF during a session are:

> For Session-related and session-unrelated flows:
>
> - Session control for the registered endpoint's sessions. It shall reject IMS communication to/from Public User Identity(s) that are barred for IMS communications after completion of registration, as described in clause 5.2.1.
> - May behave as a Proxy Server as defined in IETF RFC 3261 [12] or subsequent versions, i.e. it accepts requests and services them internally or forwards them on, possibly after translation.
> - May behave as a User Agent as defined in IETF RFC 3261 [12] or subsequent versions, i.e. it may terminate and independently generate SIP transactions.
> - Based on the determined served user, handle interaction with Services Platforms for the support of Services
> - Provide endpoints with service event related information (e.g. notification of tones/announcement together with location of additional media resources, billing notification)
> - For an originating endpoint (i.e. the originating user/UE, or originating AS)
>   - Obtain from a database the Address of the entry point for the network operator serving the destination user from the destination name (e.g. dialled phone number or SIP URI), when the destination user is a customer of a different network operator, and forward the SIP request or response to that entry point.
>
>     If a GRUU is received as the contact, ensures that the Public User Identity of the served user in the request and the Public User Identity encapsulated in the P-GRUU or associated with the T-GRUU belongs to the same service profile.
>   - When the destination name of the destination user (e.g. dialled phone number or SIP URI), and the originating user is a customer of the same network operator, forward the SIP request or response to an I-CSCF within the operator's network.
>   - Depending on operator policy, forward the SIP request or response to another SIP server located within an ISP domain outside of the IM CN subsystem.
>   - Forward the SIP request or response to a BGCF for call routing to the PSTN or CS Domain.
>   - Ensure the originating end point is subscribed to the determined IMS communication service.

[66]

68. The Accused Products perform the step of sending a call setup request from the originating gateway to the decline destination gateway when the originating gateway determines that the call cannot be setup with any destination gateways potentially capable of completing the call. For example, when a user initiates a call, the SIP INVITE is transported through Verizon's 5G network to the IMS Core, where the Serving-CSCF (S-CSCF) performs session control and evaluates the service filter criteria associated with the subscriber. As described in 3GPP TS 23.228 §4.2.4, the S-CSCF determines whether an Application Server should process the incoming SIP request based on filter information received from the HSS and obtains the corresponding Application Server address. During the Application Server termination procedure defined in TS 23.228 §5.7.8, the S-CSCF evaluates the filter criteria, forwards the SIP request to the identified

---

66 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/18.10.00_60/ts_123228v181000p.pdf, at 51

Application Server, and the Application Server terminates the SIP session according to the configured service logic instead of allowing the request to continue toward the originally addressed end-user. The SIP request is therefore redirected from the normal destination routing path to the designated Application Server, which applies specialized call handling before any further routing or call completion is attempted.

> ### 4.6.3 Serving-CSCF
>
> The Serving-CSCF (S-CSCF) performs the session control services for the UE. It maintains a session state as needed by the network operator for support of the services. Within an operator's network, different S-CSCFs may have different functionalities. The functions performed by the S-CSCF during a session are:

> For Session-related and session-unrelated flows:
>
> - Session control for the registered endpoint's sessions. It shall reject IMS communication to/from Public User Identity(s) that are barred for IMS communications after completion of registration, as described in clause 5.2.1.
> - May behave as a Proxy Server as defined in IETF RFC 3261 [12] or subsequent versions, i.e. it accepts requests and services them internally or forwards them on, possibly after translation.
> - May behave as a User Agent as defined in IETF RFC 3261 [12] or subsequent versions, i.e. it may terminate and independently generate SIP transactions.
> - Based on the determined served user, handle interaction with Services Platforms for the support of Services
> - Provide endpoints with service event related information (e.g. notification of tones/announcement together with location of additional media resources, billing notification)
> - For an originating endpoint (i.e. the originating user/UE, or originating AS)
>   - Obtain from a database the Address of the entry point for the network operator serving the destination user from the destination name (e.g. dialled phone number or SIP URI), when the destination user is a customer of a different network operator, and forward the SIP request or response to that entry point.
>
>     If a GRUU is received as the contact, ensures that the Public User Identity of the served user in the request and the Public User Identity encapsulated in the P-GRUU or associated with the T-GRUU belongs to the same service profile.
>   - When the destination name of the destination user (e.g. dialled phone number or SIP URI), and the originating user is a customer of the same network operator, forward the SIP request or response to an I-CSCF within the operator's network.
>   - Depending on operator policy, forward the SIP request or response to another SIP server located within an ISP domain outside of the IM CN subsystem.
>   - Forward the SIP request or response to a BGCF for call routing to the PSTN or CS Domain.
>   - Ensure the originating end point is subscribed to the determined IMS communication service.

[67]

---

67 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/18.10.00_60/ts_123228v181000p.pdf, at 51

### 4.2.4 IP multimedia Subsystem Service Control Interface (ISC)

The ISC interface is between the Serving CSCF and the service platform(s).

An Application Server (AS) offering value added IM services resides either in the user's home network or in a third party location. The third party could be a network or simply a stand-alone AS.

The Serving-CSCF to AS interface is used to provide services residing in an AS. Two cases were identified:

- Serving-CSCF to an AS in Home Network.
- Serving-CSCF to an AS in External Network (e.g. Third Party or Visited)

The SIP Application Server may host and execute services. The SIP Application Server can influence and impact the SIP session on behalf of the services and it uses the ISC interface to communicate with the S-CSCF. The S-CSCF shall be able to supply the AS with information to allow it to execute multiple services in order within a single SIP transaction.

***ETSI***

**3GPP TS 23.228 version 18.10.0 Release 18 32 ETSI TS 123 228 V18.10.0 (2025-07)**

The ISC interface shall be able support subscription to event notifications between the Application Server and S-CSCF to allow the Application Server to be notified of the implicit registered Public User Identities, registration state and UE capabilities and characteristics in terms of SIP User Agent capabilities and characteristics.

The S-CSCF shall decide whether an Application Server is required to receive information related to an incoming initial SIP request to ensure appropriate service handling. The decision at the S-CSCF is based on (filter) information received from the HSS. This filter information is stored and conveyed on a per Application Server basis for each user. It shall be possible to include a service indication in the filter information, which is used to identify services and the order that they are executed on an Application Server within a single SIP transaction. The name(s)/address(es) information of the Application Server (s) are received from the HSS.[68]




**Figure 5.19g: Application Server termination**

[68] *Id.* at 31-32

1. I-CSCF receives a request destined to the user.

2-3. I-CSCF queries HSS in order to determine the next hop in the routing path for the user.

4. HSS determines the routing information, which is the S-CSCF defined for the user.

5. HSS returns the S-CSCF address/capabilities to the I-CSCF.

6-7. I-CSCF, as per existing procedures, forwards the request to S-CSCF that will handle the session termination.

8. S-CSCF evaluates the filter criteria and gets the AS address where to forward the request.

9. The request is then routed towards the AS identified by the filter criteria. The AS terminates the session instead of allowing it to continue on to the address end user.

10-12. Session setup continues as per existing procedures. [69]

69. The Accused Products perform the step of receiving a special code that is sent from the decline destination gateway to the originating gateway in response to the call setup request; and sending a call decline message from the originating gateway to the customer in response to receipt of the special code. For example, when a user initiates a call, the SIP INVITE generated by the user's mobile device is transported through Verizon's 5G network to the IMS Core, where the Serving-CSCF (S-CSCF) processes the request and communicates with the SIP Application Server over the standardized ISC interface defined in 3GPP TS 23.228. As illustrated in TS 23.228 §4.2.4, the Application Server may operate as a terminating User Agent (UA) or redirect server, allowing it to receive the SIP INVITE and execute service-specific call processing on behalf of the IMS network. Consistent with RFC 3261, the terminating User Agent Server (UAS) generates an appropriate SIP response after processing the INVITE, including successful (2xx) responses or rejection/redirect responses (3xx, 4xx, 5xx, or 6xx), depending on the applicable service logic and call-handling outcome. The generated SIP response is returned through the S-CSCF over the IMS signaling path to the originating mobile device, thereby informing the originating endpoint of the result of the call setup attempt.

[69] *Id.* at 141

> Besides the Cx interface the S-CSCF supports only one standardised protocol for service control, which delegates service execution to an Application Server. The protocol to be used on the ISC interface shall be SIP (as defined by IETF RFC 3261 [12], other relevant IETF RFC's, and additional enhancements introduced to support 3GPP´s needs on the Mw, Mm, Mg interfaces).




**Figure 4.3a: Application Server acting as terminating UA, or redirect server** [70]

> **8 General User Agent Behavior**
>
> A user agent represents an end system. It contains a user agent client (UAC), which generates requests, and a user agent server (UAS), which responds to them. A UAC is capable of generating a request based on some external stimulus (the user clicking a button, or a signal on a PSTN line) and processing a response. A UAS is capable of receiving a request and generating a response based on user input, external stimulus, the result of a program execution, or some other mechanism. [71]

> When a user agent client desires to initiate a session (for example, audio, video, or a game), it formulates an INVITE request. The INVITE request asks a server to establish a session. This request may be forwarded by proxies, eventually arriving at one or more UAS that can potentially accept the invitation. These UASs will frequently need to query the user about whether to accept the

[70] *Id.* at 32-33
[71] https://datatracker.ietf.org/doc/html/rfc3261, at 34

> invitation. After some time, those UASs can accept the invitation (meaning the session is to be established) by sending a 2xx response. If the invitation is not accepted, a 3xx, 4xx, 5xx or 6xx response is sent, depending on the reason for the rejection. Before sending a final response, the UAS can also send provisional responses (1xx) to advise the UAC of progress in contacting the called user.

[72]

> ### 4.2.4 IP multimedia Subsystem Service Control Interface (ISC)
>
> The ISC interface is between the Serving CSCF and the service platform(s).
>
> An Application Server (AS) offering value added IM services resides either in the user's home network or in a third party location. The third party could be a network or simply a stand-alone AS.
>
> The Serving-CSCF to AS interface is used to provide services residing in an AS. Two cases were identified:
>
> - Serving-CSCF to an AS in Home Network.
> - Serving-CSCF to an AS in External Network (e.g. Third Party or Visited)
>
> The SIP Application Server may host and execute services. The SIP Application Server can influence and impact the SIP session on behalf of the services and it uses the ISC interface to communicate with the S-CSCF. The S-CSCF shall be able to supply the AS with information to allow it to execute multiple services in order within a single SIP transaction.
>
> ***ETSI***
>
> **3GPP TS 23.228 version 18.10.0 Release 18 32 ETSI TS 123 228 V18.10.0 (2025-07)**
>
> The ISC interface shall be able support subscription to event notifications between the Application Server and S-CSCF to allow the Application Server to be notified of the implicit registered Public User Identities, registration state and UE capabilities and characteristics in terms of SIP User Agent capabilities and characteristics.
>
> The S-CSCF shall decide whether an Application Server is required to receive information related to an incoming initial SIP request to ensure appropriate service handling. The decision at the S-CSCF is based on (filter) information received from the HSS. This filter information is stored and conveyed on a per Application Server basis for each user. It shall be possible to include a service indication in the filter information, which is used to identify services and the order that they are executed on an Application Server within a single SIP transaction. The name(s)/address(es) information of the Application Server (s) are received from the HSS.

[73]

70. By way of further example, when the SIP Application Server completes service processing over the standardized ISC interface, it returns the resulting SIP response to the Serving-CSCF (S-CSCF) in accordance with the procedures defined in 3GPP TS 23.228. The S-CSCF subsequently forwards the SIP response toward the Proxy-CSCF (P-CSCF), which serves as the first IMS contact point for the User Equipment (UE). As described in 3GPP TS 23.228 §§4.6.3

---

[72] *Id.* at 77-78

[73] https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/18.10.00_60/ts_123228v181000p.pdf, at 31-32

and 4.6.1, the P-CSCF forwards SIP requests and SIP responses between the IMS Core and the UE, enabling the response generated by the Application Server to be delivered to the originating device. Where the Application Server returns a rejection or service-specific SIP response based on the executed service logic, that response is conveyed through the S-CSCF and P-CSCF to notify the calling user of the unsuccessful call establishment.

> 4.2.4 IP multimedia Subsystem Service Control Interface (ISC)
>
> The ISC interface is between the Serving CSCF and the service platform(s).
>
> An Application Server (AS) offering value added IM services resides either in the user's home network or in a third party location. The third party could be a network or simply a stand-alone AS.
>
> The Serving-CSCF to AS interface is used to provide services residing in an AS. Two cases were identified:
>
> - Serving-CSCF to an AS in Home Network.
> - Serving-CSCF to an AS in External Network (e.g. Third Party or Visited)
>
> The SIP Application Server may host and execute services. The SIP Application Server can influence and impact the SIP session on behalf of the services and it uses the ISC interface to communicate with the S-CSCF. The S-CSCF shall be able to supply the AS with information to allow it to execute multiple services in order within a single SIP transaction.
>
> ETSI
>
> 3GPP TS 23.228 version 18.10.0 Release 18 32 ETSI TS 123 228 V18.10.0 (2025-07)
>
> The ISC interface shall be able support subscription to event notifications between the Application Server and S-CSCF to allow the Application Server to be notified of the implicit registered Public User Identities, registration state and UE capabilities and characteristics in terms of SIP User Agent capabilities and characteristics.
>
> The S-CSCF shall decide whether an Application Server is required to receive information related to an incoming initial SIP request to ensure appropriate service handling. The decision at the S-CSCF is based on (filter) information received from the HSS. This filter information is stored and conveyed on a per Application Server basis for each user. It shall be possible to include a service indication in the filter information, which is used to identify services and the order that they are executed on an Application Server within a single SIP transaction. The name(s)/address(es) information of the Application Server (s) are received from the HSS.

[74]

> 4.6.3 Serving-CSCF
>
> The Serving-CSCF (S-CSCF) performs the session control services for the UE. It maintains a session state as needed by the network operator for support of the services. Within an operator's network, different S-CSCFs may have different functionalities. The functions performed by the S-CSCF during a session are:

[74] *Id.* at 31-32

- For a destination endpoint (i.e. the terminating user/UE)
  - Forward the SIP request or response to a P-CSCF.
  - Modify the SIP request for routing an incoming session to CS domain according to HSS and service control interactions, if the user is to receive the incoming session via the CS domain.
  - Forward the SIP request or response to a BGCF for call routing to the PSTN or the CS domain.
  - Ensure the terminating end point is subscribed to the determined IMS communication service.
  - Ensure that the content of SIP request or response (e.g. value included in Content-Type SIP header, media lines included in SDP) sent or received by the destination end point matches the determined IMS communication service definition, based on terminating user's subscription.
  - If the SIP request contains preferences for characteristics of the destination endpoint, perform preference and capability matching as specified in IETF RFC 3312 [41].
  - Optionally for a redirected session, if configured through operator policies, performs attestation of the identity of the diverting subscriber initiating the diversion.
  - Proxies a terminating request to an AS associated with the terminating user for signature verification if signature verification is required.

[75]

## 4.6 Roles of Session Control Functions

### 4.6.0 General

The CSCF may take on various roles as used in the IP multimedia subsystem. The following clauses describe these various roles.

### 4.6.1 Proxy-CSCF

The Proxy-CSCF (P-CSCF) is the first contact point within the IM CN subsystem. Its address is discovered by UEs using the mechanism described in the clause "Procedures related to Local CSCF Discovery". The P-CSCF behaves like a Proxy (as defined in IETF RFC 3261 [12] or subsequent versions), i.e. it accepts requests and services them internally or forwards them on. The P-CSCF shall not modify the Request URI in the SIP INVITE message. The P-CSCF may behave as a User Agent (as defined in the IETF RFC 3261 [12] or subsequent versions), i.e. in abnormal conditions it may terminate and independently generate SIP transactions.

NOTE 1: When requests are sent towards another domain they may, if required, be routed via a local network exit point (IBCF), which will then forward the request to the entry point of the other domain. More details on this can be found in clause 4.14 and Annex I.

The P-CSCF in the role of an AF may interact with the Policy and Charging Architecture; the P-CSCF may interact over the Rx interface (see TS 29.214 [11]) with the Policy and Charging Architecture defined in TS 23.203 [54]; the P-CSCF may interact over the Rx interface (see TS 29.214 [11]) or over the N5 interface (using the Npcf_PolicyAutorization service, see TS 29.514 [96]) with the Policy and Charging Architecture defined in TS 23.503 [95].

The functions performed by the P-CSCF are:

- Forward the SIP register request received from the UE to an entry point determined using the home domain name, as provided by the UE.
- Forward SIP messages received from the UE to the SIP server (e.g. S-CSCF) whose name the P-CSCF has received as a result of the registration procedure.
- Ensure that the SIP messages received from the UE to the SIP server (e.g. S-CSCF) contain the correct or up to date information about the access network type currently used by the UE, when the information is available from the access network. Depending on operator policies, the P-CSCF may insert in any SIP message (request or response) the access network type currently used by the UE, when the information is available from the access network.

[76]

[75] *Id.* at 51
[76] *Id.* at 49

71. Defendants have and continue to indirectly infringe one or more claims of the ’062 Patent by knowingly and intentionally inducing others, including Verizon customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

72. Defendants, with knowledge that these products, or the use thereof, infringe the ’062 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continue to knowingly and intentionally induce, direct infringement of the ’062 Patent by providing these products to end-users for use in an infringing manner. Alternatively, on information and belief, Defendants have adopted a policy of not reviewing the patents of others, and instructing their officers, agents, and employees to not review the patents of others, including specifically those related to Defendants’ specific industry, thereby remaining willfully blind to the ’062 at least as early as the issuance of the ’062 Patent.

73. Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the ’062 Patent, but while remaining willfully blind to the infringement. Defendants have and continue to induce infringement by their customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants’ website, product literature and packaging, and other publications, including Defendants’ materials cited in this Complaint. On information and belief, operation of the Accused Products and services offered by Defendants necessarily infringe the ’062 Patent.

74. On information and belief, Defendants directly prepare and/or assist in the preparation of, and provide customers and end-users with, information and documents for their specific products. On information and belief, Defendants' product literature and other product information documents are prepared by or under the direction of Defendants to instruct customers and end-users on how to use the Accused Products in an infringing manner.

75. Because of Defendants' inducement, Defendants' customers and end-users use Accused Products in a way Defendants intend and directly infringe the '062 Patent. Defendants perform these affirmative acts with knowledge of the '062 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '062 Patent.

76. Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '062 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '062 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '062 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be especially made or adapted for use in the infringement of the '062 Patent. The accused components include, but are not limited to, components necessary for the operation of Defendants infringing systems including, but not limited to, the Accused Products, such as hardware and software components of Verizon's 5G network with IMS-based VoNR/VoLTE services, a 5G Core, and IMS network. Defendants perform these affirmative acts with knowledge of the '062 Patent and with intent, or

willful blindness, that they cause the direct infringement of the ’062 Patent.

77. SLR has suffered damages as a result of Defendants’ direct infringement of the ’062 Patent in an amount to be proven at trial.

78. SLR has suffered, and will continue to suffer, irreparable harm as a result of Defendants’ infringement of the ’062 Patent, for which there is no adequate remedy at law, unless Defendants’ infringement is enjoined by this Court.

## COUNT IV
## (Infringement of the ’771 Patent)

79. Paragraphs 1 through 31 are incorporated by reference as if fully set forth herein.

80. SLR has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the ’771 Patent.

81. Defendants have and continue to directly infringe the ’771 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the ’771 Patent. Such infringing products include the Accused Products and all associated hardware and software.

82. For example, Defendants have and continue to directly infringe at least Claim 11 of the ’771 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include the Accused Products, such as Verizon’s 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR.

83. The Accused Products perform a method of initiating a telecommunication connection between two or more participants, comprising: a telecommunication manager initiating a telecommunication by causing, using at least one processor, a request to be sent to each of the two or more participants based on information obtained from a plurality of participant records

stored in one or more data storage devices, each participant record of the plurality of participant records comprising at least one participant identifier for identifying a participant of the two or more participants as being associated with a respective participant record of the plurality of participant records. For example, Verizon operates 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR calling. Verizon's IMS architecture supports packetized voice services over both LTE and 5G NR access. Verizon operates a 5G network based on a Service Based Architecture (SBA) that enables network functions within the 5G Core to communicate through service based interfaces. Verizon 5G Core architecture uses cloud native network functions to support services including authentication, mobility management, session management, and data connectivity. Verizon 5G Core, which operates as an IMS-based SIP platform for VoNR/VoLTE services using SIP for session signaling, handles signaling messages between mobile networks through IMS interconnect functions. The 3GPP TS 23.228 further identifies an IMS architecture capable of operating using Service Based Architecture in conjunction with the 5G Core. Annex AA.1.0 expressly describes support for Service Based Architecture for IMS nodes and states that the architecture is intended for use with the 5G Core. Annex AA.1.1 further depicts Service Based Architecture interactions among IMS entities, including the P CSCF, S CSCF, HSS, Policy Control Function, Media Function, and Application Server. Thus, the Verizon 5G Standalone environment provides the 5G network and IMS infrastructure through which the claimed telecommunication connection can be established. The 3GPP TS 23.228 defines an IMS architecture comprising functional entities, including support for a Three-way Session. The disclosure of 3GPP TS 23.228 defines an UE which initiates the telecommunication session by causing SIP INVITE requests to be sent to each participant (e.g., first to party A and then to party B in a three-way session). These requests are generated and

processed through network elements including the Serving-CSCF (S-CSCF), handling session control and signaling. Further, prior to routing the SIP INVITE request, the S-CSCF performs an analysis of the destination address and, via the I-CSCF, queries the Home Subscriber Server (HSS) to obtain subscriber information and current location data. The HSS stores subscriber profiles, each including identifiers (e.g., public user identities) that uniquely identify participants. Based on this retrieved information, the network routes and sends the SIP INVITE request to the appropriate participants. The standard discloses initiating a telecommunication by causing requests to be sent to multiple participants based on information obtained from stored participant records.

> Verizon offered a glimpse under the hood in late 2022 when it announced that it was starting to move commercial traffic to its 5G core—a key component of the network—which features an all-new design that could support standalone and non-standalone 5G, among other advanced technologies. That's an exciting leap forward, but what do those things really mean, and why do they matter for businesses and consumers?[77]



**Verizon IMS Cell Towers**

**02-27-2023**

Cell site with performance enhancement technology that gives Verizon engineers more leeway to adjust performance based on where customers move and how they use data in various sectors[78]

[77] https://www.verizon.com/about/news/5g-standalone-why-it-matters
[78] https://www.verizon.com/about/news/feed/media-resources/attachment/016-verizon-ims-cell-towers242868

## 5G standalone: What sets Verizon apart

Verizon's 5G core—and thus its 5G SA technology—is built on a cloud-based platform that Verizon created specifically for telecommunications workloads. No other telecommunications company has taken this step (others are using cloud systems from outside providers). Because it's built specifically for telecommunications workloads, it can support the advanced technologies and services that provide the reliability and performance customers expect now, as well as what they'll need in the future. [79]

### The 5G core is built on the Verizon Cloud Platform

Verizon has officially begun moving customer traffic onto its cloud-native, containerized-design 5G core. Doing so will deliver "unprecedented levels of service agility, flexibility and automated scalability," said the carrier.

The 5G core is built on the Verizon Cloud Platform (VCP), which is an internally built telco cloud base on a Webscale software architecture that the carrier runs in its data centers. The VCP, said Verizon, will enable support for 5G standalone, 4G/5G Non-Standalone and Voice over New Radio (VoNR) services. [80]

Entner added Verizon's SA 5G core will allow the operator to take advantage of all of the "goodies" in 3GPP's Release-17 and Release-18 specifications. [81]

[79] https://www.verizon.com/about/news/5g-standalone-why-it-matters
[80] https://www.rcrwireless.com/20221014/featured/now-is-the-time-verizon-migrates-commercial-traffic-to-5g-core
[81] https://www.samenacouncil.org/samena_daily_news?news=92282

## AA.1.0 Overview

This Annex AA describes support for SBA for IMS nodes. This Annex is intended to be used in conjunction with 5GC.

## AA.1.1 Architectural Support

Figure AA.1.1-1 shows the architecture to support SBA interactions between IMS entities.




**Figure AA.1.1-1: System Architecture to support SBA in IMS**

NOTE 1: The DCSF and MRF supports NF registration and discovery, but they do not provide services in this release of the specification.

NOTE 2: Nimsas services are defined in the context of IMS Data Channel, see clause AA.2.4.

NOTE 3: If an SCP is deployed, the SCP can be used for indirect communication between NFs and NF services as described in Annex E of TS 23.501 [93]. [82]

## 4.0 General

The IP Multimedia CN subsystem comprises all CN elements for provision of multimedia services. This includes the collection of signalling and media related network elements as defined in TS 23.002 [1]. IP multimedia services are based on an IETF defined session control capability which, along with multimedia transport capabilities, utilises the IP-Connectivity Access Network (this may include an equivalent set of services to the relevant subset of CS Services).

In order to achieve access independence and to maintain a smooth interoperation with wireline terminals across the Internet, the IP multimedia subsystem attempts to be conformant to IETF "Internet standards". Therefore, the interfaces specified conform as far as possible to IETF "Internet standards" for the cases where an IETF protocol has been selected, e.g. SIP and RTP.

The IP multimedia core network (IM CN) subsystem enables operators to offer their subscribers multimedia services. The IM CN subsystem should enable the convergence of, and access to, voice, video, messaging, data and web-based technologies for the wireless and wireline user.

The complete solution for the support of IP multimedia applications consists of terminals, IP-Connectivity Access Networks (IP-CAN), and the specific functional elements of the IM CN subsystem described in this technical specification. Examples of IP-Connectivity Access Network are:

- the GPRS core network with GERAN and/or UTRAN radio access networks; and
- EPC core network and E-UTRAN radio access network; and
- 5GS access network.

Figure 4.0 below represents the IMS reference architecture including interfaces towards CS network and other IP based multimedia Networks. Details of the roles of these nodes are described in clauses 4.6, 4.7 and 4.7a. [83]

[82] https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 358

[83] https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/18.10.00_60/ts_123228v181000p.pdf, at 27




**Figure 4.0: Reference Architecture of the IP Multimedia Core Network Subsystem**

84

5.11.6.2.3 Three-way Session

A three-way session starts with an existing session, between the Initiator (I) and party (A). The initiator places this session on hold and establishes a second session with party (B). The initiator then decides to create an ad-hoc conference of all three parties.

From the point where the initiator decides to create the ad-hoc conference, shown in the leftmost diagram below, the initiator establishes another session with a third-party conference bridge service. This is shown in the centre diagram. The initiator then transfers both of the existing sessions, I->A and I->B, to the bridge, ending in the configuration shown in the rightmost diagram.




85

84. By way of further example, the 3GPP TS 23.228 defines an IMS architecture comprising functional entities, including support for a Three-way Session. The disclosure of 3GPP TS 23.228 defines an UE which initiates the telecommunication session by causing SIP INVITE requests to be sent to each participant (e.g., first to party A and then to party B in a three-way

84 *Id.* at 28

85 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 189

session). These requests are generated and processed through network elements including the Serving-CSCF (S-CSCF), handling session control and signaling. Further, prior to routing the SIP INVITE request, the S-CSCF performs an analysis of the destination address and, via the I-CSCF, queries the Home Subscriber Server (HSS) to obtain subscriber information and current location data. The HSS stores subscriber profiles each including identifiers (e.g., public user identities) that uniquely identify participants. Based on this retrieved information, the network routes and sends the SIP INVITE request to the appropriate participants. The Annex AA evidence shows an SBA based IMS architecture in which IMS entities, including the P CSCF, I/S CSCF, HSS, MF, DCSF, and AS, interact through defined SBA interfaces. Accordingly, the standard discloses initiating a telecommunication by causing requests to be sent to multiple participants based on information obtained from stored participant records.

5.11.6.2.3 Three-way Session

A three-way session starts with an existing session, between the Initiator (I) and party (A). The initiator places this session on hold and establishes a second session with party (B). The initiator then decides to create an ad-hoc conference of all three parties.

From the point where the initiator decides to create the ad-hoc conference, shown in the leftmost diagram below, the initiator establishes another session with a third-party conference bridge service. This is shown in the centre diagram. The initiator then transfers both of the existing sessions, I->A and I->B, to the bridge, ending in the configuration shown in the rightmost diagram.




The conference bridge service is in control of the termination sequence. On termination of one of the three sessions, it may either terminate the other two sessions by use of the session clearing procedures of clause 5.11, or may utilize the procedures of clause 5.11.6.2.1 above to transfer one of the remaining endpoints to the other, resulting in a simple two-party session.[86]

86 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 189-190

## 5.5 Serving-CSCF/MGCF to serving-CSCF/MGCF procedures

### 5.5.0 General

This clause presents the detailed application level flows to define the procedures for Serving-CSCF/MGCF to Serving-CSCF/MGCF.

In the IM CN subsystem the MGCF is considered as a SIP endpoint. It translates ISUP/BICC messages of the PSTN side to SIP signalling of the IM CN subsystem side and vice-versa. It should also be noted that the MGCF does not invoke Service Control.

This clause contains four session flow procedures, showing variations on the signalling path between the Serving-CSCF that handles session origination and the Serving-CSCF that handles session termination. This signalling path depends on:

- whether the originator and destination are served by the same network operator,
- whether the network operators have chosen to hide their internal configuration.

The Serving-CSCF handling session origination performs an analysis of the destination address and determines whether it is a subscriber of the same network operator or a different operator.

If the analysis of the destination address determined that it belongs to a subscriber of a different operator, the request is forwarded) to a well-known entry point in the destination operator's network, the I-CSCF. The I-CSCF queries the HSS for current location information. The I-CSCF then forwards the request to the S-CSCF. If the analysis of the destination address determines that it belongs to a subscriber of the same operator, the S-CSCF passes the request to a local I-CSCF, who queries the HSS for current location information. The I-CSCF then forwards the request to the S-CSCF. [87]

### 5.5.2 (S-S#2) Single network operator performing origination and termination

The Serving-CSCF handling session origination performs an analysis of the destination address and determines that it belongs to a subscriber of the same operator. The request is therefore forwarded to a local I-CSCF. The I-CSCF queries the HSS for current location information and finds the user either located in the home service area, or roaming. The I-CSCF therefore forwards the request to the S-CSCF serving the destination user.

87 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 112




**Figure 5.11: Serving to serving procedure - same operator**

Procedure S-S#2 is as follows:

1. The SIP INVITE request is sent from the UE to S-CSCF#1 by the procedures of the originating flow. This message should contain the initial media description offer in the SDP.
2. S-CSCF#1 invokes whatever service logic is appropriate for this session setup attempt
3. S-CSCF#1 performs an analysis of the destination address and determines the network operator to whom the subscriber belongs. Since it is local, the request is passed to a local I-CSCF.
4. I-CSCF shall query the HSS for current location information.

***ETSI***

**3GPP TS 23.228 version 19.6.0 Release 19 117 ETSI TS 123 228 V19.6.0 (2026-03)**

5. HSS responds with the address of the current Serving-CSCF for the terminating user.
6. I-CSCF forwards the INVITE request to the S-CSCF (S-CSCF#2) that will handle the session termination.
7. S-CSCF#2 invokes whatever service logic is appropriate for this session setup attempt
8. The sequence continues with the message flows determined by the termination procedure. [88]

## 5.4.6 End-user preferences and terminal capabilities

### 5.4.6.0 General

Due to different capabilities of the originating and terminating terminals, it might not be possible to establish all the media suggested by the originator for a particular session. In addition, the destination user may have different preferences of type of media depending on who is originating and on the situation e.g. being in a meeting or driving the car, etc.

### 5.4.6.1 Objectives

The general objectives concerning terminal capabilities and end-user behaviour are listed below.

- The capabilities of the terminal have impact on the SDP description in the SIP session flows, since different terminals may support different media types (such as video, audio, application or data) and may have implemented different set of codecs for audio and video. Note that the capabilities of the terminal may change when an external device, such as a video camera is attached to the terminal.
- The configuration of the terminal changes the capabilities of the terminal. This can be done by attaching external devices or possibly by a user setting of certain parameters or profiles in the terminal.

[88] *Id.* at 114-117

- The preferences of the destination user may depend on who is originating the session and on the situation. Cost, associated with the session, may also be another factor, i.e. depending on time of the day or day of the week etc. Due to this reason the user may want to accept or reject certain media components.

- The available resources in the network play an important role, as certain media streams, consuming high bandwidth, may be denied. Therefore, before the user is alerted that the session set up is successful, it is assumed that the network has guaranteed and has reserved the needed resources for one or several media streams of the session. This does not preclude the possibility for the user to indicate his/her preferences regarding the session also after the alerting, in which case the initial resource reservations may have to be modified.

- End-to-end quality of service may be provided by using a variety of mechanisms, including guaranteed end-to-end QoS and best effort. The network may not be able to guarantee the requested end-to-end QoS. This may be the case when the user is establishing sessions through the public Internet. On the other hand, certain sessions, with the agreement of the initiating and terminating endpoints, should have the right to go through even without having the requested QoS guarantee.

### 5.4.6.2 End-user expectations

From the end-user point of view the following user interactions can be listed:

- For outgoing sessions, it is assumed that the user would like to select certain parameters that define the proposed session. This can be pre-configured as preferences or defined on a per session basis.

- For incoming sessions, it is assumed that the terminal will establish a dialogue with the user. Such dialogue allows the user to manually accept some of the proposed parameters by the originator. This is typically media type (audio, video, whiteboard) and different quality parameters per media type. As an alternative, the user preferences may be pre-configured.

- Before establishing or accepting a new session, the user may define or agree on the following parameters. Some of these parameters may be pre-configured and others are defined on a per session basis.

  1. Type of media, i.e. audio, video, whiteboard, etc. This represents the user preferences of media types.

  2. Combination of QoS attributes and selection of codec. This represents the quality of the media component, the cost and the probability of availability of resources both in the access network and in the core network.

  3. Subset of capabilities used in the terminal. Terminals can have different set of capabilities. However, the user may or may not want to use the maximum set of capabilities. For instance, a user might want to establish a low cost video session with a small window on the screen.

  4. End-to-end quality of service. For certain media streams, the user may want assured end-to-end QoS while for other streams the QoS may be optional or even not desired at all (best effort). [89]

[89] *Id.* at 94-95

AA.2.4.4.2 Nimsas_ImsSessionManagement_Create service operation

**Service operation name:** Nimsas_ImsSessionManagement_Create

**Description:** This service enables the consumer NF to create an IMS session with the requested media (e.g. standalone data channel media).

NOTE 1: Only data channel media is supported in this Release.

**Inputs, Required:** Calling ID, Called ID, Media Information set.

**Calling ID:** It is the public identity of calling IMS Subscriber or the identity of the consumer NF, e.g. DC AS.

**Called ID:** It is the public identity of called IMS Subscriber.

**Media Information set:** Includes a set of media information indicating how the media used in the created session. Each media information contains:

- **Media Correlation ID**: It identifies the media stream to be created. It is allocated by the consumer NF.
- **Media Type:** It indicates the media type used in the created session, e.g. Data Channel.
- **Media Parameter set:** It indicates the related media parameters. For different media, it contains different parameters.
  - When the Media Type is Data Channel, it includes:
    - DC Type: indicates the Data Channel Type (ADC or BDC);
    - When DC Type is ADC:
      - ADC Type: the ADC type (P2A, P2P, P2A2P);
      - Application Binding Information; and
      - Target ID(s): the public identity(ies) of the IMS Subscriber the DC is targeted;

NOTE 2: For P2P ADC, the Calling ID and Called ID of the session are used as the Target IDs.

      - If P2A or P2A2P is selected, the MDC2 media endpoint address(es) of the application layer is included.
    - When DC Type is BDC:
      - Target ID: the public identity of the IMS Subscriber the DC is targeted.

**Inputs, Optional:** Notification Target Address and Notification Correlation ID.

If the request includes a Notification Target Address, the request creates an implicit subscription to be notified for the events in Table AA.2.4.4.5-1.

**Outputs, Required:** Result indication.

**Outputs, Optional:** Session ID allocated by IMS AS. [90]

[90] https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 361-362




**Figure 4.3.1-1: Non-roaming architecture for interworking between 5GS and EPC/E-UTRAN** [91]

85. The Accused Products perform the step wherein each of the plurality of participant records includes indications of a preferred form of telecommunication for the respective participant associated with the respective participant record of the plurality of participant records. For example, user preferences and terminal capabilities are maintained and used in session establishment. These preferences include, for example, preferred media types (e.g., audio, video, whiteboard), quality parameters (e.g., QoS attributes, codec selection), and other configuration settings that define how a telecommunication session is to be conducted. Such preferences may be pre-configured by the user or dynamically determined based on context (e.g., whether the user is in a meeting or driving), and are considered during session setup via SIP/SDP negotiation. Since these preferences are associated with individual users/subscribers and are retrieved and applied during session establishment (e.g., via HSS-supported subscriber data and terminal capability handling). The Annex AA shows an SBA based IMS architecture in which IMS entities, including the P CSCF, I/S CSCF, HSS, MF, DCSF, and AS, interact through defined SBA interfaces. Each

91 https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/19.07.00_60/ts_123501v190700p.pdf, at 81

participant has associated stored information reflecting preferred communication forms (e.g., media type, quality, and configuration).

## AA.1.0 Overview

This Annex AA describes support for SBA for IMS nodes. This Annex is intended to be used in conjunction with 5GC.

## AA.1.1 Architectural Support

Figure AA.1.1-1 shows the architecture to support SBA interactions between IMS entities.




**Figure AA.1.1-1: System Architecture to support SBA in IMS**

NOTE 1: The DCSF and MRF supports NF registration and discovery, but they do not provide services in this release of the specification.

NOTE 2: Nimsas services are defined in the context of IMS Data Channel, see clause AA.2.4.

NOTE 3: If an SCP is deployed, the SCP can be used for indirect communication between NFs and NF services as described in Annex E of TS 23.501 [93]. [92]

**Table AA.2.1.3.1-1: IMS Subscriber data types**

| IMS Subscriber data | Description |
|---|---|
| Service Profile Data | This may include e.g. service parameters, the S-CSCF allocated to a public identity or the list of S-CSCFs and their capabilities, Application Server address, triggers, information on subscribed media, profile parameters (e.g. barring indicator, etc.) as defined in TS 29.228 [30].<br><br>**Service Profile Data is consumed by CSCF.** |

[93]

92 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, page 348

93 *Id.* at 353

### 5.4.6 End-user preferences and terminal capabilities

#### 5.4.6.0 General

Due to different capabilities of the originating and terminating terminals, it might not be possible to establish all the media suggested by the originator for a particular session. In addition, the destination user may have different preferences of type of media depending on who is originating and on the situation e.g. being in a meeting or driving the car, etc.

#### 5.4.6.1 Objectives

The general objectives concerning terminal capabilities and end-user behaviour are listed below.

- The capabilities of the terminal have impact on the SDP description in the SIP session flows, since different terminals may support different media types (such as video, audio, application or data) and may have implemented different set of codecs for audio and video. Note that the capabilities of the terminal may change when an external device, such as a video camera is attached to the terminal.

- The configuration of the terminal changes the capabilities of the terminal. This can be done by attaching external devices or possibly by a user setting of certain parameters or profiles in the terminal.

- The preferences of the destination user may depend on who is originating the session and on the situation. Cost, associated with the session, may also be another factor, i.e. depending on time of the day or day of the week etc. Due to this reason the user may want to accept or reject certain media components.

- The available resources in the network play an important role, as certain media streams, consuming high bandwidth, may be denied. Therefore, before the user is alerted that the session set up is successful, it is assumed that the network has guaranteed and has reserved the needed resources for one or several media streams of the session. This does not preclude the possibility for the user to indicate his/her preferences regarding the session also after the alerting, in which case the initial resource reservations may have to be modified.

- End-to-end quality of service may be provided by using a variety of mechanisms, including guaranteed end-to-end QoS and best effort. The network may not be able to guarantee the requested end-to-end QoS. This may be the case when the user is establishing sessions through the public Internet. On the other hand, certain sessions, with the agreement of the initiating and terminating endpoints, should have the right to go through even without having the requested QoS guarantee.

#### 5.4.6.2 End-user expectations

From the end-user point of view the following user interactions can be listed:

- For outgoing sessions, it is assumed that the user would like to select certain parameters that define the proposed session. This can be pre-configured as preferences or defined on a per session basis.

- For incoming sessions, it is assumed that the terminal will establish a dialogue with the user. Such dialogue allows the user to manually accept some of the proposed parameters by the originator. This is typically media type (audio, video, whiteboard) and different quality parameters per media type. As an alternative, the user preferences may be pre-configured.

- Before establishing or accepting a new session, the user may define or agree on the following parameters. Some of these parameters may be pre-configured and others are defined on a per session basis.

  1. Type of media, i.e. audio, video, whiteboard, etc. This represents the user preferences of media types.

  2. Combination of QoS attributes and selection of codec. This represents the quality of the media component, the cost and the probability of availability of resources both in the access network and in the core network.

  3. Subset of capabilities used in the terminal. Terminals can have different set of capabilities. However, the user may or may not want to use the maximum set of capabilities. For instance, a user might want to establish a low cost video session with a small window on the screen.

  4. End-to-end quality of service. For certain media streams, the user may want assured end-to-end QoS while for other streams the QoS may be optional or even not desired at all (best effort).

[94]

[94] *Id.* at 94-95.

86. The Accused Products perform the step wherein at least one respective participant of the two or more participants is associated with their own respective participant record of the plurality of participant records identified by the at least one participant identifier. For example, each participant (e.g., UE/subscriber) in the IMS network is uniquely associated with subscriber data stored in the Home Subscriber Server (HSS). When a session is initiated, the Serving-CSCF (S-CSCF) can analyze the destination address and uses it to query the HSS via the I-CSCF. The HSS returns the subscriber-specific information corresponding to that identified user, thereby linking the participant to their respective stored record. Further, NhsS_ImsSDM_Get enables an NF consumer to fetch service profile data for an IMS User, with the requested IMS Subscriber data retrieved using a key for the respective IMS Subscriber data type. The associated Service Profile Data may include service parameters, an S-CSCF allocated to a public identity, information on subscribed media, and profile parameters. Thus, the evidence indicates that subscriber specific profile data is maintained and retrieved for an identified IMS user, with the public identity providing an identifier associated with that subscriber. Thus, each respective participant of the two or more participants is associated with their own respective participant record, and that record is identified and accessed using the participant identifier.

5.11.6.2.3 Three-way Session

A three-way session starts with an existing session, between the Initiator (I) and party (A). The initiator places this session on hold and establishes a second session with party (B). The initiator then decides to create an ad-hoc conference of all three parties.

From the point where the initiator decides to create the ad-hoc conference, shown in the leftmost diagram below, the initiator establishes another session with a third-party conference bridge service. This is shown in the centre diagram. The initiator then transfers both of the existing sessions, I->A and I->B, to the bridge, ending in the configuration shown in the rightmost diagram.



The conference bridge service is in control of the termination sequence. On termination of one of the three sessions, it may either terminate the other two sessions by use of the session clearing procedures of clause 5.11, or may utilize the procedures of clause 5.11.6.2.1 above to transfer one of the remaining endpoints to the other, resulting in a simple two-party session.[95]

## 5.5 Serving-CSCF/MGCF to serving-CSCF/MGCF procedures

### 5.5.0 General

This clause presents the detailed application level flows to define the procedures for Serving-CSCF/MGCF to Serving-CSCF/MGCF.

In the IM CN subsystem the MGCF is considered as a SIP endpoint. It translates ISUP/BICC messages of the PSTN side to SIP signalling of the IM CN subsystem side and vice-versa. It should also be noted that the MGCF does not invoke Service Control.

This clause contains four session flow procedures, showing variations on the signalling path between the Serving-CSCF that handles session origination and the Serving-CSCF that handles session termination. This signalling path depends on:

- whether the originator and destination are served by the same network operator,
- whether the network operators have chosen to hide their internal configuration.

The Serving-CSCF handling session origination performs an analysis of the destination address and determines whether it is a subscriber of the same network operator or a different operator.

If the analysis of the destination address determined that it belongs to a subscriber of a different operator, the request is forwarded) to a well-known entry point in the destination operator's network, the I-CSCF. The I-CSCF queries the HSS for current location information. The I-CSCF then forwards the request to the S-CSCF. If the analysis of the destination address determines that it belongs to a subscriber of the same operator, the S-CSCF passes the request to a local I-CSCF, who queries the HSS for current location information. The I-CSCF then forwards the request to the S-CSCF.[96]

### 5.5.2 (S-S#2) Single network operator performing origination and termination

The Serving-CSCF handling session origination performs an analysis of the destination address and determines that it belongs to a subscriber of the same operator. The request is therefore forwarded to a local I-CSCF. The I-CSCF queries the HSS for current location information and finds the user either located in the home service area, or roaming. The I-CSCF therefore forwards the request to the S-CSCF serving the destination user.

95 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 189-190

96 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 112




**Figure 5.11: Serving to serving procedure - same operator**

Procedure S-S#2 is as follows:

1. The SIP INVITE request is sent from the UE to S-CSCF#1 by the procedures of the originating flow. This message should contain the initial media description offer in the SDP.
2. S-CSCF#1 invokes whatever service logic is appropriate for this session setup attempt
3. S-CSCF#1 performs an analysis of the destination address and determines the network operator to whom the subscriber belongs. Since it is local, the request is passed to a local I-CSCF.
4. I-CSCF shall query the HSS for current location information.

***ETSI***

**3GPP TS 23.228 version 19.6.0 Release 19 117 ETSI TS 123 228 V19.6.0 (2026-03)**

5. HSS responds with the address of the current Serving-CSCF for the terminating user.
6. I-CSCF forwards the INVITE request to the S-CSCF (S-CSCF#2) that will handle the session termination.
7. S-CSCF#2 invokes whatever service logic is appropriate for this session setup attempt
8. The sequence continues with the message flows determined by the termination procedure. [97]

### AA.2.1.3.2 Nhss_ImsSDM_Get service operation

**Service operation name:** Nhss_ImsSDM_Get

**Description:** This service operation enables the NF consumer to fetch the service profile data, repository data and non-transparent data references for an IMS User.

The HSS shall check that the requested NF consumer is authorized to fetch the requested data. In the case that the requested data is Repository data, the HSS may also authorize based on service indication.

**Inputs, Required:** NF Type, IMS Subscriber data type(s), Key for each IMS Subscriber data type(s).

**Inputs, Optional:** Application Service Identity.

**Outputs, Required:** Result indication.

**Outputs, Optional:** Requested Data.

**Table AA.2.1.3.1-1: IMS Subscriber data types**

| IMS Subscriber data | Description |
|---|---|
| Service Profile Data | This may include e.g. service parameters, the S-CSCF allocated to a public identity or the list of S-CSCFs and their capabilities, Application Server address, triggers, information on subscribed media, profile parameters (e.g. barring indicator, etc.) as defined in TS 29.228 [30].<br><br>**Service Profile Data is consumed by CSCF.** |

[98]

97 *Id.* at 114-117
98 *Id.* at 353



Figure 4.3.1-1: Non-roaming architecture for interworking between 5GS and EPC/E-UTRAN [99]

87. The Accused Products perform the step of the telecommunication manager receiving, through at least one input device, responses to the request from at least one of the two or more participants, the responses being in the form of a telecommunication request to establish the telecommunication connection between the two or more participants. For example, during three-way session initiation procedures, the UE in conjunction with IMS control entities, such as the S-CSCF, can send a SIP INVITE request to one or more participants and the terminating endpoint can generate and transmit responses back through the signaling path. The terminating endpoint can provide multiple responses, culminating in a SIP final response (e.g., "200 OK"), which is sent once the user accepts the incoming session. This "200 OK" message can be received by the originating S-CSCF via the IMS network. The response can include acceptance of the session parameters (e.g., via SDP negotiation) and represents a telecommunication request/confirmation to establish the communication session between the participants.

99 https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/19.07.00_60/ts_123501v190700p.pdf, at 81

5.11.6.2.3 Three-way Session

A three-way session starts with an existing session, between the Initiator (I) and party (A). The initiator places this session on hold and establishes a second session with party (B). The initiator then decides to create an ad-hoc conference of all three parties.

From the point where the initiator decides to create the ad-hoc conference, shown in the leftmost diagram below, the initiator establishes another session with a third-party conference bridge service. This is shown in the centre diagram. The initiator then transfers both of the existing sessions, I->A and I->B, to the bridge, ending in the configuration shown in the rightmost diagram.




The conference bridge service is in control of the termination sequence. On termination of one of the three sessions, it may either terminate the other two sessions by use of the session clearing procedures of clause 5.11, or may utilize the procedures of clause 5.11.6.2.1 above to transfer one of the remaining endpoints to the other, resulting in a simple two-party session. [100]

5.5.2 (S-S#2) Single network operator performing origination and termination

The Serving-CSCF handling session origination performs an analysis of the destination address and determines that it belongs to a subscriber of the same operator. The request is therefore forwarded to a local I-CSCF. The I-CSCF queries the HSS for current location information and finds the user either located in the home service area, or roaming. The I-CSCF therefore forwards the request to the S-CSCF serving the destination user.

100 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 189-190




**Figure 5.11: Serving to serving procedure - same operator**

Procedure S-S#2 is as follows:

1. The SIP INVITE request is sent from the UE to S-CSCF#1 by the procedures of the originating flow. This message should contain the initial media description offer in the SDP.
2. S-CSCF#1 invokes whatever service logic is appropriate for this session setup attempt
3. S-CSCF#1 performs an analysis of the destination address and determines the network operator to whom the subscriber belongs. Since it is local, the request is passed to a local I-CSCF.
4. I-CSCF shall query the HSS for current location information.

*ETSI*

**3GPP TS 23.228 version 19.6.0 Release 19 117 ETSI TS 123 228 V19.6.0 (2026-03)**

5. HSS responds with the address of the current Serving-CSCF for the terminating user.
6. I-CSCF forwards the INVITE request to the S-CSCF (S-CSCF#2) that will handle the session termination.
7. S-CSCF#2 invokes whatever service logic is appropriate for this session setup attempt
8. The sequence continues with the message flows determined by the termination procedure.

9-12. The terminating end point responds with an answer to the offered SDP and this message is passed along the established session path.

13-16. The originator decides on the offered set of media streams, confirms receipt of the Offer Response with a Response Confirmation and forwards this information to S-CSCF#1 by the origination procedures. This message is forwarded via the established session path to the terminating end point. The Response Confirmation may also contain SDP. This may be the same SDP as in the Offer Response received in Step 12 or a subset.

17-20. Terminating end point responds to the offered SDP and the response if forwarded to the originating end point via the established session path.

21-24. Originating end point sends successful resource reservation information towards the terminating end point via the established session path.

25-28. Terminating end point sends successful resource reservation acknowledgement towards the originating end point via the established session path

29-32. Terminating end point sends ringing message toward the originating end point via the established session path.

33-36. The SIP final response, 200-OK, is sent by the terminating endpoint over the signalling path. This is typically generated when the user has accepted the incoming session setup attempt. The message is sent to S-CSCF#2 per the termination procedure.

37-40. The originating endpoint sends the final acknowledgement to S-CSCF#1 by the origination procedures and it is then sent over the signalling path to the terminating end point. [101]

[101] *Id.* at 116-117

AA.2.1.3.2 Nhss_ImsSDM_Get service operation

**Service operation name:** Nhss_ImsSDM_Get

**Description:** This service operation enables the NF consumer to fetch the service profile data, repository data and non-transparent data references for an IMS User.

The HSS shall check that the requested NF consumer is authorized to fetch the requested data. In the case that the requested data is Repository data, the HSS may also authorize based on service indication.

**Inputs, Required:** NF Type, IMS Subscriber data type(s), Key for each IMS Subscriber data type(s).

**Inputs, Optional:** Application Service Identity.

**Outputs, Required:** Result indication.

**Outputs, Optional:** Requested Data.

[102]

88. The Accused Products perform the step wherein when only one participant of the two or more participants has indicated the preferred form of telecommunication prior to initiation of the telecommunication connection, others of the two or more participants are contacted by the system upon the initiation of the telecommunication connection without having previously indicated a preferred form of telecommunication. For example, during three-way session initiation procedures, user preferences (e.g., preferred media type, QoS, codec selection) may be pre-configured for a user or alternatively determined on a per-session basis. Thus, not all participants have pre-established preferences prior to session initiation. During session establishment, the originating UE can initiate communication by sending SIP INVITE requests to other participants regardless of whether those participants have pre-configured preferences. For incoming sessions, the terminating user can be contacted and may interactively accept or negotiate session parameters (e.g., media type, quality) upon receiving the request. Such participants can be contacted upon initiation of the telecommunication connection, even if they have not previously indicated a preferred form of telecommunication. Further, NhsS_ImsSDM_Get enables an NF consumer to fetch service profile data for an IMS User, with the requested IMS Subscriber data retrieved using a key for the respective IMS Subscriber data type. The associated Service Profile Data may include

[102] *Id.* at 353

service parameters, an S-CSCF allocated to a public identity, information on subscribed media, and profile parameters.

5.11.6.2.3 Three-way Session

A three-way session starts with an existing session, between the Initiator (I) and party (A). The initiator places this session on hold and establishes a second session with party (B). The initiator then decides to create an ad-hoc conference of all three parties.

From the point where the initiator decides to create the ad-hoc conference, shown in the leftmost diagram below, the initiator establishes another session with a third-party conference bridge service. This is shown in the centre diagram. The initiator then transfers both of the existing sessions, I->A and I->B, to the bridge, ending in the configuration shown in the rightmost diagram.




The conference bridge service is in control of the termination sequence. On termination of one of the three sessions, it may either terminate the other two sessions by use of the session clearing procedures of clause 5.11, or may utilize the procedures of clause 5.11.6.2.1 above to transfer one of the remaining endpoints to the other, resulting in a simple two-party session. [103]

5.4.6 End-user preferences and terminal capabilities

5.4.6.0 General

Due to different capabilities of the originating and terminating terminals, it might not be possible to establish all the media suggested by the originator for a particular session. In addition, the destination user may have different preferences of type of media depending on who is originating and on the situation e.g. being in a meeting or driving the car, etc.

5.4.6.1 Objectives

The general objectives concerning terminal capabilities and end-user behaviour are listed below.

- The capabilities of the terminal have impact on the SDP description in the SIP session flows, since different terminals may support different media types (such as video, audio, application or data) and may have implemented different set of codecs for audio and video. Note that the capabilities of the terminal may change when an external device, such as a video camera is attached to the terminal.
- The configuration of the terminal changes the capabilities of the terminal. This can be done by attaching external devices or possibly by a user setting of certain parameters or profiles in the terminal.

103 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 189-190

- The preferences of the destination user may depend on who is originating the session and on the situation. Cost, associated with the session, may also be another factor, i.e. depending on time of the day or day of the week etc. Due to this reason the user may want to accept or reject certain media components.
- The available resources in the network play an important role, as certain media streams, consuming high bandwidth, may be denied. Therefore, before the user is alerted that the session set up is successful, it is assumed that the network has guaranteed and has reserved the needed resources for one or several media streams of the session. This does not preclude the possibility for the user to indicate his/her preferences regarding the session also after the alerting, in which case the initial resource reservations may have to be modified.
- End-to-end quality of service may be provided by using a variety of mechanisms, including guaranteed end-to-end QoS and best effort. The network may not be able to guarantee the requested end-to-end QoS. This may be the case when the user is establishing sessions through the public Internet. On the other hand, certain sessions, with the agreement of the initiating and terminating endpoints, should have the right to go through even without having the requested QoS guarantee.

### 5.4.6.2 End-user expectations

From the end-user point of view the following user interactions can be listed:

- For outgoing sessions, it is assumed that the user would like to select certain parameters that define the proposed session. This can be pre-configured as preferences or defined on a per session basis.
- For incoming sessions, it is assumed that the terminal will establish a dialogue with the user. Such dialogue allows the user to manually accept some of the proposed parameters by the originator. This is typically media type (audio, video, whiteboard) and different quality parameters per media type. As an alternative, the user preferences may be pre-configured.
- Before establishing or accepting a new session, the user may define or agree on the following parameters. Some of these parameters may be pre-configured and others are defined on a per session basis.
  1. Type of media, i.e. audio, video, whiteboard, etc. This represents the user preferences of media types.
  2. Combination of QoS attributes and selection of codec. This represents the quality of the media component, the cost and the probability of availability of resources both in the access network and in the core network.
  3. Subset of capabilities used in the terminal. Terminals can have different set of capabilities. However, the user may or may not want to use the maximum set of capabilities. For instance, a user might want to establish a low cost video session with a small window on the screen.
  4. End-to-end quality of service. For certain media streams, the user may want assured end-to-end QoS while for other streams the QoS may be optional or even not desired at all (best effort).

[104]

### AA.2.1.3.2 Nhss_ImsSDM_Get service operation

**Service operation name:** Nhss_ImsSDM_Get

**Description:** This service operation enables the NF consumer to fetch the service profile data, repository data and non-transparent data references for an IMS User.

The HSS shall check that the requested NF consumer is authorized to fetch the requested data. In the case that the requested data is Repository data, the HSS may also authorize based on service indication.

**Inputs, Required:** NF Type, IMS Subscriber data type(s), Key for each IMS Subscriber data type(s).

**Inputs, Optional:** Application Service Identity.

**Outputs, Required:** Result indication.

**Outputs, Optional:** Requested Data.

[105]

89. The Accused Products perform the step wherein when the telecommunication connection couples together each of the two or more participants, forms of telecommunication are

[104] *Id.* at 94-95
[105] *Id.* at 353

selected by the telecommunication manager according to the preferred form of telecommunication as indicated by each of the plurality of participant records associated with each of the two or more participants. For example, during establishment and coupling of multiple participants (e.g., in a three-way session or conference), the media characteristics of the telecommunication can be determined through SDP negotiation based on terminal capabilities and end-user preferences associated with each participant. Specifically, each participant has associated preferences (e.g., media type, codec selection, QoS parameters), which can be either pre-configured or provided during session setup. The IMS control entities (e.g., S-CSCF) can evaluate these preferences and capabilities and ensure that only mutually supported media components are established for the session. The originating side can confirm the selected set of media streams after receiving responses (e.g., SDP answers), thereby selecting the form(s) of telecommunication for the coupled session. Further, NhsS_ImsSDM_Get enables an NF consumer to fetch service profile data for an IMS User, with the requested IMS Subscriber data retrieved using a key for the respective IMS Subscriber data type. The associated Service Profile Data may include service parameters, an S CSCF allocated to a public identity, information on subscribed media, and profile parameters.

5.11.6.2.3 Three-way Session

A three-way session starts with an existing session, between the Initiator (I) and party (A). The initiator places this session on hold and establishes a second session with party (B). The initiator then decides to create an ad-hoc conference of all three parties.

From the point where the initiator decides to create the ad-hoc conference, shown in the leftmost diagram below, the initiator establishes another session with a third-party conference bridge service. This is shown in the centre diagram. The initiator then transfers both of the existing sessions, I->A and I->B, to the bridge, ending in the configuration shown in the rightmost diagram.



The conference bridge service is in control of the termination sequence. On termination of one of the three sessions, it may either terminate the other two sessions by use of the session clearing procedures of clause 5.11, or may utilize the procedures of clause 5.11.6.2.1 above to transfer one of the remaining endpoints to the other, resulting in a simple two-party session. 106

## 5.4.6 End-user preferences and terminal capabilities

### 5.4.6.0 General

Due to different capabilities of the originating and terminating terminals, it might not be possible to establish all the media suggested by the originator for a particular session. In addition, the destination user may have different preferences of type of media depending on who is originating and on the situation e.g. being in a meeting or driving the car, etc.

### 5.4.6.1 Objectives

The general objectives concerning terminal capabilities and end-user behaviour are listed below.

- The capabilities of the terminal have impact on the SDP description in the SIP session flows, since different terminals may support different media types (such as video, audio, application or data) and may have implemented different set of codecs for audio and video. Note that the capabilities of the terminal may change when an external device, such as a video camera is attached to the terminal.
- The configuration of the terminal changes the capabilities of the terminal. This can be done by attaching external devices or possibly by a user setting of certain parameters or profiles in the terminal.

106 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 189-190

- The preferences of the destination user may depend on who is originating the session and on the situation. Cost, associated with the session, may also be another factor, i.e. depending on time of the day or day of the week etc. Due to this reason the user may want to accept or reject certain media components.

- The available resources in the network play an important role, as certain media streams, consuming high bandwidth, may be denied. Therefore, before the user is alerted that the session set up is successful, it is assumed that the network has guaranteed and has reserved the needed resources for one or several media streams of the session. This does not preclude the possibility for the user to indicate his/her preferences regarding the session also after the alerting, in which case the initial resource reservations may have to be modified.

- End-to-end quality of service may be provided by using a variety of mechanisms, including guaranteed end-to-end QoS and best effort. The network may not be able to guarantee the requested end-to-end QoS. This may be the case when the user is establishing sessions through the public Internet. On the other hand, certain sessions, with the agreement of the initiating and terminating endpoints, should have the right to go through even without having the requested QoS guarantee.

### 5.4.6.2 End-user expectations

From the end-user point of view the following user interactions can be listed:

- For outgoing sessions, it is assumed that the user would like to select certain parameters that define the proposed session. This can be pre-configured as preferences or defined on a per session basis.

- For incoming sessions, it is assumed that the terminal will establish a dialogue with the user. Such dialogue allows the user to manually accept some of the proposed parameters by the originator. This is typically media type (audio, video, whiteboard) and different quality parameters per media type. As an alternative, the user preferences may be pre-configured.

- Before establishing or accepting a new session, the user may define or agree on the following parameters. Some of these parameters may be pre-configured and others are defined on a per session basis.

  1. Type of media, i.e. audio, video, whiteboard, etc. This represents the user preferences of media types.

  2. Combination of QoS attributes and selection of codec. This represents the quality of the media component, the cost and the probability of availability of resources both in the access network and in the core network.

  3. Subset of capabilities used in the terminal. Terminals can have different set of capabilities. However, the user may or may not want to use the maximum set of capabilities. For instance, a user might want to establish a low cost video session with a small window on the screen.

  4. End-to-end quality of service. For certain media streams, the user may want assured end-to-end QoS while for other streams the QoS may be optional or even not desired at all (best effort). [107]

### AA.2.1.3.2 Nhss_ImsSDM_Get service operation

**Service operation name:** Nhss_ImsSDM_Get

**Description:** This service operation enables the NF consumer to fetch the service profile data, repository data and non-transparent data references for an IMS User.

The HSS shall check that the requested NF consumer is authorized to fetch the requested data. In the case that the requested data is Repository data, the HSS may also authorize based on service indication.

**Inputs, Required:** NF Type, IMS Subscriber data type(s), Key for each IMS Subscriber data type(s).

**Inputs, Optional:** Application Service Identity.

**Outputs, Required:** Result indication.

**Outputs, Optional:** Requested Data.

---

[107] *Id.* at 94-95

**Table AA.2.1.3.1-1: IMS Subscriber data types**

| IMS Subscriber data | Description |
|---|---|
| Service Profile Data | This may include e.g. service parameters, the S-CSCF allocated to a public identity or the list of S-CSCFs and their capabilities, Application Server address, triggers, information on subscribed media, profile parameters (e.g. barring indicator, etc.) as defined in TS 29.228 [30].<br><br>**Service Profile Data is consumed by CSCF.** |

108

### AA.2.4.4.2 Nimsas_ImsSessionManagement_Create service operation

**Service operation name:** Nimsas_ImsSessionManagement_Create

**Description:** This service enables the consumer NF to create an IMS session with the requested media (e.g. standalone data channel media).

NOTE 1: Only data channel media is supported in this Release.

**Inputs, Required:** Calling ID, Called ID, Media Information set.

**Calling ID:** It is the public identity of calling IMS Subscriber or the identity of the consumer NF, e.g. DC AS.

**Called ID:** It is the public identity of called IMS Subscriber.

**Media Information set:** Includes a set of media information indicating how the media used in the created session. Each media information contains:

- **Media Correlation ID**: It identifies the media stream to be created. It is allocated by the consumer NF.
- **Media Type:** It indicates the media type used in the created session, e.g. Data Channel.
- **Media Parameter set:** It indicates the related media parameters. For different media, it contains different parameters.
  - When the Media Type is Data Channel, it includes:
    - DC Type: indicates the Data Channel Type (ADC or BDC);
    - When DC Type is ADC:
      - ADC Type: the ADC type (P2A, P2P, P2A2P);
      - Application Binding Information; and
      - Target ID(s): the public identity(ies) of the IMS Subscriber the DC is targeted;

NOTE 2: For P2P ADC, the Calling ID and Called ID of the session are used as the Target IDs.

      - If P2A or P2A2P is selected, the MDC2 media endpoint address(es) of the application layer is included.
    - When DC Type is BDC:
      - Target ID: the public identity of the IMS Subscriber the DC is targeted.

**Inputs, Optional:** Notification Target Address and Notification Correlation ID.

If the request includes a Notification Target Address, the request creates an implicit subscription to be notified for the events in Table AA.2.4.4.5-1.

**Outputs, Required:** Result indication.

**Outputs, Optional:** Session ID allocated by IMS AS. 109

---

108 *Id.* at 353

109 *Id.* at 363-363

90. The Accused Products perform the step wherein a preferred form of telecommunication for a first participant of the two or more participants is selected by the telecommunication manager according to the preferred form of telecommunication as indicated by a first of the at least two of the plurality of participant records associated with the first participant and another preferred form of telecommunication for a second participant of the two or more participants is selected by the telecommunication manager according to the preferred form of telecommunication as indicated by a second of the plurality of participant records associated with the second participant. For example, each participant in a session can have associated, distinct, preferences and capabilities (e.g., media type such as audio or video, codec selection, QoS parameters), which may be pre-configured or dynamically provided during session setup. During session establishment, the originating S-CSCF, can process SDP offer/answer exchanges from each participant. Each participant (e.g., first participant A and second participant B) can provide their own response indicating acceptable media parameters based on their respective preferences and capabilities. The originating side can then evaluate these responses and confirm the selected media streams. Further, NhsS_ImsSDM_Get enables an NF consumer to fetch service profile data for an IMS User, with the requested IMS Subscriber data retrieved using a key for the respective IMS Subscriber data type. The associated Service Profile Data may include service parameters, an S-CSCF allocated to a public identity, information on subscribed media, and profile parameters. Accordingly, a preferred form of telecommunication for a first participant can be selected based on that participant's own indicated preferences (e.g., limiting to audio only), while a different preferred form of telecommunication for a second participant may be selected based on that second participant's distinct preferences (e.g., supporting video and audio).

5.11.6.2.3 Three-way Session

A three-way session starts with an existing session, between the Initiator (I) and party (A). The initiator places this session on hold and establishes a second session with party (B). The initiator then decides to create an ad-hoc conference of all three parties.

From the point where the initiator decides to create the ad-hoc conference, shown in the leftmost diagram below, the initiator establishes another session with a third-party conference bridge service. This is shown in the centre diagram. The initiator then transfers both of the existing sessions, I->A and I->B, to the bridge, ending in the configuration shown in the rightmost diagram.




The conference bridge service is in control of the termination sequence. On termination of one of the three sessions, it may either terminate the other two sessions by use of the session clearing procedures of clause 5.11, or may utilize the procedures of clause 5.11.6.2.1 above to transfer one of the remaining endpoints to the other, resulting in a simple two-party session. 110

## 5.4.6 End-user preferences and terminal capabilities

### 5.4.6.0 General

Due to different capabilities of the originating and terminating terminals, it might not be possible to establish all the media suggested by the originator for a particular session. In addition, the destination user may have different preferences of type of media depending on who is originating and on the situation e.g. being in a meeting or driving the car, etc.

### 5.4.6.1 Objectives

The general objectives concerning terminal capabilities and end-user behaviour are listed below.

- The capabilities of the terminal have impact on the SDP description in the SIP session flows, since different terminals may support different media types (such as video, audio, application or data) and may have implemented different set of codecs for audio and video. Note that the capabilities of the terminal may change when an external device, such as a video camera is attached to the terminal.
- The configuration of the terminal changes the capabilities of the terminal. This can be done by attaching external devices or possibly by a user setting of certain parameters or profiles in the terminal.

110 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.06.00_60/ts_123228v190600p.pdf, at 189-190

- The preferences of the destination user may depend on who is originating the session and on the situation. Cost, associated with the session, may also be another factor, i.e. depending on time of the day or day of the week etc. Due to this reason the user may want to accept or reject certain media components.
- The available resources in the network play an important role, as certain media streams, consuming high bandwidth, may be denied. Therefore, before the user is alerted that the session set up is successful, it is assumed that the network has guaranteed and has reserved the needed resources for one or several media streams of the session. This does not preclude the possibility for the user to indicate his/her preferences regarding the session also after the alerting, in which case the initial resource reservations may have to be modified.
- End-to-end quality of service may be provided by using a variety of mechanisms, including guaranteed end-to-end QoS and best effort. The network may not be able to guarantee the requested end-to-end QoS. This may be the case when the user is establishing sessions through the public Internet. On the other hand, certain sessions, with the agreement of the initiating and terminating endpoints, should have the right to go through even without having the requested QoS guarantee.

### 5.4.6.2 End-user expectations

From the end-user point of view the following user interactions can be listed:

- For outgoing sessions, it is assumed that the user would like to select certain parameters that define the proposed session. This can be pre-configured as preferences or defined on a per session basis.
- For incoming sessions, it is assumed that the terminal will establish a dialogue with the user. Such dialogue allows the user to manually accept some of the proposed parameters by the originator. This is typically media type (audio, video, whiteboard) and different quality parameters per media type. As an alternative, the user preferences may be pre-configured.
- Before establishing or accepting a new session, the user may define or agree on the following parameters. Some of these parameters may be pre-configured and others are defined on a per session basis.
    1. Type of media, i.e. audio, video, whiteboard, etc. This represents the user preferences of media types.
    2. Combination of QoS attributes and selection of codec. This represents the quality of the media component, the cost and the probability of availability of resources both in the access network and in the core network.
    3. Subset of capabilities used in the terminal. Terminals can have different set of capabilities. However, the user may or may not want to use the maximum set of capabilities. For instance, a user might want to establish a low cost video session with a small window on the screen.
    4. End-to-end quality of service. For certain media streams, the user may want assured end-to-end QoS while for other streams the QoS may be optional or even not desired at all (best effort). [111]

### AA.2.1.3.2 Nhss_ImsSDM_Get service operation

**Service operation name:** Nhss_ImsSDM_Get

**Description:** This service operation enables the NF consumer to fetch the service profile data, repository data and non-transparent data references for an IMS User.

The HSS shall check that the requested NF consumer is authorized to fetch the requested data. In the case that the requested data is Repository data, the HSS may also authorize based on service indication.

**Inputs, Required:** NF Type, IMS Subscriber data type(s), Key for each IMS Subscriber data type(s).

**Inputs, Optional:** Application Service Identity.

**Outputs, Required:** Result indication.

**Outputs, Optional:** Requested Data. [112]

[111] *Id.* at 94-95
[112] *Id.* at 353

AA.2.4.4.2 Nimsas_ImsSessionManagement_Create service operation

**Service operation name:** Nimsas_ImsSessionManagement_Create

**Description:** This service enables the consumer NF to create an IMS session with the requested media (e.g. standalone data channel media).

NOTE 1: Only data channel media is supported in this Release.

**Inputs, Required:** Calling ID, Called ID, Media Information set.

**Calling ID:** It is the public identity of calling IMS Subscriber or the identity of the consumer NF, e.g. DC AS.

**Called ID:** It is the public identity of called IMS Subscriber.

**Media Information set:** Includes a set of media information indicating how the media used in the created session. Each media information contains:

- **Media Correlation ID**: It identifies the media stream to be created. It is allocated by the consumer NF.
- **Media Type:** It indicates the media type used in the created session, e.g. Data Channel.
- **Media Parameter set:** It indicates the related media parameters. For different media, it contains different parameters.
  - When the Media Type is Data Channel, it includes:
    - DC Type: indicates the Data Channel Type (ADC or BDC);
    - When DC Type is ADC:
      - ADC Type: the ADC type (P2A, P2P, P2A2P);
      - Application Binding Information; and
      - Target ID(s): the public identity(ies) of the IMS Subscriber the DC is targeted;

NOTE 2: For P2P ADC, the Calling ID and Called ID of the session are used as the Target IDs.

      - If P2A or P2A2P is selected, the MDC2 media endpoint address(es) of the application layer is included.
    - When DC Type is BDC:
      - Target ID: the public identity of the IMS Subscriber the DC is targeted.

**Inputs, Optional:** Notification Target Address and Notification Correlation ID.

If the request includes a Notification Target Address, the request creates an implicit subscription to be notified for the events in Table AA.2.4.4.5-1.

**Outputs, Required:** Result indication.

**Outputs, Optional:** Session ID allocated by IMS AS. [113]

91. Defendants have and continue to indirectly infringe one or more claims of the ’771 Patent by knowingly and intentionally inducing others, including Verizon customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

[113] *Id.* at 363-363

92. Defendants, with knowledge that these products, or the use thereof, infringe the ’771 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continue to knowingly and intentionally induce, direct infringement of the ’771 Patent by providing these products to end-users for use in an infringing manner. Alternatively, on information and belief, Defendants have adopted a policy of not reviewing the patents of others, and instructing their officers, agents, and employees to not review the patents of others, including specifically those related to Defendants’ specific industry, thereby remaining willfully blind to the ’771 Patent at least as early as the issuance of the ’771 Patent.

93. Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the ’771 Patent, but while remaining willfully blind to the infringement. Defendants have and continue to induce infringement by their customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants’ website, product literature and packaging, and other publications, including Defendants’ materials cited in this Complaint. On information and belief, operation of the Accused Products and services offered by Defendants necessarily infringe the ’771 Patent.

94. On information and belief, Defendants directly prepare and/or assist in the preparation of, and provide customers and end-users with, information and documents for their specific products. On information and belief, Defendants’ product literature and other product information documents are prepared by or under the direction of Defendants to instruct customers and end-users on how to use the Accused Products in an infringing manner.

95. Because of Defendants' inducement, Defendants' customers and end-users use Accused Products in a way Defendants intend and directly infringe the '771 Patent. Defendants perform these affirmative acts with knowledge of the '771 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '771 Patent.

96. Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '771 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products, such that the '771 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '771 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be especially made or adapted for use in the infringement of the '771 Patent. The Accused Components include, but are not limited to, components necessary for the operation of Defendants infringing systems including, but not limited to, the Accused Products, hardware and software components of Verizon's 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR. Defendants perform these affirmative acts with knowledge of the '771 Patent and with intent, or willful blindness, that they cause the direct infringement of the '771 Patent.

97. SLR has suffered damages as a result of Defendants' direct and indirect infringement of the '771 Patent in an amount to be proven at trial.

98. SLR has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '771 Patent, for which there is no adequate remedy at law, unless

Defendants' infringement is enjoined by this Court.

**COUNT V**
**(Infringement of the '429 Patent)**

99. Paragraphs 1 through 31 are incorporated by reference as if fully set forth herein.

100. SLR has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '429 Patent.

101. Defendants have and continue to directly infringe the '429 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '429 Patent. Such infringing products include Verizon's 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR, including all associated hardware and software.

102. For example, Defendants have and continue to directly infringe at least Claim 15 of the '429 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include Verizon's 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR.

103. The Accused Products comprise a system comprising: a mobile device configured to: cause a first packetized data connection path to be established between the mobile device and a calling service, the first packetized data connection path including (i) a data roaming connection between a first visited mobile network and a home mobile network, and (ii) a data connection between the home mobile network and the calling service. A calling service configured to: receive connection information from the mobile device, the connection information indicating a home mobile network, a first visited mobile network, and an first access type, the connection information being received through a first packetized data connection path between the mobile device and the

calling service, the first packetized data connection path including (i) a data roaming connection between the first visited mobile network and the home mobile network, and (ii) an external data connection between the home mobile network and the calling service

104. For example, Verizon operates 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR calling. Verizon's IMS architecture supports packetized voice services over both LTE and 5G NR access. Accordingly, a mobile device operating on the Verizon network can establish an IMS voice session using VoLTE over LTE or VoNR over 5G NR, with IMS signaling conveying information regarding the serving network and the access technology used by the device. When a Verizon subscriber roams, the subscriber's mobile device connects through a visited mobile network different from Verizon's home mobile network. Thus, for a Verizon subscriber, Verizon provides the home mobile network, while the roaming partner provides the first visited mobile network. The subscriber can access the IMS calling service using an applicable 3GPP access type, including LTE/E-UTRAN or 5G NR, depending on the serving network and device connection. IMS registration and call signaling provide information identifying or indicating the subscriber's home network, visited network, and access type. IMS signaling can convey access-network information, including through the P-Access-Network-Info header, which identifies information concerning the access technology and access network being used. IMS signaling also supports identification of the visited network, including through the P-Visited-Network-ID header. Accordingly, the connection information received by the IMS calling service can indicate the subscriber's home mobile network, visited mobile network, and first access type, including LTE or 5G NR. The 5G architecture includes a PDU Session for exchanging packet data between the UE and the network. In the 5G roaming configuration, the UE connects through the VPMN, and an N9 interface connects the VPMN and HPMN UPFs. Further, GSMA NG.113 and

IR.65 describe the IMS roaming architecture, showing the IMS core in the HPMN and supporting VoIMS calls through the N9 interface connection, with the IMS core connected through the IPX network for VoIMS service and call routing. Thus, the PDU Session provides packet-data connectivity from the UE through the VPMN and HPMN to the VoIMS calling service.

> Verizon offered a glimpse under the hood in late 2022 when it announced that it was starting to move commercial traffic to its 5G core—a key component of the network—which features an all-new design that could support standalone and non-standalone 5G, among other advanced technologies. That's an exciting leap forward, but what do those things really mean, and why do they matter for businesses and consumers? [114]



**Verizon IMS Cell Towers**

**02-27-2023**

Cell site with performance enhancement technology that gives Verizon engineers more leeway to adjust performance based on where customers move and how they use data in various sectors [115]

**5G standalone: What sets Verizon apart**

Verizon's 5G core—and thus its 5G SA technology—is built on a cloud-based platform that Verizon created specifically for telecommunications workloads. No other telecommunications company has taken this step (others are using cloud systems from outside providers). Because it's built specifically for telecommunications workloads, it can support the advanced technologies and services that provide the reliability and performance customers expect now, as well as what they'll need in the future. [116]

---

[114] https://www.verizon.com/about/news/5g-standalone-why-it-matters

[115] https://www.verizon.com/about/news/feed/media-resources/attachment/016-verizon-ims-cell-towers242868

[116] https://www.verizon.com/about/news/5g-standalone-why-it-matters

## The 5G core is built on the Verizon Cloud Platform

Verizon has officially begun moving customer traffic onto its cloud-native, containerized-design 5G core. Doing so will deliver "unprecedented levels of service agility, flexibility and automated scalability," said the carrier.

The 5G core is built on the Verizon Cloud Platform (VCP), which is an internally built telco cloud base on a Webscale software architecture that the carrier runs in its data centers. The VCP, said Verizon, will enable support for 5G standalone, 4G/5G Non-Standalone and Voice over New Radio (VoNR) services. 117

5.1.1.2 Initial registration

5.1.1.2.1 General

The initial registration procedure consists of the UE sending an unprotected REGISTER request and, if challenged depending on the security mechanism supported for this UE, sending the integrity-protected REGISTER request or

***ETSI***

**3GPP TS 24.229 version 19.5.0 Release 19 107 ETSI TS 124 229 V19.5.0 (2026-02)**

other appropriate response to the challenge. The UE can register a public user identity with any of its contact addresses at any time after it has acquired an IP address, discovered a P-CSCF, and established an IP-CAN bearer that can be used for SIP signalling. However, the UE shall only initiate a new registration procedure when it has received a final response from the registrar for the ongoing registration, or the previous REGISTER request has timed out.

When registering any public user identity belonging to the UE, the UE shall either use an already active pair of security associations or a TLS session to protect the REGISTER requests, or register the public user identity via a new initial registration procedure.

e) a registration expiration interval value of 600 000 seconds as the value desired for the duration of the registration;

NOTE 5: The registrar (S-CSCF) might decrease the duration of the registration in accordance with network policy. Registration attempts with a registration period of less than a predefined minimum value defined in the registrar will be rejected with a 423 (Interval Too Brief) response.

f) a Request-URI set to the SIP URI of the domain name of the home network used to address the REGISTER request;

g) the Supported header field containing the option-tag "path", and

   1) if GRUU is supported, the option-tag "gruu"; and

   2) if multiple registrations is supported, the option-tag "outbound".

h) if a security association or TLS session exists, and if available to the UE (as defined in the access technology specific annexes for each access technology), a P-Access-Network-Info header field set as specified for the access network technology (see subclause 7.2A.4);

i) a Security-Client header field to announce the media plane security mechanisms the UE supports, if any, labelled with the "mediasec" header field parameter specified in subclause 7.2A.7; 118

[117] https://www.rcrwireless.com/20221014/featured/now-is-the-time-verizon-migrates-commercial-traffic-to-5g-core

[118] https://www.etsi.org/deliver/etsi_ts/124200_124299/124229/19.05.00_60/ts_124229v190500p.pdf, at 106-108

### 7.2A.4.3 Additional coding rules for P-Access-Network-Info header field

The P-Access-Network-Info header field is populated with the following contents:

1) the access-type field set to one of "3GPP-GERAN","3GPP-UTRAN-FDD", "3GPP-UTRAN-TDD", "3GPP-E-UTRAN-FDD", "3GPP-E-UTRAN-TDD", "3GPP-E-UTRAN-ProSe-UNR", "3GPP-NR-FDD", "3GPP-NR-TDD", "3GPP-NR-U-FDD", "3GPP-NR-U-TDD", "3GPP-NR-SAT", "3GPP-NR-LEO", "3GPP-NR-MEO", "3GPP-NR-GEO", "3GPP-NR-OTHERSAT", "3GPP-WB-E-UTRAN-LEO", "3GPP-WB-E-UTRAN-MEO", "3GPP-WB-E-UTRAN-GEO", "3GPP-WB-E-UTRAN-OTHERSAT", "3GPP-NB-IoT-LEO", "3GPP-NB-IoT-MEO", "3GPP-NB-IoT-GEO", "3GPP-NB-IoT-OTHERSAT", "3GPP-LTE-M-LEO", "3GPP-LTE-M-MEO", "3GPP-LTE-M-GEO", "3GPP-LTE-M-OTHERSAT", "3GPP-NR-ProSe-L2UNR", "3GPP-NR-ProSe-L3UNR", "3GPP-NR-REDCAP", "3GPP-NR-EREDCAP", "3GPP2-1X", "3GPP2-1X-HRPD", "3GPP2-UMB", "3GPP2-1X-Femto", "IEEE-802.11", "IEEE-802.11a", "IEEE-802.11b", "IEEE-802.11g", "IEEE-802.11n", "IEEE-802.11ac", "ADSL", "ADSL2", "ADSL2+", "RADSL", "SDSL", "HDSL", "HDSL2", "G.SHDSL", "VDSL", "IDSL", "xDSL", "DOCSIS", "IEEE-802.3", "IEEE-802.3a", "IEEE-802.3e", "IEEE-802.3i", "IEEE-802.3j", "IEEE-802.3u", "IEEE-802.3ab", "IEEE-802.3ae", "IEEE-802.3ah", "IEEE-802.3ak", "IEEE-802.3aq", "IEEE-802.3an", "IEEE-802.3y", "IEEE-802.3z", or "DVB-RCS2" as appropriate to the access technology in use. [119]

**PDU Connectivity Service:** A service that provides exchange of PDUs between a UE and a Data Network.

**PDU Session:** Association between the UE and a Data Network that provides a PDU connectivity service. [120]

### 1.1 Overview

This document describes how 5G System (5GS) networks using the 5G Core (5GC) can interconnect and/or interwork when users roam onto a network different to their HPMN (Home Public Mobile Network). This will be applicable when NR (New Radio) radio bearers are used, connected to a 5GC, and both UE (User Equipment) and VPMN (Visited PMN) have matching capabilities. In addition to guidelines on the 5G roaming architecture, a key focus of this document is to describe deployment models and security impacts the operators need to consider when selecting the deployment models. [121]

### 3.3.1 N9 Operator-to-Operator Security

As per 3GPP Release 16 TS 33.501 [19], N9 traffic over the IPX network shall be confidentiality, integrity, and replay protected by operators. This tunnelled connection shall originate and terminate within the perimeter of the operator (e.g. directly at the UPF or at a Security Gateway (SEG) designed for this purpose). [122]

---

[119] *Id.* at 447

[120] https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/19.05.00_60/ts_123501v190500p.pdf, at 37

[121] https://www.gsma.com/newsroom/wp-content/uploads//NG.113-v14.0-1.pdf, at 6.

[122] *Id.* at 20

## 3 Architecture

### 3.1 Architecture models

The following diagrams are produced based on the roaming reference architectures found in 3GPP TS 23.501 [1] covering:

- 5G System Roaming architecture – Local Breakout (LBO)
  - Service Based Interface representation
  - Reference point representation
- 5G System Roaming architecture – Home Routed (HR)
  - Service Based Interface representation
  - Reference point representation

Which of the Network Functions that are used by VPMN and HPMN depends on whether local-break out (LBO) or home-routed (HR) architecture are used, as depicted in the following figures.

### 3.1.2 5G System Roaming architecture – Home Routed (HR)




123

### 5.1.2 N9 Interface between VPMN and HPMN UPF

The Home Routed (HR) scenario makes use of both SMF's and UPF's in the VPMN and HPMN. In this case the SMF in the HPMN (H-SMF) selects the UPF(s) in the HPMN, and the SMF in the VPMN (V-SMF in this case) selects the UPF(s) in the VPMN. Thus, the N9 reference point for user plane traffic is applicable to the HR scenario, as seen in Figure 4 and Figure 5. Both V-SMF and H-SMF are selected by the AMF during PDU session establishment. The V-SMF can be changed, e g., during N2 handover procedure as described in section 4.23 of 3GPP TS 23.502 [2].

124

[123] https://www.gsma.com/newsroom/wp-content/uploads//NG.113-v14.0-1.pdf, at 13, 15
[124] *Id.* at 69

**6.3.2.2 IMS Voice Roaming Architecture N9HR**

To support IMS roaming using N9 Home Routed (N9HR; refer to GSMA PRD IR.65 [38]), both the SMF/UPF and the Proxy-Call Session Control Function (P-CSCF) must be located in the HPMN. The same IMS voice roaming architecture using N9HR is used in case of IMS voice support over NR connected to 5GC and in case of EPS Fallback.

To select the correct SMF in the HPMN, the HPMN operator must not allow its IMS Voice subscribers to use VPMN addressing. See Section 6.8.2 for detailed discussion related to SMF selection and a "well-known" DNN usage related to IMS Voice Roaming.

For the VPMN and HPMN to enable N9HR IMS roaming, the following conditions must be fulfilled in 5GC and NG-RAN. Conditions in IMS are not listed:

IMS well-known DNN;

- QoS flow with 5QI=5 for SIP signalling;
- QoS flow with 5QI=1 for voice media; in case of EPS Fallback, the request to establish the QoS flow with 5QI=1 is rejected by the gNB.
- if videocall is supported, then QoS flow with 5QI=2 (or non-GBR 5QI);
- Downlink service level gating (to avoid additional and unexpected traffic on the signalling bearer) as described in 3GPP TS 23.501 [1] and 3GPP TS 23.503 [53].

This is also needed to avoid that additional and unexpected traffic on the signalling bearer reaches the lawful interception functions for N9HR in the VPMN.

If data media for IMS Data Channel as specified in section 5.1 of 3GPP Release 16 TS 26.114 [51] is supported, then QoS flow e.g. with 5QI=9, 71, 72, 73, 74, 76 as determined by the IMS data channel service.

Indication from AMF to the UE "IMS VoPS (Support Indicator) = supported" if the VPMN has a roaming agreement that covers support of IMS voice with the HPMN as specified in clause 5.16.3.2 of 3GPP TS 23.501 [1].

NOTE1: As specified in 3GPP TS 23.501 [1], "IMS VoPS" indicator can reflect the roaming agreement which is intended to support IMS voice only in EPS, while excluding the case of IMS voice via NR connected to 5GC.

Indication from AMF to the UDM "Homogeneous Support of IMS Voice over PS" based on the conditions specified in 3GPP TS 23.501[1]. [125]

[125] *Id.* at 78-79

5.16.3.2 IMS voice over PS Session Supported Indication over 3GPP access

The serving PLMN AMF shall send an indication toward the UE during the Registration procedure over 3GPP access to indicate if an IMS voice over PS session is supported or not supported in 3GPP access and non-3GPP access. A UE

*ETSI*

**3GPP TS 23.501 version 19.5.0 Release 19** **319** **ETSI TS 123 501 V19.5.0 (2026-01)**

with "IMS voice over PS" voice capability over 3GPP access should take this indication into account when performing voice domain selection, as described in clause 5.16.3.5. [126]

**2.4.2 VoIMS Roaming Architecture using LBO**

The IMS Roaming Architecture using LBO is shown below in Figure 2-6 for EPC (see also GSMA PRD IR.88 [26]). For IMS Roaming the S9 interface between V-PCRF and H-PCRF is not needed (see also GSMA PRD IR.88 [26]). For routing of media when roaming, see Section 2.3.

For IMS roaming to work, the P-CSCF and S-CSCF exchange and record each other's Uniform Resource Identifiers (URIs) during IMS registration as specified in 3GPP TS 24.229 [6]. The recorded S-CSCF URI is added as SIP route header during the session setup by P-CSCF to route the originated sessions to the S-CSCF and similarly the S-CSCF adds the recorded P-CSCF URI as a SIP route header to route terminated sessions to the P-CSCF as specified in 3GPP TS 24.229 [6].

If using SMSoIP, then the recorded S-CSCF URI is added by P-CSCF as a SIP route header to route originating stand-alone SIP signaling requests to the S-CSCF and similarily the S-CSCF adds the recorded P-CSCF URI as a SIP route header to route the terminating stand-alone SIP signaling requests to the P-CSCF.

The IPX network performs routing based exclusively upon the topmost SIP Route header that must contain the address of the destination network e.g. the A party HPMN address roaming or the B party VPMN address when roaming for the SIP invite. [127]

[126] https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/19.05.00_60/ts_123501v190500p.pdf, at 318-319

[127] https://www.gsma.com/newsroom/wp-content/uploads//IR.65-v36.0.pdf, at 17

**2A.4.3 IMS Roaming Architecture using N9HR**

The IMS Roaming Architecture using N9HR for 5GC is shown below in Figure 2A-7 (see also GSMA PRD NG.113 [57]).

The functionalities required are supported as described in section 2.4.3 but using the 5GC architecture (see 3GPP TS 23.501 [59] and GSMA PRD NG.113 [57]), namely usage of UPF in the HPMN.

The salient characteristics of the N9HR architecture for VoIMS Roaming (non-emergency services) are like described in section 2.4.3 but with some terminology changes:

- VoIMS calls are home routed using IMS well-known DNN via N9 interface; i.e. the IMS UNI is provided directly between UE and the HPMN for non-emergency calls.
- The IPX only differentiates the signalling and media traffic based on the requested QoS levels.
- The HPMN has full control over the VoIMS (non-emergency) call routing.
- The VPMN is not service aware, but it is QoS and DNN aware.
- The VPMN supports all NG-RAN (with Stand-alone NR) and 5GC capabilities to serve IMS inbound subscribers, e.g., IMS voice over PS support indication to the UE,

V35.0 Page 33 of 84

GSM Association Confidential - Full, Rapporteur, and Associate Members
Official Document IR.65 IMS Roaming, Interconnection and Interworking Guidelines

5QI=1 bearer for conversational voice; 5QI=2 bearer for conversational video, and 5QI=5 bearer for IMS signalling in NG-RAN (with Stand-alone NR) and 5GC.

- The PCC framework of the HPMN is used. QoS rules are generated in the HPMN and enforced by the VPMN as per roaming agreement.
- VPMN has the ability to downgrade requested QoS, or reject the requested bearer, in case the QoS values are outside the ranges configured in the MME per roaming agreement. Please refer to GSMA PRD NG.113 [57] for more details
- N9HR requires support for anonymous emergency calls over IMS.

7.




**Figure 2A-7: Control and User Plane Routing – S9HR** [128]

105. The Accused Products comprise a calling service configured to: determine a first call rate based on the connection information. For example, when a Verizon subscriber is roaming, Verizon and associated IMS/VoIMS policy-and-charging functionality determine an applicable call rate based on network and access information associated with the mobile device. The connection information received from the mobile device identifies the home network, visited

[128] *Id.* at 33-34

network, and access type. 3GPP TS 23.503 provides charging control for IMS service data flows and permits charging treatment to vary based on the UE's roaming status, location, and access used to carry the service data flow, with the Charging Key identifying the applicable tariff.

**6.3.2.2 IMS Voice Roaming Architecture N9HR**

To support IMS roaming using N9 Home Routed (N9HR; refer to GSMA PRD IR.65 [38]), both the SMF/UPF and the Proxy-Call Session Control Function (P-CSCF) must be located in the HPMN. The same IMS voice roaming architecture using N9HR is used in case of IMS voice support over NR connected to 5GC and in case of EPS Fallback.

To select the correct SMF in the HPMN, the HPMN operator must not allow its IMS Voice subscribers to use VPMN addressing. See Section 6.8.2 for detailed discussion related to SMF selection and a "well-known" DNN usage related to IMS Voice Roaming.

For the VPMN and HPMN to enable N9HR IMS roaming, the following conditions must be fulfilled in 5GC and NG-RAN. Conditions in IMS are not listed:

IMS well-known DNN;

- QoS flow with 5QI=5 for SIP signalling;
- QoS flow with 5QI=1 for voice media; in case of EPS Fallback, the request to establish the QoS flow with 5QI=1 is rejected by the gNB.
- if videocall is supported, then QoS flow with 5QI=2 (or non-GBR 5QI);
- Downlink service level gating (to avoid additional and unexpected traffic on the signalling bearer) as described in 3GPP TS 23.501 [1] and 3GPP TS 23.503 [53].

This is also needed to avoid that additional and unexpected traffic on the signalling bearer reaches the lawful interception functions for N9HR in the VPMN.

If data media for IMS Data Channel as specified in section 5.1 of 3GPP Release 16 TS 26.114 [51] is supported, then QoS flow e.g. with 5QI=9, 71, 72, 73, 74, 76 as determined by the IMS data channel service.

Indication from AMF to the UE "IMS VoPS (Support Indicator) = supported" if the VPMN has a roaming agreement that covers support of IMS voice with the HPMN as specified in clause 5.16.3.2 of 3GPP TS 23.501 [1].

NOTE1: As specified in 3GPP TS 23.501 [1], "IMS VoPS" indicator can reflect the roaming agreement which is intended to support IMS voice only in EPS, while excluding the case of IMS voice via NR connected to 5GC.

Indication from AMF to the UDM "Homogeneous Support of IMS Voice over PS" based on the conditions specified in 3GPP TS 23.501[1]. 129

5.16.3.2 IMS voice over PS Session Supported Indication over 3GPP access

The serving PLMN AMF shall send an indication toward the UE during the Registration procedure over 3GPP access to indicate if an IMS voice over PS session is supported or not supported in 3GPP access and non-3GPP access. A UE

*ETSI*

**3GPP TS 23.501 version 19.5.0 Release 19** **319** **ETSI TS 123 501 V19.5.0 (2026-01)**

with "IMS voice over PS" voice capability over 3GPP access should take this indication into account when performing voice domain selection, as described in clause 5.16.3.5. 130

[129] https://www.gsma.com/newsroom/wp-content/uploads//NG.113-v14.0-1.pdf, at 77-78

[130] https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/19.05.00_60/ts_123501v190500p.pdf, at 318-319

### 2A.4.3 IMS Roaming Architecture using N9HR

The IMS Roaming Architecture using N9HR for 5GC is shown below in Figure 2A-7 (see also GSMA PRD NG.113 [57]).

The functionalities required are supported as described in section 2.4.3 but using the 5GC architecture (see 3GPP TS 23.501 [59] and GSMA PRD NG.113 [57]), namely usage of UPF in the HPMN.

The salient characteristics of the N9HR architecture for VoIMS Roaming (non-emergency services) are like described in section 2.4.3 but with some terminology changes:

- VoIMS calls are home routed using IMS well-known DNN via N9 interface; i.e. the IMS UNI is provided directly between UE and the HPMN for non-emergency calls.
- The IPX only differentiates the signalling and media traffic based on the requested QoS levels.
- The HPMN has full control over the VoIMS (non-emergency) call routing.
- The VPMN is not service aware, but it is QoS and DNN aware.
- The VPMN supports all NG-RAN (with Stand-alone NR) and 5GC capabilities to serve IMS inbound subscribers, e.g., IMS voice over PS support indication to the UE,

V35.0 Page 33 of 84

GSM Association Confidential - Full, Rapporteur, and Associate Members
Official Document IR.65 IMS Roaming, Interconnection and Interworking Guidelines

5QI=1 bearer for conversational voice; 5QI=2 bearer for conversational video, and 5QI=5 bearer for IMS signalling in NG-RAN (with Stand-alone NR) and 5GC.
- The PCC framework of the HPMN is used. QoS rules are generated in the HPMN and enforced by the VPMN as per roaming agreement.
- VPMN has the ability to downgrade requested QoS, or reject the requested bearer, in case the QoS values are outside the ranges configured in the MME per roaming agreement. Please refer to GSMA PRD NG.113 [57] for more details
- N9HR requires support for anonymous emergency calls over IMS.

7.




**Figure 2A-7: Control and User Plane Routing – S9HR** [131]

### 1.5 References

| Ref | Doc Number | Title |
|---|---|---|
| [47] | 3GPP TS 23.203 | Policy and charging control architecture |
| [61] | 3GPP TS 23.503 | Procedures for the 5G System (5GS); Stage 2 |

[132]

[131] https://www.gsma.com/newsroom/wp-content/uploads//IR.65-v36.0.pdf, at 33-34
[132] *Id.* at 9

### 4.2.2a Charging requirements

The requirements in this clause apply to both PCC rules based charging and ADC rules based charging unless exceptions are explicitly mentioned.

It shall be possible to apply different rates and charging models when a user is identified to be roaming from when the user is in the home network. Furthermore, it shall be possible to apply different rates and charging models based on the location of a user, beyond the granularity of roaming.

It shall be possible to apply different rates and charging models when a user consuming network services via a CSG cell or a hybrid cell according to the user CSG information. User CSG information includes CSG ID, access mode and CSG membership indication.

It shall be possible to apply a separate rate to a specific service, e.g. allow the user to download a certain volume of data, reserved for the purpose of one service for free and then continue with a rate causing a charge.

It shall be possible to change the rate based on the time of day.

It shall be possible to enforce per-service identified by PCC Rule/per-application identified by ADC Rule usage limits for a service data flow using online charging on a per user basis (may apply to prepaid and post-paid users).

It shall be possible to apply different rates depending on the access used to carry a Service Data Flow. This applies also to a PDN connection supporting NBIFOM.

It shall be possible for the online charging system to set and send the thresholds (time and/or volume based) for the amount of remaining credit to the PCEF or TDF for monitoring. In case the PCEF or TDF detects that any of the time based or volume based credit falls below the threshold, the PCEF or TDF shall send a request for credit re-authorization to the OCS with the remaining credit (time and/or volume based).

It shall be possible for the charging system to select the applicable rate based on:

- home/visited IP-CAN;
- User CSG information;
- IP-CAN bearer characteristics (e.g. QoS);
- QoS provided for the service;
- time of day;
- IP-CAN specific parameters according to Annex A.

IP-CAN bearer characteristics are not applicable to charging performed in TDF.

NOTE 1: The same IP-CAN parameters related to access network/subscription/location information as reported for service data flow based charging may need to be reported for the application based charging at the beginning of the session and following any of the relevant re-authorization triggers.

The charging system maintains the tariff information, determining the rate based on the above input. Thus the rate may change e.g. as a result of IP-CAN session modification to change the bearer characteristics provided for a service data flow. [133]

[133] https://www.etsi.org/deliver/etsi_ts/123200_123299/123203/19.02.00_60/ts_123203v190200p.pdf, at 23

## Introduction

For references to TS 23.203 [4] made in this document,

- the IP-CAN session of TS 23.203 [4] maps to the PDU Session in 5GC.
- the APN of TS 23.203 [4] maps to DNN in 5GC.
- the IP-CAN bearer of TS 23.203 [4] maps to the QoS Flow in 5GC.
- The PCRF of TS 23.203 [4] maps to the PCF in 5GC.
- The PCEF of TS 23.203 [4] maps to the combination of SMF and UPF in 5GC.
- The BBF shall be considered as being located in the PCEF.
- TDF related description does not apply.
- NBIFOM related description does not apply.

[134]

**Charging control:** The process of associating packets, belonging to a service data flow, to a charging key and applying online charging and/or offline charging, as appropriate.

[135]

### 4.3.2 Charging related requirements

#### 4.3.2.1 General

In order to allow for charging control on service data flow, the information in the PCC rule identifies the service data flow and specifies the parameters for charging control.

For the purpose of charging correlation between service data flow level and application level (e.g. IMS) as well as on-line charging support at the application level, applicable charging identifiers and Access Type identifiers shall be passed from the PCF to the AF, if such identifiers are available.

#### 4.3.2.2 Charging models

The PCC charging shall support the following charging models for charging performed by SMF:

---

[134] https://www.etsi.org/deliver/etsi_ts/123500_123599/123503/19.05.00_60/ts_123503v190500p.pdf, at 8

[135] *Id.* at 10

- Volume based charging;
- Time based charging;
- Volume and time based charging;
- Event based charging;
- No charging.

NOTE: The charging model - "No charging" implies that charging control is not applicable, and no charging records are generated.

#### 4.3.2.3 Charging requirements

It shall be possible to apply different rates and charging models depending on a UE's roaming status.

It shall be possible to apply different rates based on the location of a UE.

It shall be possible to apply different rates for specific part of a service, e.g. allow the UE to download a certain volume for one rate, and after this volume has been reached continue with a different rate.

It shall be possible to apply different rates based on the time of day.

It shall be possible to enforce per service data flow, identified by PCC Rule, usage limits on a per UE basis.

It shall be possible to apply different rates depending on the access used to carry a Service Data Flow

It shall be possible to apply an online charging action upon Application Start/Stop events.

It shall be possible to indicate to the SMF that interactions with the CHF are not required for a PCC rule, i.e. to not perform accounting, credit control or recording of usage for the service data flow, in this case no charging information is generated.

#### 4.3.2.4 Examples of Service Data Flow Charging

There are many different services that may be used within a network, including both user-user and user-network services. Service data flows from these services may be identified and charged in many different ways. A number of examples of configuring PCC rules for different service data flows are described below.

EXAMPLE 1: A network server provides an FTP service. The FTP server supports both the active (separate ports for control and data) and passive modes of operation. A PCC rule is configured for the service data flows associated with the FTP server for the user. The PCC rule uses a filter specification for the uplink that identifies packets sent to port 20 or 21 of the IP address of the server, and the origination information is wildcarded. In the downlink direction, the filter specification identifies packets sent from port 20 or 21 of the IP address of the server.

EXAMPLE 2: A network server provides a "web" service. A PCC rule is configured for the service data flows associated with the HTTP server for the user. The PCC rule uses a filter specification for the uplink that identifies packets sent to port 80 of the IP address of the server, and the origination information is wildcarded. In the downlink direction, the filter specification identifies packets sent from port 80 of the IP address of the server.

EXAMPLE 3: An operator has a specific charging rate for user-user VoIP traffic over the IMS. A PCC rule is established for this service data flow. The filter information to identify the specific service data flow for the user-user traffic is provided by the P-CSCF (AF). [136]

136 https://www.etsi.org/deliver/etsi_ts/123500_123599/123503/19.05.00_60/ts_123503v190500p.pdf, at 17-18

6.2.1.1.1 Session management related functionality

The PCF provides the following session management related functionality:

- Policy and charging control for a service data flows;
- PDU Session related policy control;
- PDU Session event reporting to the AF.

The PCF provides authorized QoS for a service data flow and other network control regarding service data flow detection, gating, QoS and charging (except credit management) towards the SMF.

The PCF uses the service information received from the AF (e.g. SDP information or other available application information) and/or the subscription information received from the UDR to calculate the proper QoS authorization (QoS class identifier, bitrates). The PCF may also take into account the requested QoS received from the SMF and the analytics information (e.g. analytics related to "Service Experience" and "QoS and policy assistance") received from the NWDAF.

NOTE 1: The PCF provides always the maximum values for the authorized QoS even if the requested QoS is lower than what can be authorized.

The PCF may check that the service information provided by the AF is consistent with both the operator defined policies and the related subscription information as received from the UDR during PDU Session establishment before storing the service information. The PCF may reject the request received from the AF when the service information is not consistent with either the related subscription information or the operator defined policies and may indicate, in the response to the AF, the service information that can be accepted by the PCF (e.g. the acceptable bandwidth). In the absence of other policy control mechanisms outside the scope of PCC, it is recommended that the PCF include this information in the response.

In this Release, the PCF supports only the interaction with a single AF for each AF session.

The Authorization of QoS shall be based on complete service information unless the PCF is required to perform the authorization of QoS based on preliminary service information. The PCF shall after receiving the complete service information, update the affected PCC rules accordingly.

At reception of the service information from the AF if configured through policy and taking into account information defined in TS 26.114 [31], the PCF determines the Maximum Packet Loss Rate for UL and DL based on the service information and sends it to SMF along with the PCC rule.

NOTE 2: Based on local configuration, the PCF sets the Maximum Packet Loss Rate (UL, DL) corresponding to either the most robust codec configuration (e.g. codec, mode, redundancy) or the least robust codec configuration of the negotiated set in each direction.

NOTE 3: Details for setting the Maximum Packet Loss Rate are specified by SA4.

The PCF supports usage monitoring control as described in clause 6.2.1.7.

The PCF supports sponsored data connectivity for a service as described in clause 6.2.1.8.

The PCF uses the information relating to subscriber spending available in the CHF as input for policy decisions related to e.g. QoS control, gating or charging conditions. Details for policy decisions based on spending limits are described in clause 6.1.3.17.

The PCF uses one or more pieces of information defined in the clause 6.2.1.2 as input for the selection of traffic steering policies used to control the steering of the subscriber's traffic as described in clause 6.1.3.14.

The PCF reports PDU Session events, e.g. Access Type, RAT Type (if applicable), Access Network Information, PLMN identifier where the UE is located, as described in clause 6.1.3.18.

The subscription and reporting of events when the target for reporting is an Internal Group Identifier or any UE accessing a combination of (DNN, S-NSSAI), is described in clause 5.2.5.7 of TS 23.502 [3]. The events that can be reported by the PCF are described in clause 6.1.3.18. [137]

[137] *Id.* at 114-115

## 6.3 Policy and charging control rule

### 6.3.1 General

The Policy and charging control rule (PCC rule) comprises the information that is required to enable the user plane detection of, the policy control and proper charging for a service data flow. The packets detected by applying the service data flow template of a PCC rule form a service data flow.

Two different types of PCC rules exist: Dynamic rules and predefined rules. The dynamic PCC rules are provisioned by the PCF to the SMF, while the predefined PCC rules are configured into the SMF, as described in TS 23.501 [2], and only referenced by the PCF.

**Table 6.3.1: The PCC rule information in 5GC**

| Information name | Description | Category | PCF permitted to modify for a dynamic PCC rule in the SMF | Differences compared with table 6.3. in TS 23.203 [4] |
|---|---|---|---|---|
| **Charging** | *This part defines identities and instructions for charging and accounting that is required for an access point where flow based charging is configured* | | | |
| Charging key (NOTE 22) | The charging system (CHF) uses the charging key to determine the tariff to apply to the service data flow. | | Yes | None |

[138]

106. The Accused Products comprise a calling service configured to: place a call to a destination number for the mobile device subject to the determined first call rate. For example, when a Verizon subscriber initiates a voice call, the mobile device provides the destination number as part of the IMS session-establishment signaling. An IMS session is established using a SIP INVITE request, with the Request-URI identifying the intended destination of the session. The IMS network processes and routes the INVITE toward the identified destination in accordance with the IMS session-routing procedures described in 3GPP TS 23.228. When the subscriber is roaming, an applicable voice-call rate may be determined based, at least in part, on the subscriber's connection and roaming information, including the visited network or roaming location. Verizon publishes different voice rates applicable to calls made while subscribers are roaming in different countries or regions. Accordingly, after the applicable first call rate is determined for the subscriber's roaming context, Verizon's IMS-based VoLTE/VoNR network places and routes the

[138] *Id.* at 133-134

call to the destination number subject to that applicable rate. Furthermore, the network provides charging control for IMS service data flows and permits charging treatment to vary based on the UE's roaming status, location, and access used to carry the service data flow, with the Charging Key identifying the applicable tariff.

### 5.1.3 Call initiation - UE-originating case

#### 5.1.3.1 Initial INVITE request

Where multiple domains exist for initiating a call/session, before sending an initial INVITE request, the UE shall perform access domain selection in accordance with the appropriate specification for the IP-CAN in use, taking into

account the media to be requested. Access domain selection allows the policy of the network operator to be taken into account before the initial INVITE request is sent. Access dependent aspects of access domain selection are defined in the access technology specific annexes for each access technology.

Upon generating an initial INVITE request, the UE shall include the Accept header field with "application/sdp", the MIME type associated with the 3GPP IM CN subsystem XML body (see subclause 7.6.1) and any other MIME type the UE is willing and capable to accept.

The "integration of resource management and SIP" extension is hereafter in this subclause referred to as "the precondition mechanism" and is defined in RFC 3312 [30] as updated by RFC 4032 [64].

The preconditions mechanism should be supported by the originating UE.

If the precondition mechanism is disabled as specified in subclause 5.1.5A, the UE shall not use the precondition mechanism.

The UE may initiate a session without the precondition mechanism if the originating UE does not require local resource reservation.

NOTE 1: The originating UE can decide if local resource reservation is required based on e.g. application requirements, current access network capabilities, local configuration, etc.

In order to allow the peer entity to reserve its required resources, if the precondition mechanism is enabled as specified in subclause 5.1.5A; the originating UE supporting the precondition mechanism should make use of the precondition mechanism, even if it does not require local resource reservation.

Upon generating an initial INVITE request using the precondition mechanism, the UE shall:

- indicate the support for reliable provisional responses and specify it using the Supported header field; and
- indicate the support for the preconditions mechanism and specify it using the Supported header field.

Upon generating an initial INVITE request using the precondition mechanism, the UE shall:

- indicate the support for reliable provisional responses and specify it using the Supported header field; and
- indicate the support for the preconditions mechanism and specify it using the Supported header field.

Upon generating an initial INVITE request using the precondition mechanism, the UE shall not indicate the requirement for the precondition mechanism by using the Require header field.

During the session initiation, if the originating UE indicated the support for the precondition mechanism in the initial INVITE request and:

a) the received response with an SDP body includes a Require header field with "precondition" option-tag, the originating UE shall include a Require header field with the "precondition" option-tag:
   - in subsequent requests that include an SDP body, that the originating UE sends in the same dialog as the response is received from; and
   - in responses with an SDP body to subsequent requests that include an SDP body and include "precondition" option-tag in Supported header field or Require header field received in-dialog; or

b) the received response with an SDP body does not include the "precondition" option-tag in the Require header field,
   - in subsequent requests that include an SDP body, the originating UE shall not include a Require or Supported header field with "precondition" option-tag in the same dialog;
   - in responses with an SDP body to subsequent requests with an SDP body but without "precondition" option-tag in the Require or Supported header field, the originating UE shall not include a Require or Supported header field with "precondition" option-tag in the same dialog; and
   - in responses with an SDP body to subsequent requests with an SDP body and with "precondition" option-tag in the Require or Supported header field, the originating UE shall include a Require header field with "precondition" option-tag in the same dialog.

[139]

### 5.1.2A.1.2 Structure of Request-URI

The UE may include a SIP URI complying with RFC 3261 [26], a tel URI complying with RFC 3966 [22], a pres URI complying with RFC 3859 [179], an im URI complying with RFC 3860 [180], a mailto URI complying with RFC 2368 [181] or a "urn:service:test.sos.ecall" service URN with zero or more further sub-services, complying with RFC 8147 [244].

NOTE: This version of the document does not specify how the UE determines the host part of the SIP URI.

The UE may use non-international formats of E.164 numbers or non-E.164 numbers, including geo-local numbers and home-local numbers and other local numbers (e.g. private number), in the Request-URI.

The actual value of the URI depends on whether user equipment performs an analysis of the dial string input by the end user or not, see subclauses 5.1.2A.1.3 and 5.1.2A.1.4.

[140]

139 https://www.etsi.org/deliver/etsi_ts/124200_124299/124229/19.05.00_60/ts_124229v190500p.pdf, at 147-148

140 *Id.* at 141

## 5.6 Origination procedures

### 5.6.0 General

This clause presents the detailed application level flows to define the Procedures for session originations.

The flows presented in the clause assume the use of Policy and Charging Control for the establishment of QoS-Assured Sessions.

The session origination procedures specify the signalling path between the UE initiating a session setup attempt and the Serving-CSCF that is assigned to perform the session origination service. This signalling path is determined at the time of UE registration and remains fixed for the life of the registration.

A UE always has a proxy (P-CSCF) associated with it. This P-CSCF performs resource authorization and may have additional functions in handling of emergency and priority sessions. The P-CSCF is determined by the CSCF discovery process, described in clause 5.1.1 (Local CSCF Discovery).

As a result of the registration procedure, the P-CSCF determines the next hop toward the Serving-CSCF. This next hop is to the S-CSCF in the home network (MO#1). These next-hop addresses could be IP addresses, or could be names that are translated via DNS to an IP address.

Sessions originated in the PSTN to a destination in an IMS network are a special case of the Origination procedures. The MGCF uses H.248 [18] to control a Media Gateway and communicates with the SS7 network. The MGCF initiates the SIP request and subsequent nodes consider the signalling as if it came from a S-CSCF.

### 5.6.1 (MO#1) Mobile origination, roaming

This origination procedure applies to roaming users.

The UE is located in a visited network and determines the P-CSCF via the CSCF discovery procedure described in clause 5.1.1. The home network advertises the S-CSCF as the entry point from the visited network.

When registration is complete, P-CSCF knows the name/address of the next hop in the signalling path toward the serving-CSCF.




**Figure 5.14: Mobile origination procedure - roaming** [141]

---

141 https://www.etsi.org/deliver/etsi_ts/123200_123299/123228/19.05.00_60/ts_123228v190500p.pdf, at 122-123

### 5.6.2 (MO#2) Mobile origination, home

This origination procedure applies to users located in their home service area.

The UE is located in the home network and determines the P-CSCF via the CSCF discovery procedure described in clause 5.1.1. During registration, the home network allocates an S-CSCF in the home network.

When registration is complete, P-CSCF knows the name/address of S-CSCF.




**Figure 5.15: Mobile origination procedure - home** [142]

---

[142] *Id.* at 125

### 5.5.1 (S-S#1) Different network operators performing origination and termination

The Serving-CSCF handling session origination performs an analysis of the destination address and determines that it belongs to a subscriber of a different operator. The request is therefore forwarded to a well-known entry point in the destination operator's network, the I-CSCF. The I-CSCF queries the HSS for current location information and finds the user either located in the home service area, or roaming. The I-CSCF therefore forwards the request to the S-CSCF serving the destination user.

Refer to table 5.2 in clause 5.4a to see which origination sequences share this common S-S procedure. In addition the text below clarifies the role of the" Originating Network".

MO#1 Mobile origination, roaming. The "Originating Network" of S-S#1 is therefore a visited network.

MO#2 Mobile origination, home. The "Originating Network" of S-S#1 is therefore the home network.

PSTN-O PSTN origination. The "Originating Network" of S-S#1 is the PSTN network. The elements of figure 5.16 replace all elements of the Originating network and Originating Home Network in figure 5.10.

AS-O Application Server origination. The" Originating Network" of S-S#1 is the home network. The element labelled S-CSCF#1 corresponds to the S-SCSF in figure 5.16b.

NI-O Non-IMS network origination. The external SIP client of figure 5. 16b replaces all elements of the Originating network and Originating Home Network in figure 5.10. There may be other non-IMS SIP servers on the path that are not shown.

Refer to table 5.2 in clause 5.4a to see which termination sequences share this common S-S procedure. In addition the text below clarifies the role of the" Terminating Network".

MT#1 Mobile termination, roaming. The "Terminating Network" of S-S#1 is a visited network.

MT#2 Mobile termination, located in home service area. The "Terminating Network" of S-S#1 is the home network.

### 5.5.2 (S-S#2) Single network operator performing origination and termination

The Serving-CSCF handling session origination performs an analysis of the destination address and determines that it belongs to a subscriber of the same operator. The request is therefore forwarded to a local I-CSCF. The I-CSCF queries the HSS for current location information and finds the user either located in the home service area, or roaming. The I-CSCF therefore forwards the request to the S-CSCF serving the destination user.

Refer to table 5.2 in clause 5.4a to see which origination sequences share this common S-S procedure. In addition the text below clarifies the role of the" Originating Network".

MO#1 Mobile origination, roaming. The "Originating Network" of S-S#2 is therefore a visited network.

MO#2 Mobile origination, home. The "Originating Network" of S-S#2 is therefore the home network.

AS-O Application Server origination. The" Originating Network" of S-S#1 is the home network. The element labelled S-CSCF#1 corresponds to the S-CSCF in figure 5.16b.

Refer to table 5.2 in clause 5.4a to see which termination sequences share this common S-S procedure. In addition the text below clarifies the role of the" Terminating Network".

MT#1 Mobile termination, roaming,. The "Terminating Network" of S-S#2 is a visited network.

MT#2 Mobile termination, home. The "Terminating Network" of S-S#2 is the home network.

MT#3 Mobile termination, CS Domain roaming. The "Terminating Network" of S-S#2 is a CS domain network.

AS-T#1,2,3,4 Application Server termination. The elements of the corresponding AS-T termination figure (5.7.5, 5.7.6, 5.7.7 and 5.7.8) replace all elements of the Terminating Home Network and Terminating Network off figure 5.11. [143]

[143] *Id.* at 113-115

### 4.2.2a Charging requirements

The requirements in this clause apply to both PCC rules based charging and ADC rules based charging unless exceptions are explicitly mentioned.

It shall be possible to apply different rates and charging models when a user is identified to be roaming from when the user is in the home network. Furthermore, it shall be possible to apply different rates and charging models based on the location of a user, beyond the granularity of roaming.

It shall be possible to apply different rates and charging models when a user consuming network services via a CSG cell or a hybrid cell according to the user CSG information. User CSG information includes CSG ID, access mode and CSG membership indication.

It shall be possible to apply a separate rate to a specific service, e.g. allow the user to download a certain volume of data, reserved for the purpose of one service for free and then continue with a rate causing a charge.

It shall be possible to change the rate based on the time of day.

It shall be possible to enforce per-service identified by PCC Rule/per-application identified by ADC Rule usage limits for a service data flow using online charging on a per user basis (may apply to prepaid and post-paid users).

It shall be possible to apply different rates depending on the access used to carry a Service Data Flow. This applies also to a PDN connection supporting NBIFOM.

It shall be possible for the online charging system to set and send the thresholds (time and/or volume based) for the amount of remaining credit to the PCEF or TDF for monitoring. In case the PCEF or TDF detects that any of the time based or volume based credit falls below the threshold, the PCEF or TDF shall send a request for credit re-authorization to the OCS with the remaining credit (time and/or volume based).

It shall be possible for the charging system to select the applicable rate based on:

- home/visited IP-CAN;
- User CSG information;
- IP-CAN bearer characteristics (e.g. QoS);
- QoS provided for the service;
- time of day;
- IP-CAN specific parameters according to Annex A.

IP-CAN bearer characteristics are not applicable to charging performed in TDF.

NOTE 1: The same IP-CAN parameters related to access network/subscription/location information as reported for service data flow based charging may need to be reported for the application based charging at the beginning of the session and following any of the relevant re-authorization triggers.

The charging system maintains the tariff information, determining the rate based on the above input. Thus the rate may change e.g. as a result of IP-CAN session modification to change the bearer characteristics provided for a service data flow. [144]

[144] https://www.etsi.org/deliver/etsi_ts/123200_123299/123203/19.02.00_60/ts_123203v190200p.pdf, at 23

# Introduction

For references to TS 23.203 [4] made in this document,

- the IP-CAN session of TS 23.203 [4] maps to the PDU Session in 5GC.
- the APN of TS 23.203 [4] maps to DNN in 5GC.
- the IP-CAN bearer of TS 23.203 [4] maps to the QoS Flow in 5GC.
- The PCRF of TS 23.203 [4] maps to the PCF in 5GC.
- The PCEF of TS 23.203 [4] maps to the combination of SMF and UPF in 5GC.
- The BBF shall be considered as being located in the PCEF.
- TDF related description does not apply.
- NBIFOM related description does not apply.

[145]

**Charging control:** The process of associating packets, belonging to a service data flow, to a charging key and applying online charging and/or offline charging, as appropriate. [146]

## 4.3.2 Charging related requirements

### 4.3.2.1 General

In order to allow for charging control on service data flow, the information in the PCC rule identifies the service data flow and specifies the parameters for charging control.

For the purpose of charging correlation between service data flow level and application level (e.g. IMS) as well as on-line charging support at the application level, applicable charging identifiers and Access Type identifiers shall be passed from the PCF to the AF, if such identifiers are available.

### 4.3.2.2 Charging models

The PCC charging shall support the following charging models for charging performed by SMF:

---

145 https://www.etsi.org/deliver/etsi_ts/123500_123599/123503/19.05.00_60/ts_123503v190500p.pdf, at 7

146 *Id.* at 10

- Volume based charging;
- Time based charging;
- Volume and time based charging;
- Event based charging;
- No charging.

NOTE: The charging model - "No charging" implies that charging control is not applicable, and no charging records are generated.

#### 4.3.2.3 Charging requirements

It shall be possible to apply different rates and charging models depending on a UE's roaming status.

It shall be possible to apply different rates based on the location of a UE.

It shall be possible to apply different rates for specific part of a service, e.g. allow the UE to download a certain volume for one rate, and after this volume has been reached continue with a different rate.

It shall be possible to apply different rates based on the time of day.

It shall be possible to enforce per service data flow, identified by PCC Rule, usage limits on a per UE basis.

It shall be possible to apply different rates depending on the access used to carry a Service Data Flow

It shall be possible to apply an online charging action upon Application Start/Stop events.

It shall be possible to indicate to the SMF that interactions with the CHF are not required for a PCC rule, i.e. to not perform accounting, credit control or recording of usage for the service data flow, in this case no charging information is generated.

#### 4.3.2.4 Examples of Service Data Flow Charging

There are many different services that may be used within a network, including both user-user and user-network services. Service data flows from these services may be identified and charged in many different ways. A number of examples of configuring PCC rules for different service data flows are described below.

EXAMPLE 1: A network server provides an FTP service. The FTP server supports both the active (separate ports for control and data) and passive modes of operation. A PCC rule is configured for the service data flows associated with the FTP server for the user. The PCC rule uses a filter specification for the uplink that identifies packets sent to port 20 or 21 of the IP address of the server, and the origination information is wildcarded. In the downlink direction, the filter specification identifies packets sent from port 20 or 21 of the IP address of the server.

EXAMPLE 2: A network server provides a "web" service. A PCC rule is configured for the service data flows associated with the HTTP server for the user. The PCC rule uses a filter specification for the uplink that identifies packets sent to port 80 of the IP address of the server, and the origination information is wildcarded. In the downlink direction, the filter specification identifies packets sent from port 80 of the IP address of the server.

EXAMPLE 3: An operator has a specific charging rate for user-user VoIP traffic over the IMS. A PCC rule is established for this service data flow. The filter information to identify the specific service data flow for the user-user traffic is provided by the P-CSCF (AF).

[147]

107. The Accused Products comprise a calling service configured to: communicate data packets of call audio to the mobile device through the first packetized data connection path. For example, during an IMS voice call, call audio is packetized and transported as IP media between the IMS voice service and the subscriber's mobile device over the packet-data connection established for the voice session. A PDU Session is provided between the UE and the Data

[147] *Id.* at 16-17

Network for exchanging packet data, while GSMA NG.113 identifies the N9 connection as carrying user-plane traffic between the visited and home networks. GSMA IR.65 further depicts a VoIMS roaming architecture in which the UE is connected to the IMS core through the visited network, the N9/IPX connection, and the home network.

> **PDU Connectivity Service:** A service that provides exchange of PDUs between a UE and a Data Network.
>
> **PDU Session:** Association between the UE and a Data Network that provides a PDU connectivity service.

[148]

> **5.1.2 N9 Interface between VPMN and HPMN UPF**
>
> The Home Routed (HR) scenario makes use of both SMF's and UPF's in the VPMN and HPMN. In this case the SMF in the HPMN (H-SMF) selects the UPF(s) in the HPMN, and the SMF in the VPMN (V-SMF in this case) selects the UPF(s) in the VPMN. Thus, the N9 reference point for user plane traffic is applicable to the HR scenario, as seen in Figure 4 and Figure 5. Both V-SMF and H-SMF are selected by the AMF during PDU session establishment. The V-SMF can be changed, e g., during N2 handover procedure as described in section 4.23 of 3GPP TS 23.502 [2].

[149]

> **6.3.2.2 IMS Voice Roaming Architecture N9HR**
>
> To support IMS roaming using N9 Home Routed (N9HR; refer to GSMA PRD IR.65 [38]), both the SMF/UPF and the Proxy-Call Session Control Function (P-CSCF) must be located in the HPMN. The same IMS voice roaming architecture using N9HR is used in case of IMS voice support over NR connected to 5GC and in case of EPS Fallback.
>
> To select the correct SMF in the HPMN, the HPMN operator must not allow its IMS Voice subscribers to use VPMN addressing. See Section 6.8.2 for detailed discussion related to SMF selection and a "well-known" DNN usage related to IMS Voice Roaming.
>
> For the VPMN and HPMN to enable N9HR IMS roaming, the following conditions must be fulfilled in 5GC and NG-RAN. Conditions in IMS are not listed:

[148] https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/19.05.00_60/ts_123501v190500p.pdf, at 38

[149] https://www.gsma.com/newsroom/wp-content/uploads//NG.113-v14.0-1.pdf, at 69

> IMS well-known DNN;
>
> - QoS flow with 5QI=5 for SIP signalling;
> - QoS flow with 5QI=1 for voice media; in case of EPS Fallback, the request to establish the QoS flow with 5QI=1 is rejected by the gNB.
> - if videocall is supported, then QoS flow with 5QI=2 (or non-GBR 5QI);
> - Downlink service level gating (to avoid additional and unexpected traffic on the signalling bearer) as described in 3GPP TS 23.501 [1] and 3GPP TS 23.503 [53].
>
> This is also needed to avoid that additional and unexpected traffic on the signalling bearer reaches the lawful interception functions for N9HR in the VPMN.
>
> If data media for IMS Data Channel as specified in section 5.1 of 3GPP Release 16 TS 26.114 [51] is supported, then QoS flow e.g. with 5QI=9, 71, 72, 73, 74, 76 as determined by the IMS data channel service.
>
> Indication from AMF to the UE "IMS VoPS (Support Indicator) = supported" if the VPMN has a roaming agreement that covers support of IMS voice with the HPMN as specified in clause 5.16.3.2 of 3GPP TS 23.501 [1].
>
> NOTE1: As specified in 3GPP TS 23.501 [1], "IMS VoPS" indicator can reflect the roaming agreement which is intended to support IMS voice only in EPS, while excluding the case of IMS voice via NR connected to 5GC.
>
> Indication from AMF to the UDM "Homogeneous Support of IMS Voice over PS" based on the conditions specified in 3GPP TS 23.501[1].

[150]

> **5.16.3.2 IMS voice over PS Session Supported Indication over 3GPP access**
>
> The serving PLMN AMF shall send an indication toward the UE during the Registration procedure over 3GPP access to indicate if an IMS voice over PS session is supported or not supported in 3GPP access and non-3GPP access. A UE

> with "IMS voice over PS" voice capability over 3GPP access should take this indication into account when performing voice domain selection, as described in clause 5.16.3.5.
>
> The serving PLMN AMF may only indicate IMS voice over PS session supported over 3GPP access in one of the following cases:
>
> - If the network and the UE are able to support IMS voice over PS session in the current Registration Area with a 5G QoS Flow that supports voice as specified in clause 5.7.

[151]

---

[150] https://www.gsma.com/newsroom/wp-content/uploads//NG.113-v14.0-1.pdf, at 77-78

[151] https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/19.05.00_60/ts_123501v190500p.pdf, at 320-321

**2A.4.3 IMS Roaming Architecture using N9HR**

The IMS Roaming Architecture using N9HR for 5GC is shown below in Figure 2A-7 (see also GSMA PRD NG.113 [57]).

The functionalities required are supported as described in section 2.4.3 but using the 5GC architecture (see 3GPP TS 23.501 [59] and GSMA PRD NG.113 [57]), namely usage of UPF in the HPMN.

The salient characteristics of the N9HR architecture for VoIMS Roaming (non-emergency services) are like described in section 2.4.3 but with some terminology changes:

- VoIMS calls are home routed using IMS well-known DNN via N9 interface; i.e. the IMS UNI is provided directly between UE and the HPMN for non-emergency calls.
- The IPX only differentiates the signalling and media traffic based on the requested QoS levels.
- The HPMN has full control over the VoIMS (non-emergency) call routing.
- The VPMN is not service aware, but it is QoS and DNN aware.
- The VPMN supports all NG-RAN (with Stand-alone NR) and 5GC capabilities to serve IMS inbound subscribers, e.g., IMS voice over PS support indication to the UE,

V35.0 Page 33 of 84

GSM Association Confidential - Full, Rapporteur, and Associate Members
Official Document IR.65 IMS Roaming, Interconnection and Interworking Guidelines

5QI=1 bearer for conversational voice; 5QI=2 bearer for conversational video, and 5QI=5 bearer for IMS signalling in NG-RAN (with Stand-alone NR) and 5GC.

- The PCC framework of the HPMN is used. QoS rules are generated in the HPMN and enforced by the VPMN as per roaming agreement.
- VPMN has the ability to downgrade requested QoS, or reject the requested bearer, in case the QoS values are outside the ranges configured in the MME per roaming agreement. Please refer to GSMA PRD NG.113 [57] for more details
- N9HR requires support for anonymous emergency calls over IMS.

7.




**Figure 2A-7: Control and User Plane Routing – S9HR** [152]

108. Defendants have and continue to indirectly infringe one or more claims of the ’429 Patent by knowingly and intentionally inducing others, including Verizon customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

[152] https://www.gsma.com/newsroom/wp-content/uploads//IR.65-v36.0.pdf, at 33-34

109. Defendants, with knowledge that these products, or the use thereof, infringe the ’429 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continue to knowingly and intentionally induce, direct infringement of the ’429 Patent by providing these products to end-users for use in an infringing manner. Alternatively, on information and belief, Defendants have adopted a policy of not reviewing the patents of others, and instructing their officers, agents, and employees to not review the patents of others, including specifically those related to Defendants’ specific industry, thereby remaining willfully blind to the ’429 Patent at least as early as the issuance of the ’429 Patent.

110. Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the ’429 Patent, but while remaining willfully blind to the infringement. Defendants have and continue to induce infringement by their customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants’ website, product literature and packaging, and other publications, including any of Defendants’ materials cited in this Complaint.

111. On information and belief, Defendants directly prepare and/or assist in the preparation of, and provide customers and end-users with, information and documents for their specific products. On information and belief, Defendants’ product literature and other product information documents are prepared by or under the direction of Defendants to instruct customers and end-users on how to use the Accused Products in an infringing manner.

112. Because of Defendants’ inducement, Defendants’ customers and end-users use Accused Products in a way Defendants intend and directly infringe the ’429 Patent. Defendants

perform these affirmative acts with knowledge of the ’429 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’429 Patent.

113. Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the ’429 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants’ affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others’ use and manufacture of the Accused Products, such that the ’429 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the ’429 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be especially made or adapted for use in the infringement of the ’429 Patent. The accused components include, but are not limited to, components necessary for the operation of Defendants infringing systems including, but not limited to, the hardware and software associated with Verizon’s 4G LTE and 5G mobile networks that support IMS-based VoLTE and VoNR. Defendants perform these affirmative acts with knowledge of the ’429 Patent and with intent, or willful blindness, that they cause the direct infringement of the ’429 Patent.

114. SLR has suffered damages as a result of Defendants’ direct and indirect infringement of the ’429 Patent in an amount to be proven at trial.

115. SLR has suffered, and will continue to suffer, irreparable harm as a result of Defendants’ infringement of the ’429 Patent, for which there is no adequate remedy at law, unless Defendants’ infringement is enjoined by this Court.

**COUNT VI**
**(Infringement of the '459 Patent)**

116. Paragraphs 1 through 31 are incorporated by reference as if fully set forth herein.

117. SLR has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '459 Patent.

118. Defendants have and continue to directly infringe the '459 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '459 Patent. Such infringing products include the Verizon cloud-native 5G Core, including all associated hardware and software.

119. For example, Defendants have and continue to directly infringe at least Claim 24 of the '459 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include the Verizon cloud-native 5G Core.

120. The Accused Products perform a method for providing data access security in a communications network, the method comprising: authenticating, in an interconnect network of the communications network, a general packet radio service (GPRS) tunnel protocol (GTP) request to create a new session, the authenticating including authenticating network and subscriber information included in the GTP request. For example, the Verizon cloud-native 5G Core supports 4G/LTE and 5G connectivity, including LTE/EPC-based packet-data services and inter-operator roaming. Accordingly, the data-access security functionality is provided within Verizon's LTE/EPC roaming and interconnect network, where GTP signaling associated with roaming data sessions traverses the interconnect infrastructure and is subject to GTP security and filtering mechanisms at the interconnect-facing network edge, as described in GSMA FS.20 specification (section 4.3). This functionality is also applicable to 5G NSA deployments, which retain the

underlying LTE/EPC core and GTP-based packet-data architecture. Thus, Verizon's network, including its LTE/EPC packet core and roaming/interconnect infrastructure, provides the communications network supporting GTP-based data-access security for LTE and 5G NSA.

> Verizon offered a glimpse under the hood in late 2022 when it announced that it was starting to move commercial traffic to its 5G core—a key component of the network—which features an all-new design that could support standalone and non-standalone 5G, among other advanced technologies. That's an exciting leap forward, but what do those things really mean, and why do they matter for businesses and consumers?

> Verizon's 5G core—and thus its 5G SA technology—is built on a cloud-based platform that Verizon created specifically for telecommunications workloads. No other telecommunications company has taken this step (others are using cloud systems from outside providers). Because it's built specifically for telecommunications workloads, it can support the advanced technologies and services that provide the reliability and performance customers expect now, as well as what they'll need in the future.

[153]

> **The 5G core is built on the Verizon Cloud Platform**
>
> Verizon has officially begun moving customer traffic onto its cloud-native, containerized-design 5G core. Doing so will deliver "unprecedented levels of service agility, flexibility and automated scalability," said the carrier.
>
> The 5G core is built on the Verizon Cloud Platform (VCP), which is an internally built telco cloud base on a Webscale software architecture that the carrier runs in its data centers. The VCP, said Verizon, will enable support for 5G standalone, 4G/5G Non-Standalone and Voice over New Radio (VoNR) services.

[154]

[153] https://www.verizon.com/about/news/5g-standalone-why-it-matters
[154] https://www.rcrwireless.com/20221014/featured/now-is-the-time-verizon-migrates-commercial-traffic-to-5g-core



155

The global mobile industry stands at a critical juncture. A shift is underway to transform telecommunication networks from simple connectivity pipes into intelligent, programmable platforms. Through standardized Network APIs and initiatives like GSMA Open Gateway and CAMARA, the industry is creating a unified, cross-operator framework to expose powerful network capabilities. This enables developers and enterprises to harness powerful network capabilities, transforming current applications and building the foundation for future innovation.
Join leaders from Verizon and RCR Wireless News for a forward-looking discussion on this industry-wide transformation. Get a firsthand look at how Verizon is pioneering this evolution in North America, turning the promise of the programmable network into a reality.
Sponsored by the GSMA. 156

**— Operator Platform Group**

These companies are working to provide Operator Platform products and solutions.

| Company | Headquarters | Solution | Website | Contact Details |
|---|---|---|---|---|
| Ori Industries | UK | New generation of cloud infrastructure | | |
| SK Telecom | South Korea | Wireless telecommunications operator | | |
| T-Mobile | USA | Mobile Network Operator | | |
| Telefónica | Spain | Mobile Network Operator | | |
| TIM | Italy | Cloud Solutions | | |
| Verizon | USA | Telecommunications conglomerate | | |

157

155 https://www.verizon.com/about/sites/default/files/2022-05/Investor-Day-2022-Presentation_rv1.pdf
156 https://www.gsma.com/solutions-and-impact/gsma-open-gateway/gsma_events/open-gateway-community-webinar-the-programmable-network/
157 https://www.gsma.com/solutions-and-impact/technologies/networks/5g-network-technologies-and-solutions/the-5g-ecosystem/



**Verizon IMS Cell Towers**

02-27-2023

Cell site with performance enhancement technology that gives Verizon engineers more leeway to adjust performance based on where customers move and how they use data in various sectors 158

Interconnecting networks between mobile operators offers many benefits to customers such as interoperable VoLTE (voice over LTE) calls with HD Voice quality as well as interoperable Rich Communications Services (RCS). It works by using all-IP (Internet Protocol) technology, which lets consumers connect and make rich and reliable calls with their contacts across networks. So we were delighted to hear about the decision of US operators AT&T and Verizon Wireless to interconnect their networks and make VoLTE HD Voice available to their customer bases next year with a view to introducing other services beyond VoLTE such as video calls and rich messaging in the future as well. 159

For larger carriers, IPX is a more efficient means of exchanging traffic that is already in IP form and handling special types of traffic such as rich communications services (RCS). Some carriers also like IPX's ability to support different settlement rates for different-priority traffic.

For now, at least, IPX is catching on primarily in the international market, with smaller carriers gaining connectivity outside the U.S. via a larger carrier such as AT&T, Verizon, Level 3 or Tata Communications, according to Giuhat.

160

Entner added Verizon's SA 5G core will allow the operator to take advantage of all of the "goodies" in 3GPP's Release-17 and Release-18 specifications. 161

[158] https://www.verizon.com/about/news/feed/media-resources/attachment/016-verizon-ims-cell-towers242868

[159] https://www.gsma.com/solutions-and-impact/technologies/networks/digest/att-and-verizon-wireless-get-themselves-connected/

[160] https://www.ivr.com/resources/blog/post/telecom-ipx-is-hot-topic-at-international-telecoms-week

[161] https://www.samenacouncil.org/samena_daily_news?news=92282




**Figure 4.2.2-1: Roaming architecture for 3GPP accesses. Home routed traffic** [162]

**1.1 Overview**

This document describes attacks on the mobile core network performed through the General Packet Radio Service (GPRS) Exchange (GRX) or Internet Protocol Exchange (IPX) network or the internet. The GPRS Tunnelling Protocol (GTP) that is used between roaming partners on the GRX/IPX network is the target of the attackers. They either abuse the GTP interface exposed to the network, or they send their own messages to the network element (NE) in order to receive messages back that reveal information the attackers are interested in.

This document briefly explains the issues and presents the types of attacks a mobile network is exposed to, before it addresses mitigation strategies and countermeasures. This document is intended to be read by staff of mobile network operators (MNOs) to determine what additional security measures should be implemented on their networks to prevent the attacks described here. IPX providers are affected if they process GTP messages on behalf of their customer MNOs (see section 2.1). [163]

121. By way of further example, in an LTE roaming configuration, Verizon's LTE/EPC network supports GTP session establishment between the Serving Gateway (S-GW) and Packet Data Network Gateway (P-GW) over the S8 roaming interface, with GTP signaling exchanged through the roaming/interconnect infrastructure. GSMA FS.20 specifications (section 4.3)

---

162 https://www.etsi.org/deliver/etsi_ts/123400_123499/123401/18.08.00_60/ts_123401v180800p.pdf, at 22

163 https://www.gsma.com/solutions-and-impact/technologies/security/wp-content/uploads/2019/10/FS.20-v6.1.pdf, at 4

describes security controls for Gp/S8 traffic exposed to a GRX/IPX interconnect network, including GTP firewall functions that perform security and plausibility checks on GTP signaling. These checks include validation of information representing the roaming partner, such as IP addresses, MCC, MNC, and IMSI prefix, to determine whether the information consistently identifies the same roaming partner. FS.20 also identifies IMSI and MSISDN as information representing the roaming subscriber and describes subscriber and session-related validation, including checks involving IMSI, MSISDN, APN, and subscriber-location information obtained through HLR/HSS-related mechanisms, with invalid or inconsistent GTP signaling subject to rejection. Accordingly, Verizon's network, including its LTE/EPC packet core and roaming/interconnect infrastructure, supports GTP session-establishment signaling and associated network, roaming-partner, and subscriber-information security validation.

> 7.2.1 Create Session Request
>
> The direction of this message shall be from MME/S4-SGSN to SGW and from SGW to PGW, and from ePDG/TWAN to the PGW (see Table 6.1-1).
>
> The Create Session Request message shall be sent on the S11 interface by the MME to the SGW, and on the S5/S8 interface by the SGW to the PGW as part of the procedures:

[164]

> **4.3 GTP Security**
>
> Once a communication partner can reach the GTP network service on a GGSN/PGW or SGSN/SGW, it is important to define the purpose of the communication. While intra-MNO communication with GTP uses the 3GPP Gn/S5 interface, communication with roaming partners is based on the 3GPP Gp/S8 interface. The MNO should ensure that only Gp/S8 traffic is granted access at the network edge exposed to the IPX network. In addition, the SGSN/SGW and GGSN/PGW should check the plausibility of values sent in GTP messages. This section covers both of these aspects.

[165]

---

164 https://www.etsi.org/deliver/etsi_ts/129200_129299/129274/18.08.00_60/ts_129274v180800p.pdf, at 37

165 https://www.gsma.com/solutions-and-impact/technologies/security/wp-content/uploads/2019/10/FS.20-v6.1.pdf, at 32

**4.3.3 GTP Category 2 – Home-Network Packet**

There are few GTP-C messages that are originated from the GGSN/PGW in HPLMN towards the SGSN/SGW in VPLMN. These messages should be allowed from GRX/IPX network into the VPLMN because of the need to provide service to inbound roamers.

However, the following checks should be implemented:

- If the request message contains an IMSI/MSISDN, it should not target a home subscriber. Additionally and optionally it should belong to the proper source network, which could be correlated from source IP address and GRX/IPX DNS).
- If the request does not contain an IMSI/MSISDN, it should still not target the home subscribers GTP-U sessions. Possible protection could be implemented directly in the SGSN/SGW because these elements can resolve corresponding IMSI/MSISDN from the existing GTP-U sessions. This is because the SGSN/SGW associates the IMSI/MSISDN to a GTP-U session in the initial GTP-C signalling and maintains it until after the session is released. This behaviour is used also when the CDRs are generated.). [166]

**4.3.4 GTP Category 3 – Plausible-Network Packet**

Most of the GTP-C messages on the Gp/S8 interface are from the SGSN/SGW in the VPLMN towards the GGSN/PGW in the HPLMN. These messages should be allowed from the IPX network into the HPLMN because of the need to provide service to outbound roamers.

However, the following checks should be implemented:

- If the subscriber (identified by IMSI/MSISDN in GTP message) is currently located in the HPLMN network and the corresponding GTP Category 3 message is received from GRX/IPX network, the message should be considered as illegal.
  - The subscriber location can be determined by monitoring of SS7/Diameter traffic and performing correlation and analysis across them or by checking the current location in HLR/HSS.
- If the subscriber (identified by IMSI/MSISDN in GTP message) current location is different compared to the location seen in the GTP Category 3 message, the message should be considered as illegal.
  - The subscriber PLMN location can be determined by monitoring of SS7/Diameter traffic or by checking the current location in HLR/HSS.
  - The translation of GTP source IP into location from SS7/Diameter (e.g. MCC, MNC) is not trivial and GRX/IPX DNS should be used for the translation.
- If a GTP Category 3 message is received without previously having received a GTP-C v1 Create PDP Context message or GTP-C v2 Create Session Request.

NOTE: Before the actual deployment it is strongly recommended to validate the robustness of the checks by first monitoring/logging the signalling traffic according to the defined rules, and only then apply robust checks that do not introduce false positives. [167]

[166] https://www.gsma.com/solutions-and-impact/technologies/security/wp-content/uploads/2019/10/FS.20-v6.1.pdf, at 34-35
[167] *Id.* at 35

**4.3.5 Plausibility of GTP Messages and GTP message validation**

Whenever possible, MNOs should perform plausibility checks, i.e. seek to determine if incoming GTP messages make sense and if they are valid and not malformed. If they don't make sense, the messages shall not be processed any further. These plausibility checks are also a task for the GTP Gp/S8 firewall.

Useful GTP-C message validity checks are:

- Presence of mandatory IEs;
- Correct sequence of IEs;
- Correct message length; and
- Correct Type-Length-Value (TLV) format of IEs.

Useful GTP-C message plausibility checks are:

- Validity of IP addresses in GTP messages;
- Cross-layer checks for validity of information that appears in multiple layers (e.g. IP addresses in IP header and GTP message IEs);
- Validity of information in IEs representing the roaming partner (i.e. IP addresses and IMSIs);
- Validity of information in IEs representing a roaming subscriber (i.e. IMSI and MSISDN);
- Verification of the occurrence of the IEs [168]

**4.3.5.3 Validity of Information in IEs Representing the Roaming Partner**

Several IEs represent the roaming partner. These are the IP addresses, the MCC, the MNC, and the IMSI prefix. The GTP firewall should check if all this information points to the same roaming partner. If this information is inconsistent, this is a hint that the messages have been forged or manipulated. The GTP firewall should detect and discard these messages.

**4.3.5.4 Validity of Information in IEs Representing a Roaming Subscriber**

Two IEs represent the roaming subscriber. These are the IMSI and the MSISDN. A relevant NE should check if all this information points to the same roaming subscriber. If this information is inconsistent, this is a hint that the messages have been forged or manipulated. The NE should detect and discard these messages.

The PCRF behind the GGSN/PGW could be used to strictly validate the GTP Category 3 messages according to the user profile which should be aligned with the HLR/HSS profile For example, it could validate the IMSI, MSISDN and selected APN received in GTP-C signalling towards the HLR/HSS profile. If discrepancies are detected, the GTP-C signalling could be reported and rejected. [169]

122. The Accused Products perform the step of providing the data access security by preventing access to data, accessed via the interconnect network using a GTP tunnel established for the new session, by blocking the GTP tunnel from being established in an event the GTP request

[168] *Id.* at 35-36
[169] *Id.* at 38

cannot be authenticated. For example, GSMA FS.20 (section 4.3) specifies GTP security controls at the network edge exposed to a GRX/IPX interconnect network. The GTP-C Category 2 and Category 3 filtering rules provide mechanisms for blocking inbound GTP-C messages based on subscriber and network information, including IMSI/MSISDN and subscriber location. Further, section 4.3.5 describes plausibility and consistency checks on GTP signaling, including validation of subscriber and session-related information such as IMSI, MSISDN, and APN, with invalid or inconsistent GTP-C signaling subject to rejection. Accordingly, Verizon's network, including its LTE/EPC packet core and roaming/interconnect security infrastructure, supports GTP security and filtering functionality that can prevent unauthorized GTP-C session-establishment signaling from being processed. When a GTP request fails the applicable network or subscriber validation checks, rejection or blocking of the request prevents the associated GTP session and tunnel from being established.

**4.3 GTP Security**

Once a communication partner can reach the GTP network service on a GGSN/PGW or SGSN/SGW, it is important to define the purpose of the communication. While intra-MNO communication with GTP uses the 3GPP Gn/S5 interface, communication with roaming partners is based on the 3GPP Gp/S8 interface. The MNO should ensure that only Gp/S8 traffic is granted access at the network edge exposed to the IPX network. In addition, the SGSN/SGW and GGSN/PGW should check the plausibility of values sent in GTP messages. This section covers both of these aspects.

[170]

[170] https://www.gsma.com/solutions-and-impact/technologies/security/wp-content/uploads/2019/10/FS.20-v6.1.pdf, at 32

**4.3.5.3 Validity of Information in IEs Representing the Roaming Partner**

Several IEs represent the roaming partner. These are the IP addresses, the MCC, the MNC, and the IMSI prefix. The GTP firewall should check if all this information points to the same roaming partner. If this information is inconsistent, this is a hint that the messages have been forged or manipulated. The GTP firewall should detect and discard these messages.

**4.3.5.4 Validity of Information in IEs Representing a Roaming Subscriber**

Two IEs represent the roaming subscriber. These are the IMSI and the MSISDN. A relevant NE should check if all this information points to the same roaming subscriber. If this information is inconsistent, this is a hint that the messages have been forged or manipulated. The NE should detect and discard these messages.

The PCRF behind the GGSN/PGW could be used to strictly validate the GTP Category 3 messages according to the user profile which should be aligned with the HLR/HSS profile For example, it could validate the IMSI, MSISDN and selected APN received in GTP-C signalling towards the HLR/HSS profile. If discrepancies are detected, the GTP-C signalling could be reported and rejected. [171]

**C.3.4 Category 2 Filtering**

**C.3.4.1 GTP-C Category 2 filtering to protect home subscribers**

This rule covers the filtering of GTP-C Category 2 inbound messages that target the home subscribers.

| Title | Rule | Rationale |
|---|---|---|
| GTP-C Message Type Cat.2 filtering | `for each inbound message,`<br>`If (IMSI or MSISDN) is from HPLMN`<br>`and MessageType =`<br>`GTPC_Request_Cat2_OnPoI then`<br>`BLOCK` | Block Category 2 messages targeting home subscribers if the message contains IMSI or MSISDN. (For MSISDN checks also number portability with national roaming should be considered.) |

**Table 12 – GTP-C Message Type Cat.2 filtering rule to protect home subscribers**

**C.3.5 Category 3 Filtering**

**C.3.5.1 GTP-C Category 3 filtering**

This rule covers the filtering of GTP-C Category 3 inbound messages if the subscriber is located in HPLMN.

| Title | Rule | Rationale |
|---|---|---|
| GTP-C Message Type Cat.3 filtering | `for each inbound message,`<br>`If (Last_Sub_SS7_Loc is in HPLMN or`<br>`Last_Sub_Diameter_Loc is in HPLMN)`<br>`and MessageType =`<br>`GTPC_Request_Cat3_OnPoI then`<br>`BLOCK` | Block Category 3 inbound messages from international interconnect if the subscriber is currently in home network on last known location based on IMSI or MSISDN. |

**Table 13 – GTP-C Message Type Cat.3 filtering rule to subscribers in home network** [172]

[171] *Id.* at 38
[172] *Id.* at 58-59

123. The Accused Products perform the step wherein the interconnect network is a GPRS roaming exchange (GRX) network or an internet protocol (IP) exchange (IPX) network. For example, in an LTE-based roaming configuration, Verizon's LTE/EPC network supports GTP session-establishment signaling between the Serving Gateway (S-GW) and the Packet Data Network Gateway (P-GW) over the S8 roaming interface, with the associated GTP signaling exchanged through the roaming/interconnect infrastructure. The GRX/IPX interconnect infrastructure provides inter-operator connectivity for roaming traffic, enabling GTP signaling to be exchanged between serving and home networks. Consistent with this architecture, GSMA FS.20 describes the GRX/IPX network as the interconnect network through which GTP traffic is exchanged between roaming partners and specifies security controls for GTP traffic exposed to the GRX/IPX network.

**1.1 Overview**

This document describes attacks on the mobile core network performed through the General Packet Radio Service (GPRS) Exchange (GRX) or Internet Protocol Exchange (IPX) network or the internet. The GPRS Tunnelling Protocol (GTP) that is used between roaming partners on the GRX/IPX network is the target of the attackers. They either abuse the GTP interface exposed to the network, or they send their own messages to the network element (NE) in order to receive messages back that reveal information the attackers are interested in.

This document briefly explains the issues and presents the types of attacks a mobile network is exposed to, before it addresses mitigation strategies and countermeasures. This document is intended to be read by staff of mobile network operators (MNOs) to determine what additional security measures should be implemented on their networks to prevent the attacks described here. IPX providers are affected if they process GTP messages on behalf of their customer MNOs (see section 2.1). [173]

124. Defendants have and continue to indirectly infringe one or more claims of the '459 Patent by knowingly and intentionally inducing others, including Verizon customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing

[173] https://www.gsma.com/solutions-and-impact/technologies/security/wp-content/uploads/2019/10/FS.20-v6.1.pdf, at 4

technology.

125. Defendants, with knowledge[174] that these products, or the use thereof, infringe the ’459 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continue to knowingly and intentionally induce, direct infringement of the ’459 Patent by providing these products to end-users for use in an infringing manner. Alternatively, on information and belief, Defendants have adopted a policy of not reviewing the patents of others, and instructing their officers, agents, and employees to not review the patents of others, including specifically those related to Defendants’ specific industry, thereby remaining willfully blind to the ’459 Patent at least as early as the issuance of the ’459 Patent.

126. Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the ’459 Patent, but while remaining willfully blind to the infringement. Defendants have and continue to induce infringement by their customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants’ website, product literature and packaging, and other publications, including any of Defendants’ materials cited in this Complaint.

127. On information and belief, Defendants directly prepare and/or assist in the preparation of, and provide customers and end-users with, information and documents for their specific products. On information and belief, Defendants’ product literature and other product

[174] Alternative, Defendants gained knowledge of the ’459 Patent in relation to Defendant Verizon Patent And Licensing Inc.’s U.S. Patent No. 11,445, 357, which issued on September 13, 2022, and cites to the ’459 Patent family. According, Defendants had knowledge of the ’459 Patent no later than September 13, 2022. *See* https://patents.google.com/patent/US11284459B2/en?oq=11%2c284%2c459#citedBy.

information documents are prepared by or under the direction of Defendants to instruct customers and end-users on how to use the Accused Products in an infringing manner.

128. Because of Defendants' inducement, Defendants' customers and end-users use Accused Products in a way Defendants intend and directly infringe the '459 Patent. Defendants perform these affirmative acts with knowledge of the '459 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '459 Patent.

129. Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '459 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '459 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '459 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be especially made or adapted for use in the infringement of the '459 Patent. The accused components include, but are not limited to, components necessary for the operation of Defendants infringing systems including, but not limited to, the hardware and software associated with the Verizon cloud-native 5G Core. Defendants perform these affirmative acts with knowledge of the '459 Patent and with intent, or willful blindness, that they cause the direct infringement of the '459 Patent.

130. SLR has suffered damages as a result of Defendants' direct and indirect infringement of the '459 Patent in an amount to be proven at trial.

131. SLR has suffered, and will continue to suffer, irreparable harm as a result of

Defendants' infringement of the '459 Patent, for which there is no adequate remedy at law, unless Defendants' infringement is enjoined by this Court.

**COUNT VII**
**(Infringement of the '462 Patent)**

132. Paragraphs 1 through 31 are incorporated by reference as if fully set forth herein.

133. SLR has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '462 Patent.

134. Defendants have and continue to directly infringe the '462 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '462 Patent. Such infringing products include the Verizon cloud-native 5G Core, including all associated hardware and software.

135. For example, Defendants have and continue to directly infringe at least Claim 1 of the '462 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include the Verizon cloud-native 5G Core.

136. The Accused Products perform a method of identifying a type of communications service of a user, the method comprising: receiving, from an originating user device at a first operator network, a user identifier for a terminating user, wherein the terminating user is at a second operator network that is different from the first operator network. For example, the Verizon cloud-native 5G Core supports 4G/LTE and 5G connectivity, including VoLTE and VoNR services, with Verizon IMS-based voice services operating within the GSMA IMS/VoLTE framework for interoperable IP-based communications. The GSMA IMS standards define the signaling framework for establishing and managing IP-based voice sessions, including exchange of user and service information between originating and terminating networks. Further, the GSMA

NG.105 ENUM/IPX framework describes identifying a terminating user's communication service capability based on user profile information, including whether the user is provisioned for IMS or non-IMS services. Accordingly, the NG.105 ENUM/IPX framework enables the network to determine the communications service associated with a user.

Verizon offered a glimpse under the hood in late 2022 when it announced that it was starting to move commercial traffic to its 5G core—a key component of the network—which features an all-new design that could support standalone and non-standalone 5G, among other advanced technologies. That's an exciting leap forward, but what do those things really mean, and why do they matter for businesses and consumers?

Verizon's 5G core—and thus its 5G SA technology—is built on a cloud-based platform that Verizon created specifically for telecommunications workloads. No other telecommunications company has taken this step (others are using cloud systems from outside providers). Because it's built specifically for telecommunications workloads, it can support the advanced technologies and services that provide the reliability and performance customers expect now, as well as what they'll need in the future. [175]

**The 5G core is built on the Verizon Cloud Platform**

Verizon has officially begun moving customer traffic onto its cloud-native, containerized-design 5G core. Doing so will deliver "unprecedented levels of service agility, flexibility and automated scalability," said the carrier.

The 5G core is built on the Verizon Cloud Platform (VCP), which is an internally built telco cloud base on a Webscale software architecture that the carrier runs in its data centers. The VCP, said Verizon, will enable support for 5G standalone, 4G/5G Non-Standalone and Voice over New Radio (VoNR) services. [176]

[175] https://www.verizon.com/about/news/5g-standalone-why-it-matters

[176] https://www.rcrwireless.com/20221014/featured/now-is-the-time-verizon-migrates-commercial-traffic-to-5g-core



177

The global mobile industry stands at a critical juncture. A shift is underway to transform telecommunication networks from simple connectivity pipes into intelligent, programmable platforms. Through standardized Network APIs and initiatives like GSMA Open Gateway and CAMARA, the industry is creating a unified, cross-operator framework to expose powerful network capabilities. This enables developers and enterprises to harness powerful network capabilities, transforming current applications and building the foundation for future innovation.
Join leaders from Verizon and RCR Wireless News for a forward-looking discussion on this industry-wide transformation. Get a firsthand look at how Verizon is pioneering this evolution in North America, turning the promise of the programmable network into a reality.
Sponsored by the GSMA. 178

**– Operator Platform Group**

These companies are working to provide Operator Platform products and solutions.

| Company | Headquarters | Solution | Website | Contact Details |
|---|---|---|---|---|
| Ori Industries | UK | New generation of cloud infrastructure | | |
| SK Telecom | South Korea | Wireless telecommunications operator | | |
| T-Mobile | USA | Mobile Network Operator | | |
| Telefónica | Spain | Mobile Network Operator | | |
| TIM | Italy | Cloud Solutions | | |
| Verizon | USA | Telecommunications conglomerate | | |

179

177 https://www.verizon.com/about/sites/default/files/2022-05/Investor-Day-2022-Presentation_rv1.pdf
178 https://www.gsma.com/solutions-and-impact/gsma-open-gateway/gsma_events/open-gateway-community-webinar-the-programmable-network/
179 https://www.gsma.com/solutions-and-impact/technologies/networks/5g-network-technologies-and-solutions/the-5g-ecosystem/



**Verizon IMS Cell Towers**

**02-27-2023**

Cell site with performance enhancement technology that gives Verizon engineers more leeway to adjust performance based on where customers move and how they use data in various sectors [180]

Interconnecting networks between mobile operators offers many benefits to customers such as interoperable VoLTE (voice over LTE) calls with HD Voice quality as well as interoperable Rich Communications Services (RCS). It works by using all-IP (Internet Protocol) technology, which lets consumers connect and make rich and reliable calls with their contacts across networks. So we were delighted to hear about the decision of US operators AT&T and Verizon Wireless to interconnect their networks and make VoLTE HD Voice available to their customer bases next year with a view to introducing other services beyond VoLTE such as video calls and rich messaging in the future as well. [181]

For larger carriers, IPX is a more efficient means of exchanging traffic that is already in IP form and handling special types of traffic such as rich communications services (RCS). Some carriers also like IPX's ability to support different settlement rates for different-priority traffic.

For now, at least, IPX is catching on primarily in the international market, with smaller carriers gaining connectivity outside the U.S. via a larger carrier such as AT&T, Verizon, Level 3 or Tata Communications, according to Giuhat.

[182]

[180] https://www.verizon.com/about/news/feed/media-resources/attachment/016-verizon-ims-cell-towers242868
[181] https://www.gsma.com/solutions-and-impact/technologies/networks/digest/att-and-verizon-wireless-get-themselves-connected/
[182] https://www.ivr.com/resources/blog/post/telecom-ipx-is-hot-topic-at-international-telecoms-week

> **1.2 Scope**
>
> This GSMA official document provides recommendations on ENUM to facilitate successful interworking inter-Service Provider services. In particular, guidelines for general and service specific configuration of ENUM servers, GSMA processes and procedures relating to formats, usage of domain names and sub-domain names, and guidelines and recommendations on GSMA Carrier ENUM.

[183]

> **4.1.4 Access to ENUM servers and Interconnection policy**
>
> SPs connected to the IPX network will be able to perform an ENUM Query and obtain a result dependant on the policy established for data accessibility. That is, either the querying SP has access to all ENUM servers, or, an error is returned (see section 4.2.3 for more details on responses).

[184]

> **2.1 Number Resolution Requirements**
>
> Where a SP (service provider) offers IP (internet protocol) services via a telephone number there is a requirement to translate the phone number into another form of address which is routable in an IP technology domain. This process, where the originating SP discovers the routable destination information and service platform information is called number resolution.
>
> The number resolution solution shall be designed to meet the requirements below:
>
> - Provide IP routable information for a telephone number to enable commonly used routing scenarios.
> - Provide a list of service and platform information against a telephone number.

> The number resolution solution should be designed to meet the below recommendations:
>
> - The number resolution activity between SPs should take place under secure and private conditions, i.e. the data owner can restrict this data to the required business user group. Steps should be taken to prevent spoofing, fraud, spamming or denial of service attacks if the number resolution systems are susceptible.
> - The number resolution approach should enable commonly used routing scenarios, such as internal network routing, national routing and international routing.
> - The number resolution approach should be applicable to all commonly used models of interconnection, for example bi-lateral, multilateral and hub.
> - The number resolution should be independent of the service and apply to all commonly understood services to simplify network architecture, for example voice, MMS (multimedia messaging service), IM (instant message), Video, RCS (rich communication suite), VoLTE (voice over LTE), and etc. It should also be applicable to a variety of technologies and protocols, for example IMS (IP multimedia sub-system) and SIP (session initiation protocol). Number resolution should be extensible to future services.

[185]

---

[183] https://www.gsma.com/newsroom/wp-content/uploads//NG.105-v2.0.pdf, at 5

[184] *Id.* at 17

[185] *Id.* at 9

**2.2 Number Resolution Recommendations**

GSMA working groups have studied number resolution solutions and recommend the use of ENUM (E.164 number mapping) for number resolution. ENUM is a telephone look up or number resolution technology, standardised by the Internet Engineering Task Force (IETF). It enables number registries to be queried and return lists of end point information relating to a telephone number.

ENUM registries can:

- Provide IP routable information against a phone number
- Provide a list of service/platform information against a number and correction in case of NP [186]

**4.3.2 Functional Node Description**

The ENUM proxy could be divided into 2 sub-components, implementing two major functions in order to support the IMS interconnection and handle SIP messages from IMS A to B:

- ENUM proxy 1: discovery of the destination SP (with NP taken into account)
- ENUM proxy 2: retrieval of the IMS destination profile [187]

In fact, SIP/IMS URI format could be adapted depending of the status of the knowledge of the 2 following parameters of the destination:

- Service Provider identity
- user profile

| Service Provider Identity | User Profile | NNI Selection |
|---|---|---|
| yes | IMS | Select IMS NNI |
| yes | Non IMS (or tel) | Break out to legacy NNI (if applicable) |
| yes | Unknown | Continue the IMS session setup |
| Unknown | Unknown | Continue the IMS session setup |

[188]

[186] *Id.* at 10
[187] *Id.* at 25
[188] *Id.* at 27




**Figure 15 Use Case – multilateral – no NP resolution in IPX – SIP URI** [189]

137. By way of further example, Verizon cloud-native 5G Core supports 4G/LTE and 5G connectivity, including VoLTE and VoNR services, with Verizon IMS-based voice services operating within the GSMA IMS/VoLTE framework for interoperable IP-based communications. For example, the GSMA IMS standards define the signaling framework for establishing and managing IP-based voice sessions, including exchange of user and service information between originating and terminating networks. The GSMA IR.65 describes that an MSISDN may be represented as a SIP URI or Tel URI and used as a Public User Identity. During an IMS call, the originating user device provides the called user's E.164/MSISDN to originating Service Provider A, which receives and processes the identifier. In NG.105 Figure 15, User A is connected to originating Service Provider A, and the terminating subscriber's E.164 number is carried in the call signaling through the IPX toward User B, who is served by a different destination Service Provider. Accordingly, the GSMA IMS/IPX framework enables an originating operator network to receive a terminating user's identifier and establish communication with a user on a different network.

[189] *Id.* at 34

**6.1 User and UE Addressing**

IMS user addressing is defined in 3GPP TS 23.228 [5] and its format is defined in 3GPP TS 23.003 [10]. GSMA PRD IR.92 [28] and NG.114 [56] further clarifies that UEs and IMS core network must support Public User Identities in the form of SIP URIs (both alphanumeric and those representing Mobile Subscriber ISDN Numbers (MSISDNs)) and Tel URIs as follows:

9. Alphanumeric SIP URIs
10. Example: sip:voicemail@example.com
11. MSISDN represented as a SIP URI
12. Example: sip:+447700900123@example.com;user=phone
13. MSISDN represented as a Tel URI
14. Example: tel:+447700900123

To support the use of MSISDN as a Public User Identity, the network must associate a Tel URI with an alphanumeric SIP URI using the mechanisms specified in 3GPP TS 23.228 [5] and 3GPP TS 24.229 [6]. [190]

15. Session requests based upon E.164 format Public User Identities (see clause 6.1) should be converted into an NNI routable SIP URI format. This conversion can be done using ENUM (see GSMA PRD NG.105 [54] for more information).
Section 5 of this document as well as GSMA PRD NG.105 [54] specify a number of cases where an IMS NNI can be used even if the E.164 number conversion using ENUM is not performed or has failed. For such cases the originating operator may either:

- Send the SIP request using the Tel URI format, or
- Prior to sending the SIP request, convert the Tel URI to a SIP URI as follows: The content of the Tel URI is placed in the User part, the domain name of the next network (Carrier or Terminating operator) is placed in the host part and a user parameter set to "Phone" is added, resulting in sip:<E.164>@<next_network>;user=phone [191]

**1.3 Definitions**

| Term | Description |
|---|---|
| Service Provider | The Service Provider who provides the services for a given end user.<br>Originating Service Provider will be named "A", while destination Service Provider will be named "B" into this document |

[192]

---

[190] https://www.gsma.com/newsroom/wp-content/uploads//IR.65-v36.0.pdf, at 53
[191] *Id.* at 56
[192] https://www.gsma.com/newsroom/wp-content/uploads//NG.105-v2.0.pdf, at 5

> ENUM is only applicable to E.164 numbers (as defined in ITU-T Recommendation E.164 [37]), that are, telephone numbers in their full/international format of CC+NDC+SN (Country Code + National Destination Code + Subscriber Number). If a given dialled number is not in the E.164 number format for example national format, it needs first to be converted to this format. If a given dialled number is a short code or some other type of SP address, it will need to be mapped to an E.164 number, or else, be resolved by a defined reverse lookup function to an E.164 number.

[193]




**Figure 15 Use Case – multilateral – no NP resolution in IPX – SIP URI**

[194]

138. The Accused Products perform the step of requesting, from an Internet Protocol eXchange, a service identifier corresponding to a type of communications service for which the terminating user, at the second operator network, is provisioned, the requesting based on the user identifier received from the originating user device at the first operator network. For example, the GSMA IMS standards define the signaling framework for establishing and managing IP-based voice sessions, including exchange of user and service information between originating and terminating networks via an Internet Protocol eXchange. The GSMA IR.65 specifies that the originating Service Provider may rely on an IPX provider to determine whether the destination

[193] *Id.* at 10
[194] *Id.* at 34

user is IMS capable using Carrier ENUM based on the terminating user's telephone number. Further, NG.105 provides that the IPX query with ENUM for the destination user profile, including subscriber information provisioned by the Service Provider. In Figure 17 further shows an IPX based ENUM query used to retrieve the terminating User B profile with service identity. Accordingly, the GSMA ENUM/IPX framework enables the originating network to request the terminating user's service information based on the user's E.164/MSISDN.

> The originating Service Provider is responsible to determine which voice NNI to use for any particular call/session according to its local policy, as well as the requirements the originator needs to fulfill to its subscribers, VoIMS NNI knowledge, technical capabilities available, and cost. It is assumed that:
>
> 8. The originator will find a way to deliver traffic and,
>    - In the case of an IMS to IMS session the preferred solution is to deliver the traffic as IP end to end utilizing VoIMS NNI as described in Section 5.2.3
>    - The originator may also rely on the IPX provider services to determine if the destination is IMS capable or not.
>
> II-NNI knowledge can be obtained through look up services. GSMA recommends the use of Carrier ENUM for this purpose as defined in NG.105 [54]. Carrier ENUM provides information on an international public telecommunications number basis and can indicate which routing via the II-NNI is possible. IMS routing is possible when a Carrier ENUM translation request provides a globally routable SIP URI. If this translation attempt fails at the originating S-CSCF the call can be delivered via IMS to CS interworking. IMS to CS interworking technical capabilities available to the originator may include:

[195]

> A Carrier ENUM lookup may be used during session setup to identify that the terminating user is an IMS subscriber as defined in GSMA PRD NG.105 [54]. Call breakout to CS occurs when the session cannot be routed further via the VoIMS NNI. CS breakout can be done either in the originating network, IPX or terminating network, depending on the agreement between Service Providers. At CS breakout, the originating BGCF selects the terminating network according to the defined rules. A session is forwarded either to local MGCF (via Mj interface) or to a BGCF of the terminating network (via Mk interface). MGCF handles the needed protocol interworking on the control plane between 3GPP SIP and BICC, SIP-I or ISUP. IMS-MGW handles the user plane interworking between RTP/UDP/IP (Mb interface) and PSTN user plane interface.

[196]

[195] https://www.gsma.com/newsroom/wp-content/uploads//IR.65-v36.0.pdf, at 42
[196] *Id.* at 45

### 1.3 Definitions

| Term | Description |
|---|---|
| DNS Server | A DNS Server can be a Name server, a Local Caching DNS Server or both. It is common that all DNS Servers cache all results from queries for a specific amount of time. |
| IPX | GPRS roaming eXchange/IP Packet eXchange. The IPX is an inter-operator IP backbone network that is transparent to subscribers. It is used for back-end routing/tunnelling purposes only. |
| IPX Domain | Refers to the whole group of business entities comprising interconnected Service Providers and IPX Providers |
| IPX Provider | A business entity (such as an IP Carrier) offering IP interconnect capability for one or many IPX Services compliant with the IPX PRDs. |
| IPX Service | An IP based service using the IPX as a means of interconnection that is provided by a Service Provider to an end-user. |
| Service Provider | The Service Provider who provides the services for a given end user.<br>Originating Service Provider will be named "A", while destination Service Provider will be named "B" into this document |

[197]

#### 4.3.3 Interface description

The key feature of ENUM framework is to standardize how destination user information could be exchanged between ENUM proxies, non ENUM components and SIP nodes, especially for SP identity and user profile of the destination. [198]

#### 4.1.4 Access to ENUM servers and Interconnection policy

SPs connected to the IPX network will be able to perform an ENUM Query and obtain a result dependant on the policy established for data accessibility. That is, either the querying SP has access to all ENUM servers, or, an error is returned (see section 4.2.3 for more details on responses). [199]

ENUM (E):

- ENUM1 is an ENUM interface used by IMS and/or SIP Proxy to query ENUM Proxy
- ENUM2 is an ENUM interface used by the ENUM Proxy to query ENUM hierarchical model using ENUM FQDN format like 9.8.7.6.5.4.3.2.1. e164enum.net for "+123456789" E.164 number as defined in section 4.2.2).
- ENUM3 is an ENUM interface used to exchange information between ENUM proxy1 and ENUM Proxy2 when they are interconnected.

[197] https://www.gsma.com/newsroom/wp-content/uploads//NG.105-v2.0.pdf, at 5
[198] *Id.* at 26
[199] *Id.* at 17

Non ENUM (NE):

- NENUM1 is a Non ENUM interface used to query external database able to provide the destination SP identity.
- NENUM2 is a Non ENUM interface used to query external database able to provide the destination user profile. [200]

ENUM is only applicable to E.164 numbers (as defined in ITU-T Recommendation E.164 [37]), that are, telephone numbers in their full/international format of CC+NDC+SN (Country Code + National Destination Code + Subscriber Number). If a given dialled number is not in the E.164 number format for example national format, it needs first to be converted to this format. If a given dialled number is a short code or some other type of SP address, it will need to be mapped to an E.164 number, or else, be resolved by a defined reverse lookup function to an E.164 number. [201]

Public ENUM cannot be used on the IPX network (internet protocol packet exchange network), as it is insecure, incomplete, no private and has no guaranteed QoS (quality of service) or data integrity. Therefore, Carrier ENUM should be used on the IPX network. The following sub-sections describe how Carrier ENUM is implemented in the IPX network for inter-SP services (referred as "Carrier ENUM on the IPX").

**4.3.4.1 SIP/IMS URI format**

On the ENUM and SIP interfaces of the ENUM framework, addressing must be specified to assure interworking between the SIP Proxy and/or ENUM proxy provided by different entities or suppliers.

It is especially important to standardize the SIP/IMS URI format (sip:+<E.164_number>@<domain>;user=phone) to be used in the ENUM response and to be routed in the SIP signalling for the IMS session setup. [202]

[200] https://www.gsma.com/newsroom/wp-content/uploads//NG.105-v2.0.pdf, at 26-27
[201] *Id.* at 10
[202] *Id.* at 11

In fact, SIP/IMS URI format could be adapted depending of the status of the knowledge of the 2 following parameters of the destination:

- Service Provider identity
- user profile

The following table summarises, for different states, the NNI selection which could be performed by IMS A, SIP proxy 1/2 or IMS B:

| Service Provider Identity | User Profile | NNI Selection |
|---|---|---|
| yes | IMS | Select IMS NNI |
| yes | Non IMS (or tel) | Break out to legacy NNI (if applicable) |
| yes | Unknown | Continue the IMS session setup |
| Unknown | Unknown | Continue the IMS session setup |

[203]

In order to carry this state node by node in ENUM or SIP, domain names will be adapted with the following structure: <service>.<Service Provider identity>

Where

- <service> could identify the user profile knowledge (ims, tel, ukn) as defined in the previous table
- <Service Provider identity>
    - mnc<MNC>.mcc<MCC>3gppnetwork.org for mobile network operators
    - Non mobile networks could use SPN identifier to replace MCC/MNC

[204]

**4.3.6 Non ENUM2 Interface**

Non ENUM 2 (NENUM2) interface will be used to query Non ENUM database to retrieve information related to the user profile of the destination.

| NENUM2 | | | | ENUM1/3 |
|---|---|---|---|---|
| Database | Protocol | Msg | Parameter | Parameter |
| HSS | DIAMETER | UDR | | |

**Table 2 NENUM2 Interface Table**

[203] *Id.* at 26
[204] *Id.* at 27

**4.3.6.1 DIAMETER**

Various DIAMETER (defined in RFC 3588) messages could be used to retrieve B user profile information.

3GPP TS 29.329 – Sh Interface

The IMS specification defines the Sh interface as the method of communication between the Application Server (AS) function and the HSS, or between multiple IMS Application Servers. The AS uses the Sh interface in two basic ways:

- To query or update a user's data stored on the HSS
- To subscribe to and receive notifications when a user's data changes on the HSS

User-Data-Request/Answer (AS-->HHS)

This AS asks for the subscriber related information from HSS. Subscriber related data at HSS is either provisioned by the SP and/or received from the network and/or it has been earlier stored by the AS itself with the help of the Profile-Update-Request/Answer.[205]

**5.1.4 IPX A retrieves SP id and queries User Profile via ENUM3**

This use case is based on 2 IPX providers, interconnected by SIP and ENUM protocol. The first IPX A will resolve the NP by querying the ENUM proxy, providing in this example the information in a non ENUM interface. IPX A will then fill in the domain with the "MCC / MNC" parameters and delegate via ENUM3 interface the ENUM query to the next IPX B provider, having a direct interconnection with the B SP in order to retrieve the B user profile (using ENUM or non ENUM).

In this example, the B user profile that is IMS and ENUM Proxy (IPX B) will answer to ENUM proxy (IPX A) with URI domain prefixed with "ims".

Finally, IPX A will route the SIP IMS messages to IPX B, in order to reach directly the final destination B.[206]

[205] *Id.* at 32
[206] *Id.* at 35




**Figure 17 Use Case – multilateral with 2 IPX –ENUM delegation via ENUM3 for NP**[207]

139. The Accused Products perform the step of receiving, from the Internet Protocol eXchange, the service identifier in response. For example, the GSMA NG.105 ENUM/IPX framework describes that, after an originating network request the terminating user profile based on the user identifier, the IPX/ENUM framework returns service information indicating the communication capability of the terminating user, including whether the user is associated with an IMS or non-IMS service. Further, Figure 17 shows that, after the terminating User B profile is requested, the IPX returns information indicating that User B has an IMS profile (ims). Accordingly, the GSMA ENUM/IPX framework enables the terminating user's service information to be received from the IPX in response to the request.

---

[207] *Id.* at 35

**4.3.4.1 SIP/IMS URI format**

On the ENUM and SIP interfaces of the ENUM framework, addressing must be specified to assure interworking between the SIP Proxy and/or ENUM proxy provided by different entities or suppliers.

It is especially important to standardize the SIP/IMS URI format (sip:+<E.164_number>@<domain>;user=phone) to be used in the ENUM response and to be routed in the SIP signalling for the IMS session setup. [208]

In fact, SIP/IMS URI format could be adapted depending of the status of the knowledge of the 2 following parameters of the destination:

- Service Provider identity
- user profile

The following table summarises, for different states, the NNI selection which could be performed by IMS A, SIP proxy 1/2 or IMS B:

| Service Provider Identity | User Profile | NNI Selection |
|---|---|---|
| yes | IMS | Select IMS NNI |
| yes | Non IMS (or tel) | Break out to legacy NNI (if applicable) |
| yes | Unknown | Continue the IMS session setup |
| Unknown | Unknown | Continue the IMS session setup |

In order to carry this state node by node in ENUM or SIP, domain names will be adapted with the following structure: <service>.<Service Provider identity>

Where

- <service> could identify the user profile knowledge (ims, tel, ukn) as defined in the previous table
- <Service Provider identity>
  - mnc<MNC>.mcc<MCC>3gppnetwork.org for mobile network operators
  - Non mobile networks could use SPN identifier to replace MCC/MNC

[209]

[208] https://www.gsma.com/newsroom/wp-content/uploads//NG.105-v2.0.pdf, at 11
[209] *Id.* at 27

**5.1.4 IPX A retrieves SP id and queries User Profile via ENUM3**

This use case is based on 2 IPX providers, interconnected by SIP and ENUM protocol. The first IPX A will resolve the NP by querying the ENUM proxy, providing in this example the information in a non ENUM interface. IPX A will then fill in the domain with the "MCC / MNC" parameters and delegate via ENUM3 interface the ENUM query to the next IPX B provider, having a direct interconnection with the B SP in order to retrieve the B user profile (using ENUM or non ENUM).

In this example, the B user profile that is IMS and ENUM Proxy (IPX B) will answer to ENUM proxy (IPX A) with URI domain prefixed with "ims".

Finally, IPX A will route the SIP IMS messages to IPX B, in order to reach directly the final destination B.




**Figure 17 Use Case – multilateral with 2 IPX –ENUM delegation via ENUM3 for NP**[210]

140. The Accused Products perform the step of using the service identifier to allow the first operator network to choose how to route the call to provide for communication between the originating user device and the terminating user based on the service identifier corresponding to the type of communications service for which the terminating user is provisioned, wherein the Internet Protocol eXchange accesses a user profile database to respond to the request for the type of communications service for which the terminating user is provisioned. For example, the GSMA

210 *Id.* at 35

IR.65 specifies that the originating network may use information from the IPX to determine whether the terminating user supports IMS service (ims). NG.105 further shows that when the terminating user has an IMS profile, the call can be routed through the IMS network, while a non-IMS profile can result in routing through a legacy voice network. GSMA NG.105 also provides that the IPX/ENUM framework can query a user profile database, such as the HSS, to obtain the terminating user's service information. Accordingly, the GSMA ENUM/IPX framework enables the originating network to use the terminating user's service information to select the appropriate routing for establishing communication between originating and terminating users based on the provisioned communication service.

**5.2.2 Multiple Voice NNIs**

The originating Service Provider has a preference list for the outgoing VoIMS calls, for example:

1. Direct IMS-to-IMS call; this does not require the use of conversions or fallback mechanisms, offering the best possible quality. Signalling uses SIP and media RTP/RTCP. Other IMS based services, such as RCS, may also use the same IP based interface (see GSMA PRD IR.90 [27])
2. Fallback to CS domain, where the VoIMS call is converted into a CS call. The voice NNI can be:
   - IP based: SIP-I Signalling and RTP/RTCP media (see GSMA PRD IR.83 [33])
   - IP based: BICC Signalling and RTP/RTCP media with Nb UP Framing (see 3GPP TS 29.163 [7])
   - ATM based: BICC Signalling and media with Nb UP Framing (see 3GPP TS 29.163 [7])

> The originating Service Provider is responsible to determine which voice NNI to use for any particular call/session according to its local policy, as well as the requirements the originator needs to fulfill to its subscribers, VoIMS NNI knowledge, technical capabilities available, and cost. It is assumed that:
>
> 8. The originator will find a way to deliver traffic and,
>
> - In the case of an IMS to IMS session the preferred solution is to deliver the traffic as IP end to end utilizing VoIMS NNI as described in Section 5.2.3
> - The originator may also rely on the IPX provider services to determine if the destination is IMS capable or not.
>
> II-NNI knowledge can be obtained through look up services. GSMA recommends the use of Carrier ENUM for this purpose as defined in NG.105 [54]. Carrier ENUM provides information on an international public telecommunications number basis and can indicate which routing via the II-NNI is possible. IMS routing is possible when a Carrier ENUM translation request provides a globally routable SIP URI. If this translation attempt fails at the originating S-CSCF the call can be delivered via IMS to CS interworking. IMS to CS interworking technical capabilities available to the originator may include:

[211]

> A Carrier ENUM lookup may be used during session setup to identify that the terminating user is an IMS subscriber as defined in GSMA PRD NG.105 [54]. Call breakout to CS occurs when the session cannot be routed further via the VoIMS NNI. CS breakout can be done either in the originating network, IPX or terminating network, depending on the agreement between Service Providers. At CS breakout, the originating BGCF selects the terminating network according to the defined rules. A session is forwarded either to local MGCF (via Mj interface) or to a BGCF of the terminating network (via Mk interface). MGCF handles the needed protocol interworking on the control plane between 3GPP SIP and BICC, SIP-I or ISUP. IMS-MGW handles the user plane interworking between RTP/UDP/IP (Mb interface) and PSTN user plane interface.

[212]

> **4.3.4.1 SIP/IMS URI format**
>
> On the ENUM and SIP interfaces of the ENUM framework, addressing must be specified to assure interworking between the SIP Proxy and/or ENUM proxy provided by different entities or suppliers.
>
> It is especially important to standardize the SIP/IMS URI format (sip:+<E.164_number>@<domain>;user=phone) to be used in the ENUM response and to be routed in the SIP signalling for the IMS session setup.

[213]

---

[211] https://www.gsma.com/newsroom/wp-content/uploads//IR.65-v36.0.pdf, at 42.
[212] *Id.* at 45
[213] https://www.gsma.com/newsroom/wp-content/uploads//NG.105-v2.0.pdf, at 11

In fact, SIP/IMS URI format could be adapted depending of the status of the knowledge of the 2 following parameters of the destination:

- Service Provider identity
- user profile

The following table summarises, for different states, the NNI selection which could be performed by IMS A, SIP proxy 1/2 or IMS B:

| Service Provider Identity | User Profile | NNI Selection |
|---|---|---|
| yes | IMS | Select IMS NNI |
| yes | Non IMS (or tel) | Break out to legacy NNI (if applicable) |
| yes | Unknown | Continue the IMS session setup |
| Unknown | Unknown | Continue the IMS session setup |

In order to carry this state node by node in ENUM or SIP, domain names will be adapted with the following structure: <service>.<Service Provider identity>

Where

- <service> could identify the user profile knowledge (ims, tel, ukn) as defined in the previous table
- <Service Provider identity>
  - mnc<MNC>.mcc<MCC>3gppnetwork.org for mobile network operators
  - Non mobile networks could use SPN identifier to replace MCC/MNC [214]

**5.1.4 IPX A retrieves SP id and queries User Profile via ENUM3**

This use case is based on 2 IPX providers, interconnected by SIP and ENUM protocol. The first IPX A will resolve the NP by querying the ENUM proxy, providing in this example the information in a non ENUM interface. IPX A will then fill in the domain with the "MCC / MNC" parameters and delegate via ENUM3 interface the ENUM query to the next IPX B provider, having a direct interconnection with the B SP in order to retrieve the B user profile (using ENUM or non ENUM).

In this example, the B user profile that is IMS and ENUM Proxy (IPX B) will answer to ENUM proxy (IPX A) with URI domain prefixed with "ims".

Finally, IPX A will route the SIP IMS messages to IPX B, in order to reach directly the final destination B.

[214] *Id.* at 27




**Figure 17 Use Case – multilateral with 2 IPX –ENUM delegation via ENUM3 for NP**[215]

### 4.3.6 Non ENUM2 Interface

Non ENUM 2 (NENUM2) interface will be used to query Non ENUM database to retrieve information related to the user profile of the destination.

| **NENUM2** | | | | **ENUM1/3** |
|---|---|---|---|---|
| Database | Protocol | **Msg** | **Parameter** | **Parameter** |
| **HSS** | **DIAMETER** | **UDR** | | |

**Table 2 NENUM2 Interface Table**

[215] *Id.* at 35

**4.3.6.1 DIAMETER**

Various DIAMETER (defined in RFC 3588) messages could be used to retrieve B user profile information.

3GPP TS 29.329 – Sh Interface

The IMS specification defines the Sh interface as the method of communication between the Application Server (AS) function and the HSS, or between multiple IMS Application Servers. The AS uses the Sh interface in two basic ways:

- To query or update a user's data stored on the HSS
- To subscribe to and receive notifications when a user's data changes on the HSS

User-Data-Request/Answer (AS-->HHS)

This AS asks for the subscriber related information from HSS. Subscriber related data at HSS is either provisioned by the SP and/or received from the network and/or it has been earlier stored by the AS itself with the help of the Profile-Update-Request/Answer. [216]

141. Defendants have and continue to indirectly infringe one or more claims of the '462 Patent by knowingly and intentionally inducing others, including Verizon customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

142. Defendants, with knowledge[217] that these products, or the use thereof, infringe the '462 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continue to knowingly and intentionally induce, direct infringement of the '462 Patent by providing these products to end-users for use in an infringing manner. Alternatively, on information and belief, Defendants have adopted a policy of not reviewing the patents of others, and instructing their officers, agents, and employees to not review the patents of others, including specifically those related to Defendants' specific industry, thereby remaining willfully blind to the

[216] *Id.* at 32

[217] Alternative, Defendants gained knowledge of the '462 Patent in relation to Verizon Patent and Licensing Inc.'s U.S. Patent No. 11,444,987, which issued on September 13, 2022, and cites to the '462 Patent family. Accordingly, Defendants had knowledge of the '462 Patent no later than September 13, 2022. *See* https://patents.google.com/patent/US10979462B2/en?oq=10%2c979%2c462#citedBy

’462 Patent at least as early as the issuance of the ’462 Patent.

143. Defendants have induced infringement by others, including end-users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end-users, infringe the ’462 Patent, but while remaining willfully blind to the infringement. Defendants have and continue to induce infringement by their customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendants’ website, product literature and packaging, and other publications, including any of Defendants’ materials cited in this Complaint.

144. On information and belief, Defendants directly prepare and/or assist in the preparation of, and provide customers and end-users with, information and documents for their specific products. On information and belief, Defendants’ product literature and other product information documents are prepared by or under the direction of Defendants to instruct customers and end-users on how to use the Accused Products in an infringing manner.

145. Because of Defendants’ inducement, Defendants’ customers and end-users use Accused Products in a way Defendants intend and directly infringe the ’462 Patent. Defendants perform these affirmative acts with knowledge of the ’462 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’462 Patent.

146. Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the ’462 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants’ affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used,

sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '462 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '462 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendants to be especially made or adapted for use in the infringement of the '462 Patent. The accused components include, but are not limited to, components necessary for the operation of Defendants infringing systems including, but not limited to, the hardware and software associated with the Verizon cloud-native 5G Core. Defendants perform these affirmative acts with knowledge of the '462 Patent and with intent, or willful blindness, that they cause the direct infringement of the '462 Patent.

147. SLR has suffered damages as a result of Defendants' direct and indirect infringement of the '462 Patent in an amount to be proven at trial.

148. SLR has suffered, and will continue to suffer, irreparable harm as a result of Defendants' infringement of the '462 Patent, for which there is no adequate remedy at law, unless Defendants' infringement is enjoined by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, SLR prays for relief against Defendants as follows:

a. Entry of judgment declaring that Defendants have directly infringed one or more claims of each of the Patents-in-Suit;

b. An order pursuant to 35 U.S.C. § 283 permanently enjoining Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further acts of infringement of one or more of the Patents-in-Suit;

c. An order awarding damages sufficient to compensate SLR for Defendants' infringement of the Patents-in-Suit, but in no event less than a reasonable royalty, together with interest and costs;

d. Entry of judgment declaring that this case is exceptional and awarding SLR its costs and reasonable attorney fees under 35 U.S.C. § 285; and

e. Such other and further relief as the Court deems just and proper.

Dated: November 3, 2026

Respectfully submitted,

*<u>/s/ Vincent J. Rubino, III</u>*

Alfred R. Fabricant
NY Bar No. 2219392
Email: ffabricant@frlip.com
Peter Lambrianakos
NY Bar No. 2894392
Email: plambrianakos@frlip.com
Vincent J. Rubino, III
NY Bar No. 4557435
Email: vrubino@frlip.com
**Fabricant, Rubino & Lambrianakos LLP**
411 Theodore Fremd
Avenue Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797
Facsimile: (212) 257-5796

John Andrew Rubino
NY Bar No. 5020797
Email: jarubino@rubinoip.com
Michael Mondelli III
NY Bar No. 5805114
Email: mmondelli@rubinoip.com
**RUBINO IP**
1200 Harbor Blvd., 10th Floor
Weehawken Township, NJ 07086
Telephone: (201) 817-1840
Facsimile: (973) 535-0921

***ATTORNEYS FOR PLAINTIFF, SESSION LINK RESEARCH LLC***